UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
FEN X. CHEN, QIU CHEN, YU ZHENG,                                 :
CHAI CHEN, DANG ZHENG, HUA CHEN,                                 :
YONG CHEN, KUN HUANG, and QI LIU,                                :
                                                                 :
              Plaintiffs,                                        :
                                                                 :
           - against -                                           :   01 Civ. 0792 (ILG) (RML)
                                                                 :
STREET BEAT SPORTSWEAR, INC.,                                    :
ALBERT PAPOUCHADO, MICHEL AMAR,                                  :
JIAN WEN LIANG a.k.a. RAYMOND                                    :
LIANG, FEN CHEN a.k.a. HUA FEN CHEN,                             :
LUN WEI FAN, 1A FASHIONS INC., and                               :
RED ARROW INC.,                                                  :
                                                                 :
              Defendants.                                        :
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CROSS
MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS
STREET BEAT, MICHEL AMAR, AND ALBERT PAPOUCHADO, AND
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................v

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF FACTS ...................................................................3

ARGUMENT.......................................................................................7

POINT I     DEFENDANT STREET BEAT IS PLAINTIFFS' JOINT
EMPLOYER UNDER THE FAIR LABOR STANDARDS
ACT...................................................................................7

        A.   *The Reality of Plaintiffs' Economic Dependence On
Defendant Determines Whether Defendant Is Plaintiffs'
Joint Employer* ..............................................................7

        B.   *The Record Shows that Street Beat Was Plaintiffs' Joint
Employer Under the Economic Reality Test Set Forth In
Liberty Apparel* ...........................................................10

            1.   Use of Manufacturer's Premises and Equipment and
Manufacturer's Ease of Access to Work Area.............................11

            2.   Factories' Inability to Shift As a Unit.........................................13

            3.   Plaintiffs' Jobs Are Integral To Street Beat's
Process of Production .................................................................14

            4.   Responsibility Under the Contracts Could Pass
From One Subcontractor to Another Without Material
Changes.....................................................................................20

            5.   Street Beat and Its Agents Supervised Plaintiffs' Work
and Effectively Controlled Plaintiffs' Employment
Schedule.....................................................................................24

            6.   Plaintiffs Worked Exclusively or
Predominantly for Street Beat......................................................28

            7.   Other Factors Relevant to the Economic Reality of
Joint Employment ......................................................................29

i

Page

C.    *Conclusion* ...................................................................................30

POINT II      DEFENDANTS AMAR AND PAPOUCHADO ARE
              INDIVIDUALLY LIABLE FOR STREET BEAT'S
              VIOLATIONS OF THE FAIR LABOR STANDARDS ACT.................30

              A.    *Individuals With Operational Control Over a Company*
                    *Are individually Liable To the Company's Employees*
                    *For Wage and Hour Violations* ...........................................31

              B.    *The Record Demonstrates that Defendants Amar and*
                    *Papouchado Are Individually Liable for Street Beat's*
                    *Violations of the FLSA* ......................................................33

POINT III     DEFENDANTS STREET BEAT IS PLAINTIFFS' EMPLOYER
              UNDER NEW YORK LABOR LAW.......................................................34

              A.    *Street Beat Suffered or Permitted Plaintiffs to Work In Its*
                    *Business, and Failed to Take Reasonable Measures to*
                    *Discover or Prevent Violations* ...........................................34

              B.    *The Record Establishes That Street Beat Was Plaintiffs'*
                    *Employer Pursuant to New York Labor Law* .....................38

POINT IV      DEFENDANTS AMAR AND PAPOUCHADO ARE
              INDIVIDUALLY LIABLE FOR STREET BEAT'S VIOLATIONS
              OF THE NEW YORK LABOR LAW.......................................................39

              A.    *Individuals With Operational Control Over a Company*
                    *Are Individually Liable to the Company's Employees For*
                    *Violations of the New York Labor Law* ...............................39

              B.    *The Record Demonstrates that Defendants Amar and*
                    *Papouchado Are Individually Liable for Street Beat's*
                    *Violations of the New York Labor Law* ...............................41

POINT V       PLAINTIFFS ARE THIRD PARTY BENEFICIARIES OF THE
              ACPA AND PLAINTIFFS ARE ENTITLED TO SUMMARY
              JUDGMENT ON THE QUESTION OF WHETHER
              DEFENDANTS MATERIALLY BREACHED THE
              ACPA AND THAT PLAINTIFFS ARE THUS ENTITLED
              TO RECOVER DAMAGES....................................................................41

**Page**

A.  *The Undisputed Facts Demonstrate That Street Beat Breached Its Obligations Under the ACPA, and Plaintiffs Were Damaged As A Result* ...............................................42

    1.  Economic Feasibility of Payments to Contractor Factories.........43

    2.  Written Purchase Agreements With Contractor Factories...........45

    3.  Monitoring and Enforcement Requirements................................45

    4.  Frequency of Monitoring Pursuant to the PMC...........................51

    5.  Payments to Workers in Contractor Factories ............................51

B.  *The FLSA Does Not "Preempt" Plaintiffs' Cause of Action as Third Party Beneficiaries of the ACPA* ..........................................52

C.  *The Purpose of the ACPA Was to Ensure That Factories Hired By Street Beat Paid Their Workers In Compliance With The FLSA* ...................................................................................53

D.  *Plaintiffs Are Not Affected By The DOL's Agreement Not To Bring Legal Action Except Under Certain Conditions, and If They Are, Those Conditions Have Been Satisfied*...................54

POINT VI    ALTERNATIVELY, PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CAUSES OF ACTION FOR NEGLIGENCE UNDER NEW YORK STATE LAW, WHICH ARE NOT PREEMPTED BY THE FLSA ...................................56

A.  *Negligent Hiring and Negligent Supervision*.....................................56

B.  *Negligence Based Upon Violation of a Statutory Standard*...............57

C.  *The Undisputed Evidence On the Record Establishes That the Street Beat Defendants Failed to Satisfy Their Duties to Plaintiffs*...............................................................................................59

D.  *Plaintiffs' Negligence Claims Are Not "Preempted" By the FLSA* ...................................................................................61

**Page**

POINT VII    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT
ON THE ISSUE OF WHETHER DEFENDANTS
VIOLATIONS WERE WILLFUL, AND DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT SHOULD BE
DENIED........................................................................................................64

POINT VIII    THE COURT SHOULD EXERCISE SUPPLEMENTAL
JURISDICTIONAL OVER THE STATE LAW CAUSES OF
ACTION .....................................................................................................64

POINT IX    MINIMUM WAGE AND OVERTIME VIOLATIONS...........................65

CONCLUSION.....................................................................................................................68

iv

# TABLE OF AUTHORITIES

## Cases

**Page**

Akins v. Glens Falls City Sch. Dist., 53 N.Y.2d 325, 424 N.E.2d 531,
441 N.Y.S.2d 644, 648 (1981)......................................................................57

Alexander v. Vesta Ins. Group, Inc., 147 F. Supp. 2d 1223
(N.D. Ala. 2001) .........................................................................................63

Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946) ............................66

Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184
(S.D.N.Y. 2003)......................................................................................33, 37

Antenor v. D&S Farms, 88 F.3d 925 (11th Cir. 1996) .......................................8

Arcure v. Annie Liebovitz Studios, Inc., No. 98 CV 9127,
2001 WL 262736 (S.D.N.Y. Mar. 15, 2001) ..............................................57

Bartels v. Birmingham, 332 U.S. 126 (1947) .....................................................8

Becker v. Poling Transp. Corp. 356 F.3d 381 (2d Cir. 2004)............................59

Bureerong v. Uvawas, 959 F. Supp. 1231 (C.D. Cal. 1997)........................58, 63

Carlock v. Westchester Lighting Co., 268 N.Y. 345, 197 N.E. 306 (1935) .....................58

Carter v. Dutchess Cmty. Coll., 735 F.2d 8 (2d Cir. 1984) ................................40

Chen v. Street Beat Sportswear, Inc., 226 F. Supp. 2d 355
(E.D.N.Y. 2002)........................................................................41, 53, 56, 62

Chu Chung v. New Silver Palace Rest., Inc., 272 F. Supp. 2d 314
(S.D.N.Y. 2003)......................................................................................41, 58

Cubby, Inc. v. Compuserve, Inc., 776 F. Supp. 135 (S.D.N.Y. 1991) ..............57

Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union,
494 F.2d 1230 (2d Cir. 1974)......................................................................18

Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962 (6th Cir. 1991)...................32

Donovan v. Agnew, 712 F.2d 1509 (1st Cir. 1983)............................................32

## Cases

|  | Page |
|---|---|
| Donovan v. Sabine Irrigation Co., 695 F.2d 190 ( 5th Cir. 1983) | 32 |
| Gade v. Nat'l Solid Wastes Management Ass'n, 505 U.S. 88 (1992) | 62 |
| Green v. McMullen, Snare & Triest, Inc., 177 A.D. 771, 64 N.Y.S. 948 (1st Dep't 1917) | 36 |
| Greenstein v. National Skirt & Sportswear Ass'n, 178 F. Supp. 681 (S.D.N.Y 1959) | 18 |
| Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132 (2d Cir. 1999) | 31-33, 40, 64 |
| Jarmoc v. Consol. Elec. Distribs., Inc., 92 C3697, 1992 U.S. Dist. LEXIS 12717 (N.D. Ill. Aug. 25, 1992) | 63 |
| Johnston v. Davis Sec., Inc., 217 F. Supp. 2d 1224 (D. Utah 2002) | 63 |
| Jou-Jou Designs, Inc. v. Int'l Ladies Garment Workers Union, 643 F.2d 905 (2d Cir. 1981) | 17 |
| Joyce v. Rumsey Realty Corp., 17 N.Y.2d 118, 216 N.E.2d 317, 269 N.Y.S.2d 105 (1966) | 58 |
| Kleeman v. Rheingold, 81 N.Y.2d 270, 614 N.E.2d 712, 598 N.Y.S.2d 149 (1999) | 57 |
| In re Larry Jay, Inc., 3 A.D.2d 386, 160 N.Y.S.2d 790 (1st Dep't 1957) aff'd, 4 N.Y.2d 912, 151 N.E.2d 93, 174 N.Y.S.2d 662 (1958) | 18, 36-37, 39 |
| Ling Nan Zheng v. Liberty Apparel Co., 99 Civ. 9033 (RCC), 2002 U.S. Dist. LEXIS 4226 (S.D.N.Y. 2002) | 58 |
| Ling Nan Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir. 2003) | passim |
| Lopez v. Silverman, 14 F. Supp. 2d 405 (S.D.N.Y. 1998) | passim |
| Mack v. Altmans Stage Lighting Co., 98 A.D.2d 468, 470 N.Y.S.2d 664 (2d Dep't 1984) | 58 |
| Melbourne v. New York Life Ins. Co., 271 A.D.2d 296, 707 N.Y.S.2d 64 (1st Dep't 2000) | 57 |
| Nettles v. Techplan Corp., 704 F. Supp. 95 (D.S.C. 1988) | 63 |

**Cases**

Page

Patrowich v. Chem. Bank, 63 N.Y.2d 541, 473 N.E.2d 11,
    483 N.Y.S.2d 659 (1984) ............................................................................40

People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.,
    225 N.Y. 25, 121 N.E. 474 (1918) ...............................................35, 38, 57

Petras v. Johnson, 92 Civ. 8298 (CSH) 1993 U.S. Dist. LEXIS 8464
    (S.D.N.Y. June 16, 1992) ............................................................................63

R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear &
    Allied Workers' Union Local 89-22-1, 33 F.3d 145 (2d Cir. 1994) .............8

Reich v. Souther New Eng. Telecomms. Corp., 121 F.3d 58
    (2d Cir. 1997) .............................................................................................66

Rosenberg v. Equitable Life Assurance Soc'y, 79 N.Y.2d 663,
    584 N.Y.S.2d 765, 595 N.E.2d 840 (1992) .................................................59

Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947) ...................... passim

Stoganovic v. Dinolfo, 92 A.D.2d 729, 461 N.Y.S.2d 121 (4th Dep't 1983),
    aff'd, 61 N.Y.2d 812, 462 N.E.2d 149, 473 N.Y.S.2d 972 (1984) .............40

Tombrello v. USX Corp., 763 F. Supp. 541 (N.D. Ala. 1991) ...........................63

United States Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775
    (6th Cir. 1995) ............................................................................................33

Walling v. Portland Terminal Co., 330 U.S. 152 (1947) ....................................7

Walling v. Rutherford Food Corp., 156 F.2d 513 (10th Cir. 1946), modified by
    Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947) .........................20

Wang v. Hau Great Procetech, 98 CV 2786 ....................................................18

Williamson v. Gen. Dynamics Corp., 208 F.3d 1144 (9th Cir. 2000) ........62, 63

Wing Wong v. King Sung Yee, 257 A.D.2d 452, 653 N.Y.S.2d 259
    (1st Dep't 1999) ..........................................................................................40

Zeng Liu v. Jen Chu Fashion Corp., 00 Civ. 4221 (RJH)
    2004 U.S. Dist. LEXIS 35 (S.D.N.Y. Jan. 7, 2004) ...................................41

## Statutes & Rules

**Page**

12 NYCRR § 142-2.1(a) ...........................................................................................65

12 NYCRR § 142-2.14(a) .........................................................................................34

12 NYCRR § 142-2.4 ...............................................................................................65

12 NYCRR § 142-3.2 ...............................................................................................65

28 U.S.C. § 1367 ......................................................................................................65

28 U.S.C. § 1367(c)(1) .............................................................................................65

29 U.S.C. § 202 ........................................................................................................58

29 U.S.C. § 203(d) .....................................................................................................7

29 U.S.C. § 203(e)(1) .................................................................................................7

29 U.S.C. § 203(g) .....................................................................................................7

29 U.S.C. § 206(a)(1) ...............................................................................................65

29 U.S.C. § 207(a) ....................................................................................................65

29 U.S.C. § 215(a) ....................................................................................................58

29 U.S.C. § 216(b) .....................................................................................................7

29 U.S.C. § 217 ........................................................................................................58

29 U.S.C. § 218(a) ....................................................................................................63

29 C.F.R. § 791.2(a) ...................................................................................................9

29 C.F.R. § 791.2(b) ...................................................................................................9

CPLR §§ 5001-5004. ...............................................................................................67

Fed. R. Evid. 1006 ...................................................................................................67

N.Y.Labor Law § 2(5) ..............................................................................................40

N.Y. Labor Law § 2(6) .........................................................................................39, 40

## Statutes & Rules

|  | Page |
|---|---|
| N.Y. Labor Law § 2(7) | 34 |
| N.Y. Labor Law § 21 | 65 |
| N.Y. Labor Law § 196-a. | 66 |
| N.Y. Labor Law § 240(1) | 58 |
| N.Y. Labor Law § 241(1) | 28 |
| N.Y. Labor Law § 345(10) | 58 |
| N.Y. Labor Law § 650 | 39 |
| N.Y. Labor Law § 652 | 65 |
| N.Y. Labor Law § 663 | 39 |

Pursuant to Federal Rule of Civil Procedure 56, plaintiffs respectfully submit this memorandum of law in support of their cross motion for summary judgment on all of their claims against defendants Street Beat Sportswear, Inc. ("Street Beat"), Michel Amar ("Amar"), and Albert Papouchado ("Papouchado") (collectively, the "Street Beat Defendants") and in opposition to the motion for summary judgment submitted by the same defendants.

## PRELIMINARY STATEMENT

Plaintiffs are eleven garment workers who assembled garments belonging to defendant Street Beat, a garment manufacturer owned and operated by defendants Amar and Papouchado.[1]  Plaintiffs worked well over 90 hours most weeks, and up to 140 hours during others, in several New York City sweatshops that assembled Street Beat's garments exclusively or predominantly (the "SB Factories") and in which Street Beat directly and indirectly controlled the conditions of employment.  The SB Factories depended entirely upon Street Beat for the money with which they paid their workers, which was insufficient to cover the minimum wage and overtime.  Most plaintiffs worked at piece rates, earning the same number of pennies per garment regardless of how many hours they worked.  Other plaintiffs earned flat weekly salaries that sometimes did not yield the minimum wage.  None of the plaintiffs' piece or wage earnings were ever supplemented with the required overtime or spread of hours payments.  The Street Beat defendants exploited this market by developing relationships with factories that did not pay their workers the overtime and spread of hours payments required by law.  By thus saving labor costs, Street Beat hoped to more profitably compete against imports from

---

[1] Nine plaintiffs filed the Amended Complaint, and two later opted in.

cheap-labor countries and against other manufacturers who exploited the same domestic labor market.

On February 12, 2001, plaintiffs sued all defendants for failure to pay the required minimum wage, overtime, and spread of hours payments for the time that plaintiffs worked assembling Street Beat's garments, and on May 18, 2001 they filed an amended complaint. Defendants moved to partially dismiss the complaint, and this Court denied defendants' motion to dismiss on January 22, 2002. Defendants filed an amended answer on March 24, 2003. Following discovery, the Street Beat Defendants moved for summary judgment on all of plaintiffs' claims on August 26, 2004.

Plaintiffs now submit this memorandum in support of plaintiffs' cross motion for summary judgment on all of plaintiffs' claims against the Street Beat Defendants (Street Beat, Amar, and Papouchado) and in opposition to the Street Beat Defendants' motion for summary judgment. Plaintiffs move for summary judgment that they were denied adequate wages pursuant to the minimum wage, overtime, and spread of hours provisions of state and federal law (Point IX). Plaintiffs move for summary judgment that Street Beat was liable for these violations as plaintiffs' joint employer pursuant to the Fair Labor Standards Act ("FLSA") and the New York Labor Law, and that Defendants Amar and Papouchado are individually liable for Street Beat's violations (Points I-IV). Plaintiffs also move for summary judgment, as third party beneficiaries of Street Beat's Augmented Compliance Program Agreement ("ACPA") with the Department of Labor ("DOL"), that Street Beat violated the ACPA and is liable to plaintiffs for the resulting denial of wages (Point V). Finally, in the alternative to their joint employer claims, plaintiffs move for summary judgment that Street Beat is liable for negligent hiring and

2

supervision of the contractors who ran the factories where plaintiffs worked, and that

Street Beat and Defendants Amar and Papouchado are liable for negligence per se for

violating the standards of the Hot Goods provisions of state and federal law (Point VI).[2]

## STATEMENT OF FACTS

Plaintiffs have set forth the material facts not in dispute in their Rule 56.1

Statement, and plaintiffs refer the Court to that statement for citations to the record. In

addition, in each Point of this memorandum below, there is a discussion of the particular

facts relevant to the legal discussion, also with record citations. In the statement that

follows, plaintiffs briefly summarize the relationship between Street Beat Sportswear, the

sweatshop factories where plaintiffs worked (referred to herein as the "SB Factories"),

and the plaintiffs themselves.

Street Beat Sportswear produces women's sportswear. Its inexpensive garments

are sold to low-priced retailers and flea markets. Street Beat, like many manufacturers,

has faced pressure from cheap imports to lower the costs of its domestic production. This

import pressure has driven down wages, the major element of the cost of a garment. See

infra Point I.

Street Beat produces it garments in factories that are owned and directly managed

by others. The DOL has discovered several sweatshops manufacturing garments for

Street Beat in the past, and even found that Street Beat had failed to pay some of its own

---

[2] Plaintiffs recognize this is a lengthy memorandum, but felt its length was necessary to thoroughly address the six different legal theories of plaintiffs' cross motion and to oppose the arguments put forth in defendants' memorandum. In an effort to reduce its length, where facts are applicable to more than one legal theory, plaintiffs have attempted to incorporate them by reference to other Points of this memorandum.

cutting-room employees for overtime. As a result, at the end of February 1997, Street Beat entered into an Augmented Compliance Program Agreement ("ACPA") with the DOL, which required Street Beat to monitor the contractors with which it did business for compliance with the labor laws. See infra, Point V.

However, despite the agreement, the DOL continued to find Street Beat garments in sweatshops. Street Beat's major contacts with the SB Factories were defendant Jian Wen Liang, also known as Raymond, and his associate, defendant Lun Wei Fan, also known to Street Beat as "Little Ray." Civil litigation had previously been brought against Street Beat with respect to labor law violations at factories managed by Liang, and Liang himself was criminally convicted for labor law violations at factories with which Street Beat previously contracted. Nevertheless, Street Beat continued to contract with factories associated with Liang until his actual conviction. Then, Street Beat continued to contract with factories associated with his friend and colleague, defendant Fan. See infra, Point I.

Plaintiffs worked in the many different factories that were associated with Liang and Fan producing Street Beat garments. Sometimes they moved from one to another, often at the request of one of the supervisors. In all of these factories all or almost all of the garments manufactured were made for Street Beat. See infra, Point I.

The central issue in this matter is whether Street Beat can be held responsible as plaintiffs' employer for the labor law violations in the factories making Street Beat garments. Plaintiffs' experts, Louis Vanegas, the former head of the DOL's "No Sweat" program for the Northeast region, and Dr. Richard Greenwald, a labor historian, concluded that the common garment industry practice of outsourcing sewing arose as a

4

widespread effort by manufacturers to avoid responsibility for labor conditions, including the costs of adequate wages, and that the reason it persists is the same today.  The Street Beat defendants have asserted other reasons for the current practice, but have provided no evidence about Street Beat's operations in support of their assertions.  See infra, Point I.

As is argued more fully below, plaintiffs assert that Street Beat effectively dominated the SB Factories and that plaintiffs and other workers were economically dependent on Street Beat for their wages.  Street Beat dominated the SB Factories by supplying them with all or nearly all of the factories' work, unilaterally setting the prices Street Beat would pay for the work, controlling the deadlines for completion, and closely supervising the physical process of sewing the garments, through its quality control personnel.  On several occasions, these quality control personnel, who visited each factory several times each week, instructed the factories to keep plaintiffs working overnight if necessary to finish an order by the following day.  Several plaintiffs refer to Street Beat's president as the "Big Boss."  See infra, Point I.

The sheer volume of garments demanded by Street Beat dictated that plaintiffs and the other factory workers had to work overtime to complete Street Beat's orders.  All of the plaintiffs recount six- and seven-day workweeks that began each day early in the morning and did not end until 12 to 17 hours later.  See infra, Points I and IX.

Street Beat was well aware that the volume of the work it supplied to its factories necessitated overtime, but never paid the factories sufficiently to enable the factories to make overtime payments to the workers.  Even when the SB Factories reported they could not cover their costs at the prices Street Beat paid them, adjustments were rarely, if

5

ever, made. Street Beat often unilaterally retroactively reduced its payments to the factories below the prices that the factories invoiced. See infra, Points I and V.

In addition, because of Street Beat's reliance on the sweatshop conditions in the SB Factories to keep its costs of production down, Street Beat completely avoided its responsibilities under the Augmented Compliance Program Agreement that it entered into with the DOL. The provisions of the ACPA would have required Street Beat to report to the DOL the minimum wage and overtime violations that occurred in the SB Factories, as well as to make semi-annual reports of any types of problems in the factories. Street Beat was responsible, pursuant to the ACPA, for paying plaintiffs and the other workers in the SB Factories their unpaid wages. See infra, Point V.

However, Street Beat fired its outside monitoring firm, Apparel Resources, Inc. ("ARI"), shortly after ARI discovered indicia of potential labor law violations at two of the SB Factories, Covello and XMG Fashion. Street Beat continued to do business with those factories and replaced ARI with Helen Cheung, one of its quality control personnel. Ms. Cheung proceeded to "monitor" the factories for labor law violations once every three to six months, less frequently than required by the ACPA. She admits that she did not accurately record the information she obtained from interviews and from reviewing the factories' payroll records. Nobody from Street Beat ever reviewed her reports, which she never even gave to her supervisor at Street Beat until the end of her year as a monitor. Street Beat never reported the labor law violations or other problems in the factories to the DOL and never compensated plaintiffs for their unpaid wages. See infra, Point V.

Street Beat not only failed to monitor its factories and report its findings of potential problems to DOL, it actually helped these factories to violate the law. Street

Beat paid its factories almost exclusively with checks in amounts less than $10,000, almost invariably cutting multiple checks in the same day for the same factory, which could be cashed without triggering IRS reporting requirements. See infra, Point I.

ARGUMENT

POINT I

DEFENDANT STREET BEAT IS PLAINTIFFS' JOINT EMPLOYER UNDER THE FAIR LABOR STANDARDS ACT.

A.    *The Reality of Plaintiffs' Economic Dependence on Defendant Determines Whether Defendant is Plaintiffs' Joint Employer*

Street Beat was plaintiffs' joint employer and thus is liable for violations of plaintiffs' rights pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The statute in turn defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The statute defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). The Supreme Court has emphasized that this definition is intentionally broad, "comprehensive enough to require its application to many persons and working relationships which prior to this Act were not deemed to fall within an employer-employee category." Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947) (quoting Walling v. Portland Terminal Co., 330 U.S. 148, 150 (1947)).

In Ling Nan Zheng v. Liberty Apparel Co., 355 F.3d 61, 69 (2d Cir. 2003), the Second Circuit Court of Appeals held that "the broad language of the FLSA, as interpreted by the Supreme Court in Rutherford, demands that a district court look beyond an entity's formal right to control physical performance of another's work before

7

declaring that the entity is not an employer under the FLSA." See also Bartels v. Birmingham, 332 U.S. 126, 130 (1947) ("Obviously control is characteristically associated with the employer-employee relationship but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service."); cf. R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89-22-1, 33 F.3d 145, 153 (2d Cir. 1994) (noting the integrated production process in the New York City garment industry, the fact that the manufacturer is in effect the employer of the contractor factory's workers, and the "symbiotic relationship" between garment manufacturers and contractor factories).

Whether an employer-employee relationship exists depends, thus, not upon the formalistic names given to the parties but upon an analysis of the economic relationship between the parties. The goal of the economic reality analysis is to determine "whether the employees in question are economically dependent upon the putative employer." Lopez v. Silverman, 14 F. Supp. 2d 405, 414 (S.D.N.Y. 1998) (citing Bartels, 332 U.S. at 130). These defendants cannot avoid their obligations under the FLSA through the use of independent contractors if, as is shown below, plaintiffs are in fact "economically dependent" upon them. The economic reality test does not permit defendants to hide behind sweatshop operators, but recognizes that the economic reality of the relationship between the plaintiffs, the sweatshop operators, and Street Beat is such that plaintiffs are dependent on both Street Beat and the sweatshops jointly, and that Street Beat is plaintiffs' joint employer. See Lopez, 14 F. Supp. 2d at 420 (citing Antenor v. D&S Farms, 88 F.3d 925, 932 (11th Cir. 1996)).

8

The Supreme Court in Rutherford recognized that under certain conditions, an individual employed by an independent contractor is also employed by the entity that hires the contractor, the "joint employer."[3]  Subsequent cases have more fully developed the economic reality test for joint employers, most recently in the Second Circuit's decision in Liberty Apparel.

Liberty Apparel sets forth a list of factors useful in determining whether plaintiff garment factory workers could state a joint employer claim under the FLSA against a garment manufacturer that contracted with the sewing factories where plaintiffs worked. The Liberty Apparel factors are:

(1) whether the manufacturer's premises and equipment were used for the plaintiffs' work;

---

[3] DOL regulations promulgated under the FLSA also recognize the existence of "joint employment," circumstances in which "a single individual may stand in the relation of employee to two or more employers at the same time under the FLSA . . . if the facts establish . . . that employment by one employer is not completely disassociated from employment by the other employer(s)." 29 C.F.R. § 791.2(a).  In such circumstances, "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including overtime provisions, with respect to the entire employment for the particular workweek." Id.  The DOL regulation states that

"Where the employee performs work which simultaneously benefits two or more employers . . ., a joint employment relationship generally will be considered to exist in situations such as: . . . (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or  (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer."

29 C.F.R. § 791.2(b).

(2) whether the sewing factories which directly employed the plaintiffs had a business that could or did shift as a unit from one putative joint employer to another;

(3) the extent to which plaintiffs performed a discrete line-job that was integral to the manufacturer's process of production;

(4) whether responsibility under the contracts could pass from one subcontractor to another without material changes;

(5) the degree to which the manufacturer or their agents supervised plaintiffs' work; and

(6) whether plaintiffs worked exclusively or predominantly for the defendant manufacturer. <u>Liberty Apparel</u>, 355 F.2d at 72.

The Second Circuit also encouraged the district court to "consider any other factors it deems relevant to its assessment of the economic realities." <u>Id.</u> The Circuit Court made clear that it was not necessary for all of the factors to be present in order to make a determination of joint employment, but rather, that a court should consider the "economic" reality in light of all the factors. <u>Id.</u> at 69, 75 n. 12. <u>Cf.</u> <u>Lopez v. Silverman</u>, 14 F. Supp. 2d 405 (S.D.N.Y. 1998) (applying similar factors and holding that a garment manufacturer and its individual owner were the joint employers of the contractor sewing factory's workers). Under this test, Street Beat is a joint employer

B.    *The Record Shows that Street Beat Was Plaintiffs' Joint Employer Under the Economic Reality Test Set Forth in <u>Liberty Apparel</u>.*

Applying the economic reality test set forth in <u>Liberty Apparel</u>, undisputed facts in the record establish that plaintiffs are entitled to summary judgment on the issue of whether Street Beat was their joint employer.

10

1. Use Of Manufacturer's Premises and Equipment and
   Manufacturer's Ease of Access to Work Area

This first element of the joint employment test attempts to capture the ease of

physical access that a joint employer has to the premises where the subcontracted work is

carried out.  In Rutherford, that ease of access resulted from the contractor's tenancy on

the joint employer's property.  In the instant case, despite the fact that the contractor

factories were not tenants on Street Beat's property, the very same ease of access was

available to Street Beat.

In Rutherford, plaintiff workers reported to an independent contractor charged

with de-boning meat at the defendant slaughterhouse.  The workers brought their own

hooks and knives, sharpeners, and leather aprons to a separate room on the premises of

their joint employer, de-boned the cattle carcasses that the joint employer owned and had

slaughtered, skinned and dressed, and then waited for their joint employer to remove the

resulting meat from the room where they worked.  Rutherford, 331 U.S. at 725-26.

Because the subcontractor worked on the defendant's premises, defendant's manager was

able to walk through the work area daily.  Id. at 726.

The operation of Street Beat's contractor sewing factories is entirely analogous to

the situation in Rutherford, save for the fact that the room where plaintiffs worked was

separated from Street Beat's operations by a 15-minute city drive (Affirmation of Albert

Papouchado, submitted by defendants attached to Affirmation of Alan Pearl

11

("Papouchado Aff.") ¶ 5; Deposition of Helen Cheung dated July 1, 2003.[4] ("Cheung Dep.") at 30); www.mapquest.com/directions ), no great distance in modern times.

As in Rutherford, Street Beat had authority and proximity granting its personnel unfettered access to the factories where its garments were sewn. Street Beat's quality control personnel spent 100% of their time on the premises of the contractor factories (Cheung Dep. at 21-22), and were present in each contractor factory on average several times per week, sometimes as often as every day (Deposition of Albert Papouchado dated December 11, 2002 ("Papouchado Dep.") at 110, 135-136; Cheung Dep. at 25; Deposition of Lun Wei Fan dated July 7, 2003. ("Fan Dep.") at 107).   While in the factories, Street Beat personnel inspected the garments, gave the workers direct instructions about how to correct their work, assisted with production problems, and generally smoothed out mistakes (Cheung Dep. at 34, 37-38, 43; Fan Dep. at 102-103; Papouchado Dep. at 69-70), just as the manager of the joint employer in Rutherford gave instructions to the contractor's employees. Rutherford, 331 U.S. at 726.   Street Beat's access to the premises of its contractor also permitted Street Beat to keep a constant backlog of its cut-work at the factories (Fan Dep. at 130), ensuring that there would be a steady stream of Street Beat garments coming out of the factories.

Street Beat's unfettered physical access to the premises where plaintiffs worked demonstrates that it treated the contractor factories' premises as its own.  The fact that the contractors paid rent to some entity other than Street Beat is not determinative.[5]

---

[4] All excerpts from deposition transcripts, declarations, certifications, and numbered exhibits cited herein are attached to the Declaration of Kenneth Kimerling, Esq. unless otherwise noted.

In fact, Street Beat's premises were also at times used for plaintiffs' work, such as on occasions when plaintiffs made errors in hanging or packaging garments. In such instances, Street Beat required certain plaintiffs to come to Street Beat and work there for several hours to correct their errors. (Fan Dep. at 90-93; Papouchado Dep. at 197-198; Deposition of Dang Fang Zheng dated February 20, 2003 ("Zheng Dep.") at 79-81, 129; Deposition of Fen X. Chen, dated February 26, 2003 ("F. X. Chen Dep.") at 50; Deposition of Qiu Ru Chen, dated March 12, 2003 ("Q. Chen Dep.") at 87-88).

## 2. Factories' Inability to Shift as a Unit

Street Beat's contractor factories did constitute discreet business units, but those business units could not and did not shift to other joint employers (Papouchado Aff. ¶ 46(2), Affidavit of Allen Smith, submitted by defendants attached to Affirmation of Alan Pearl ("Smith Aff.") ¶ 33(b); Affidavit of Michel Amar, submitted by defendants attached to Affirmation of Alan Pearl ("Amar Aff.") ¶¶ 25(2), 30(b)). The factories were entirely dependent upon Street Beat to supply them with work because of the overabundance of sewing factories in relation to the number of manufacturers with work available (Declaration of Louis Vanegas. ("Vanegas Decl.") ¶ 9(d)-(e), (g), ¶ 10(b), (c)). Street Beat made its contractor factories dependent upon it by providing a core group of factories just enough work to stay in business in slow periods, so as to have a claim on their entire capacity during busy periods. (Papouchado Dep. at 62-63, 190-191).[6] Street

---

[5] Similarly, the physical separation of the factory and the manufacturer is not relevant unless it evidences a lack of access.

[6] This was common in the industry. See Form 10-K of Jenna Lane, Inc., filed June 29, 1998, at 7-8 (public filing of New York based women's sportswear manufacturer describing the benefits to Jenna Lane of Jenna Lane's relationship with its "captive" outside contractors).

13

Beat needed this dependency so that its work would always have priority and it could make its deadlines.  If another manufacturer gave a factory work at a better price, Street Beat would have to pull its work out of the factory and send it somewhere else. (Cheung Dep. at 39; Papouchado Dep. at 70, 137).  Thus, Street Beat was an economic sponsor for the SB Factories, and it would have been extremely difficult for the factories to find another sponsor, given the competitive conditions in the industry. (Vanegas Decl. ¶ 9 (a),(d),(e),(h)).

As the Liberty Apparel Court notes, this factor is only illustrative insofar as "a subcontractor that seeks business from a variety of contractors is *less likely* to be part of a subterfuge arrangement than a subcontractor that serves a single client." Liberty Apparel, 335 F.3d at 72 (emphasis added).  Because the evidence cited infra under factor 7 establishes that Street Beat *was* engaged in a subterfuge with its contractor factories, the fact that the factories were discrete units is unpersuasive.  In addition, this second factor must be considered jointly with the sixth factor in determining whether plaintiffs in fact depended upon Street Beat for their income.  "Together, these two factors help the factfinder determine if a subcontractor's apparent dependence on particular contractors translates into functional control by those contractors over the subcontractor's employees." Id. at 75, n.12.  When considered together, these factors show that the contractor factories were economically dependent on Street Beat.

### 3.  Plaintiffs' Jobs Are Integral to Street Beat's Process of Production

In Lopez v. Silverman, the Court observed that the fact that a garment factory performs a discrete line job integral to the manufacturer's production process was the

14

strongest element of the joint employment relationship, where the factory "functioned for certain periods essentially as [the manufacturer's] own sewing and pressing unit, merely located a few blocks away from the main plant." 14 F. Supp. 2d 405, 420 (S.D.N.Y. 1998). The Court in Lopez also found that the limited skill required for sewing, which was just one of many "discrete tasks essential to the manufacturing process," was instructive in establishing that the factories were "but one part of an 'integrated economic unit' operated by [the manufacturer]." Id. The Liberty Apparel court stated that the Rutherford requirements were met if the work in question "lies on the usual path of an employee." Liberty Apparel, 335 F.3d at 73 (citing Rutherford at 729). The Liberty Apparel Court stated that the joint employment relationship in Rutherford represented one extreme along the spectrum of circumstances measured by this element, "piecework on a producer's premises that requires minimal training or equipment, and which constitutes an essential step in the producer's integrated manufacturing process." Id.

Street Beat's relationship with plaintiffs matches this extreme of the Rutherford joint employment scenario in almost all respects. The assembly of garments is clearly an integrated step in Street Beat's process of production. Most of the plaintiffs performed piecework, meaning they were paid by the piece, just as Street Beat paid the factories by the piece. (Vanegas Decl. ¶ 9(h)). See also infra, Point IX. The work required minimal training. (Vanegas Decl. ¶ 9(a), (d)). Street Beat could have easily established its own factories if it had wished to do so. The equipment is inexpensive, credit is readily available, and often the entire cost can be covered by people of limited means who themselves used to be garment workers. (Vanegas Decl. ¶ 9(f)).

Street Beat provided all of the essential components of the finished product except thread to the SB Factories: the actual fabric pieces that were cut to make the garment, trimmings, zippers, buttons, and other related items, such as labels and poly bags. (Fan Dep. at 58; Papouchado Dep. at 100-101). Street Beat also provided patternmaker's instructions on how to assemble the garments, including how many parts the garment would have, how much trimming, and a brief description of how to sew the garment. (Papouchado Dep. at 102). Before providing these components to the sewing factories, Street Beat designed the garment, purchased the fabric, created a pattern, and cut the fabric into garment pieces in its own facilities (Deposition of Michel Amar dated December 21, 2002 ("Amar Dep.") at 50; Amar Aff. ¶ 3; Papouchado Dep. 15-16, 39; Certification of Ai Ling Mui ("Mui Certif.") ¶ 11).

After the factory assembled the garment, Street Beat picked it up and took it back to its own facilities to prepare it for shipping to its customers. (Papouchado Dep. at 15-16). Street Beat's production process—the manufacture of garments—clearly depended upon the step performed by plaintiffs, the sewing of the garment itself. (Papouchado Dep. at 38). As a result, Street Beat attempted to foster the contractor factories' economic dependence, as described supra under the second factor.

In addition, Street Beat engaged in practices that demonstrated that it operated as an economic unit with the factories, including using the factories' drivers to deliver trimmings at no charge, and absorbing the costs of faulty goods from the factories as "part of the course of business." (Deposition of Allen Smith, dated April 30, 2003 ("Smith Dep.") at 144-45; Papouchado Dep. at 82, 107-109). Indeed, the only distinction that can be drawn between the discrete line job performed by the boners in Rutherford

16

and the discrete line job performed by the factory workers for Street Beat is that in Rutherford, the contractor worked on the premises of the joint employer.  As noted above under the first factor, this distinction makes little difference.

In determining whether a subcontractor's work lies "on the usual path of an employee," the Liberty Apparel Court instructed that "industry custom and historical practice should be consulted." 335 F.3d at 73.  The Court held that, "if plaintiffs can prove that, as a historical matter, a contracting device has developed in response to and as a means to avoid applicable labor laws, the prevalence of that device may, in particular circumstances, be attributable to widespread evasion of labor laws." Id. at 74.

Plaintiffs' expert, Dr. Richard Greenwald, an historian of the New York City garment industry at the turn of the 20th century, observed in his declaration that by the 1920s, almost 75% of the garment assembly work had shifted from in-house shops owned by manufacturers to outside shops owned by independent contractors (Declaration of Dr. Richard Greenwald. ("Greenwald Decl.") ¶ 7).  The impetus for this shift was the manufacturers' attempts to escape responsibility for the factory workers' wages and working conditions. (Greenwald Decl. ¶ 8; see also Ex. 1 to Greenwald Decl. (Dr. Greenwald's expert report providing the historical basis for his conclusion)).

The Second Circuit itself has previously made the observation on several occasions that the New York City garment industry adopted outsourcing in an effort to avoid the labor laws.  Jou-Jou Designs, Inc. v. Int'l Ladies Garment Workers Union, 643 F.2d 905, 906 (2d Cir. 1981) ("'In an effort to avoid unionization, and to evade all direct responsibility to production employees, manufacturers who operated inside shops, the then prevalent method of manufacturing and marketing of garments, abandoned their

17

shops.  Instead they contracted out all or a part of the work to outside contractors whose employees worked on materials supplied by the manufacturers.  And so the outside system of production came into being.  These contractors generally were marginal operators without financial resources and again the worker was exploited.'") (quoting Greenstein v. Nat'l Skirt & Sportswear Ass'n, 178 F. Supp. 681, 687 (S.D.N.Y 1959)); Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union, 494 F.2d 1230, 1234 (2d Cir. 1974) (observing that, in particular in New York City, garment manufacturers shifted production from inside shops to outside shops which were fiercely competitive with one another, such that "'the jobber had no direct dealing with employees, was not responsible to them for wages, and was unconcerned with hours and adequate standards'"); see also In re Larry Jay, Inc., 3 A.D.2d 386, 388, 160 N.Y.S.2d 790, 792 (1st Dep't 1957) ("To evade the policing efforts of the union and to secure the competitive advantage of substandard wages and working conditions, many manufacturers discontinued production inside their own factories.") aff'd, 4 N.Y.2d 912, 151 N.E.2d 93, 174 N.Y.S.2d 662 (1958).

Presently, the primary reason that manufacturers contract out their sewing work continues to be an attempt to avoid the costs of complying with the minimum wage and overtime laws. (Vanegas Decl. ¶ 9(p)).  Street Beat is has itself succumbed to the same pressures that faced manufacturers at the turn of the century—in 1995, the DOL found that Street Beat had not paid overtime to several of its in-house cutting room employees (Ex. 4 to Kimerling Decl.)  Subsequently, Street Beat's has contracted with at least seven different factories where the minimum wage or overtime was not paid (Exs. 3, 4, 6-8, 19, 20 to Kimerling Decl). See also Wang v. Hua Great Procetech, 98 CV 2786 (E.D.N.Y.).

18

The Street Beat Defendants do not dispute the reasons for the rise of outsourcing, as set forth in Dr. Greenwald's uncontroverted report. Instead, the Street Beat Defendants attempt to distance themselves from those reasons by arguing that there are other, different reasons for outsourcing today. Specifically, the Street Beat Defendants assert that Street Beat must outsource its sewing because of the constant flux in the types of fabric used in its clothing, which all require different machinery. (Papouchado Aff. ¶ 7). However, Street Beat manufactures one type of clothing: inexpensive junior women's sportswear. (Papouchado Dep. at 17-19, 134). Street Beat has produced no evidence to establish that the mix of fabrics necessary for these types of garments, and thus the mix of machinery required, is in such constant and unpredictable flux that there is a "substantial, independent economic purpose," for Street Beat's relationship with its core group of factories. Liberty Apparel, 344 F.3d at 72.

In fact, Defendant Papouchado admitted that in addition to the "tops" factories, which include the SB factories, Street Beat employs groups of "bottoms" and knitwear factories that it uses steadily. (Papouchado Dep. at 48-49). Plaintiffs do not deny that in theory there could be occasions that Street Beat might require a contractor factory skilled in silk or embroidery, precisely because these are not common requirements of the types of garments that Street Beat manufactures. (Claudino Dep. at 42). But the Street Beat Defendants have put forward no evidence that Street Beat has any legitimate reason to contract out its core business in sportswear tops, bottoms, and knits.

The bare assertions that cheap foreign imports necessitate Street Beat's outsourcing have not been substantiated or explained, and are not sufficient to overcome the presumption created by the historical reasons for contracting, which are established in

19

Dr. Greenwald's uncontroverted report. The imports argument amounts to nothing more than reciting that Street Beat needs to cut costs in order to overcome cheaper competition. In fact, if Street Beat's contractor factories paid legal wages and overtime (and thus faced the same labor costs that Street Beat would face), Street Beat would gain an economic advantage if it owned its own shops, because it would not have to provide a profit margin to the contractor. (Vanegas Decl. ¶ 9(o)). In response to seasonal volume swings, Street Beat could do what contractors currently do: cut back hours or employees during the slow seasons (Vanegas Decl. ¶ 9(n); Deposition of Steven Thomas dated August 2, 2004 ("Thomas Dep.") at 101-102). Thus, the only reason for Street Beat to contract out its core business is to avoid the payment of lawful wages.

### 4. Responsibility Under the Contracts Could Pass From One Subcontractor To Another Without Material Changes

In Walling v. Rutherford Food Corp., 156 F.2d 513 (10th Cir. 1946), modified by Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947), a pair of independent contractors entered into a written contract with the defendant joint employer, and hired four other people to work for them in service of the slaughterhouse. They worked at a piecework rate of $.40 per hundred pounds of boneless beef, the proceeds of which were shared equally among the workers. When those contractors quit, one of their workers entered into a second oral contract with Rutherford and hired "a similar group of people" to do the work. When the second contractor quit, two of his workers took over, also pursuant to an oral contract. When one of them quit, the other entered into a written contract similar to the original contract, except that the piece work rate, two years later, was now $.45 per hundred pounds of boneless beef. The group of boners assembled by

this third contractor then carried on with the boning as before. Id. at 515. Contrary to the Street Beat Defendants' assertions, there is no indication that the same group of workers was employed by each supervisor—only that each supervisor had been a former worker. Id.

Several characteristics of the joint employment relationship in Rutherford permitted the contract to pass from one contractor to another without material changes, and these characteristics are also present in Street Beat's relationships with its contractors. See, e.g., Ling Nan Zheng v. Liberty Apparel Co., 355 F.3d 61 (2d Cir. 2003).

First, the work was manual labor, piece-work which required little skill or training and no formal education or English language skills, and for which there was a large supply of labor. (Vanegas Decl. ¶ 9 (a),(d),(e),(h)). Second, the work was directed toward the production of a simple physical product, as opposed to a complex or intellectual product. Thus it was simple to do the work properly and easy for the joint employer to determine whether the work was being done properly. (Vanegas Decl. ¶ 9(b)). Third, the production process was labor-intensive, meaning that there were few opportunities to compete or reduce production costs on the basis of capital improvements (such as better technology or machinery) (Vanegas Decl. ¶ 9(e),(f)). These three conditions led to the establishment of a very simple relationship between the joint employer and the contractor, whereby the contractor served no purpose other than to provide the joint employer with employees. The contracts, whether written or oral, needed only to specify the piece rate at which the work would be completed and the

21

deadline.[7]  Under these conditions, "essentially any economically dependent group of workers could be brought in to replace a prior group performing identical work." Lopez, 14 F. Supp. 2d at 417.

The major factor in determining the bid price is the amount of wages paid to the contractor's workers (Deposition of Anthony Claudino dated September 15, 2004 ("Claudino Dep.") at 51-53; Vanegas Dep. at 95-97; Vanegas Decl. ¶¶ 9(h)-(i)).  And indeed, Street Beat favored the factories that would perform at the lowest price (Papouchado Aff. ¶ 11; Papouchado Dep. at 62-63), even though it meant denying legal wages to the factories' workers.

It was usually not necessary for Street Beat to haggle or negotiate with its contractors over price, because the contractors understood that if they did not accept the price Street Beat offered, the work would be sent elsewhere.  Street Beat sent work to its contractor factories often without establishing a price beforehand. (Fan Dep. at 124-26). The contractors dared not even raise the issue of price, and defendant Fan, one of Street Beat's contractors, did not even feel he had the right to ask for more if, after the work was finished, he didn't have enough to cover his costs. (Fan Dep. at 199-201).  As Louis Vanegas, plaintiffs' expert, put it, "the minute they mentioned the price, they would not get the orders." (Vanegas Dep. at 95-96).  In fact, Street Beat often unilaterally paid its factories less than the amount invoiced (Smith Dep. at 136-137; Exs. 12, 14-16, 21 to

---

[7] The written contracts in Rutherford also specified that the joint employer would not have the right to direct or supervise the work of the contractor's employees and, in one case, that the contractor would pay the joint employer rent for the space it used.  However, neither of these clauses prevented a finding of joint employment, nor do they appear in the case at hand.  Walling v. Rutherford Food Corp, 156 F.2d 513 at 514-515 (10th Cir. 1946).

Kimerling Decl.), because it could do so without consequences. Between January, 2000 and March, 2001, Street Beat reduced the price per garment from what 1A Fashion had invoiced Street Beat on more than 130 separate occasions, i.e., on average two times a week (Ex. 12 to Kimerling Decl.). Occasionally, factories had to take losses on the work they did for Street Beat. (Papouchado Dep. at 65).

Street Beat's contracts with its factories also shifted unchanged from one contractor to another because a core group of factory agents was involved in maintaining Street Beat's relationship with the SB Factories as the factories changed names and addresses over time. (Ex. 5 to Kimerling Decl. (N.L.R.B decision finding the interrelationship between several SB Factories)). These agents included defendants Liang and Fan. Defendant Liang was a supervisor at New Port Fashion, Hua Great Procetech, and XMG. (Papouchado Dep. at 82, 84; Exs. 5-7 to Kimerling Decl.). Additionally, Street Beat understood that Liang was connected with CCY New Worktech, Covello, and defendant 1A Fashions. (Papouchado Dep. at 83-86). Several of these factories had been cited for labor law violations by the DOL, as set forth above under the third factor.

Jian Wen Liang and Lun Wei Fan were friends and would often come to Street Beat together to obtain work for factories. (Papouchado Dep. at 84-85, 99). Fan was called "Little Ray" by the officers and employees of Street Beat, because he often came with Liang to Street Beat's offices. (Papouchado Dep. at 99). Defendant Lun Wei Fan, meanwhile, was a supervisor at both Red Arrow and 1A Fashions, and was responsible for going to Street Beat to obtain work for both factories. (Fan Dep. at 79-80). Street Beat's quality control person, Helen Cheung, even believed that Fan was the owner of 1A

23

Fashions (Cheung Dep. at 32). Lun Wei Fan (Little Ray) continued to come to Street Beat after Street Beat terminated its relationship with Jian Wen Liang (Raymond), but nobody from Street Beat ever asked Fan whether any of the work they gave him went to shops affiliated with Liang. (Papouchado Dep. at 92-93).

In addition to the factories being linked by their agents, plaintiffs were often required to move from one SB Factory to another in order to work on Street Beat orders at the other factories. They received these orders from the contractors' managers, from Street Beat quality control personnel, and from defendants Fan and Liang. (F. X. Chen Decl. ¶¶ 6, 8; Declaration of Hua Ping Chen ("H. Chen Decl.") ¶ 2; Q. Chen Decl. ¶¶ 7, 8; Declaration of Kun Huang ("Huang Decl.") ¶ 2; D. Zheng Decl. ¶ 5; Declaration of Yu Qing Zheng ("Y. Zheng Decl.") ¶¶ 3-5; Declaration of Qi Fen Liu ("Q. Liu Decl.") ¶ 8; Exh. 5 to Kimerling Decl.).

> 5.  Street Beat and Its Agents Supervised Plaintiffs' Work
> and Effectively Controlled Plaintiffs' Employment
> Schedule

The nature of the supervision which qualifies a defendant as a joint employer is naturally different from the supervision a primary employer exercises. The defendant in Rutherford was a joint employer even though it did not (i) hire or fire the workers, (ii) set their hours, or (iii) pay the workers. Liberty Apparel, 355 F.3d at 70. In Rutherford Food Corp. v. McComb, the defendant slaughterhouse's manager "never attempted to control the hours of the boners, but they [had to] 'keep the work current and the hours they work[ed] depend[ed] in large measure upon the number of cattle slaughtered'." 331 U.S. 722, 726 (1947). In Lopez, the garment manufacturer's supervision over the quality of the product and its practice of providing all of the materials, instructions, and criteria for

24

the work "meant that [the manufacturer] and not [the contractor] controlled the substance of the plaintiffs' daily work—both physically and procedurally—from a project's beginning until end." 14 F. Supp 2d at 421. Thus, where the defendant is so influential in the operation of the contractor that it affects the plaintiffs' hours, conditions, and rates of pay, this element of the economic reality test is satisfied. Liberty Apparel, 355 F.3d at 74-75.

Street Beat's supervision of the SB Factories impacted heavily upon plaintiffs' working conditions. The contractor factories' days and hours of operation were determined by the amount of work Street Beat gave the factories and when it was due. (Fan Dep. at 23-24; Vanegas Dep. at 128; Vanegas Decl. ¶ 9(j)). Street Beat determined both the turnaround time for garments being sewn in the factories and the delivery schedule for the garments, and its on-site quality control inspectors ensured that the deadlines were met and that the garments were produced to Street Beat's specifications (Papouchado Dep. at 193).

On several occasions, Street Beat quality control personnel instructed plaintiffs or their supervisors that plaintiffs and other workers in the SB Factories should work through the night if necessary to complete an order for the following day. (F. Chen Decl. ¶ 6; Q. Chen Decl. ¶ 6; D. Zheng Decl. ¶ 11). Sales personnel would instruct the factories, through Ai Ling Mui, which orders should be completed first (Mui Certif. ¶ 8). Street Beat's quality control inspectors came to the factories several times per week to ensure that the schedules were met, to direct the workers to make corrections, and to direct them as to which lots should be prioritized. (Cheung Dep. at 25, 34, 37-38, 43; Fan Dep. at 102-103, 107). Such behavior constituted supervision of the workers. (Vanegas

25

Decl. ¶ 9(b), (m)).  In addition, in at least one instance, the displeasure of Street Beat's quality control inspector upon finding a presser pressing two or three garments at a time resulted in the termination of the presser.  (Papouchado Dep. at 105-106.)  Thus, it was not surprising that several plaintiffs refer to Street Beat's president as the "big boss." (F. Chen Decl. ¶ 5; Q. Chen Decl. ¶¶ 3, 5;  Z. Lin Decl. ¶ 13; D. Zheng Decl. ¶ 8). Defendants Papouchado and Liang once even hired some of plaintiffs and other factory workers to participate in a counter-picket on Street Beat's behalf. (H. Chen Decl. ¶ 4; Z. Lin Decl. ¶ 14; D. Zheng Decl. ¶ 8).

Street Beat's President, Albert Papouchado, knew how many hours workers needed to sew Street Beat's garments. (Papouchado Dep. at 67-68).  He knew how busy the factories were, and he decided when to take some work away from one factory and give it to another and when to give a factory extra time to finish a job.  (Cheung Dep. at 38-39; Papouchado Dep. at 70; Mui Certif. ¶ 15).  Papouchado even made a conscious effort to keep certain factories during slow times. (Papouchado Dep. at 189-191).  Papouchado was aware that at times the factories took a loss on the work they performed for Street Beat and that they thus had very thin margins, but still, he did not take into consideration overtime costs when fixing the prices paid to the factories. (Papouchado Dep. at 65, 141; Vanegas Decl. ¶ 9(h)).  Street Beat was well aware that as a result of Street Beat's demands and the factories' margins, the factories could not afford to pay their workers for their overtime. (Vanegas Decl. ¶¶ 9(l), 10).

For example, Plaintiffs' expert, Louis Vanegas, examined documents produced by defendants in discovery and found that on May 11, 2000 and May 12, 2000, Street Beat paid 1A Fashion, Inc. $57,820.91 for the garments that it had received from the factory in

26

the week since the prior Wednesday. Invoices corresponding to those checks reveal that there were about 46,700 garments made in a week's time. Most of these garments were two-piece sets with smocking. Street Beat paid between $1.50 to $2.00 for each garment and $.35 for the smocking. A compliance report Street Beat prepared on that factory states that there were 60 employees in the factory on May 10, 2000. This amount of work could not have been produced without requiring substantial overtime beyond a 40-hour work week. (Vanegas Decl.) ¶ 10(h)). Considerable overtime would have been necessary even if the two pieces in the set were treated as one garment—23,000 garments is a sizeable request for one week (Vanegas Decl. ¶ 10(h)). If Street Beat's prices did not account for that overtime, 1A Fashion could not have afforded to pay it (Vanegas Decl.¶ 10(h)). Mr. Vanegas concluded that Street Beat's records revealed that the considerable amount of work requested and the inadequate remuneration offered in this instance were not atypical. (Vanegas Decl. ¶ 10(h)).

Street Beat was the source of all or almost all of the funds paid to plaintiffs as wages, because, due to Street Beat's efforts to dominate the factories, all or almost all of the work in the SB Factories was for Street Beat. See supra under the sixth factor. As is common, the factories where plaintiffs worked depended on Street Beat's payments in order to operate and make their payroll (Papouchado Dep. at 234; Vanegas Decl. ¶ 9(i)). Papouchado acknowledged that the factories probably used the money they obtained from Street Beat to pay their workers, since Street Beat paid the factories every week on Friday and that would give the factories time to cash the checks and make the payroll by Saturday. (Papouchado Dep. at 103-104; 216).

6. Plaintiffs Worked Exclusively or Predominantly For
Street Beat

When a plaintiff works exclusively or predominantly for a single joint employer,

that joint employer may become de facto responsible for the employee's pay and work

schedule. Liberty Apparel, 355 F.3d at 75.  As noted by the Court in Lopez, this factor is

a test of actual conditions, without regard to the reasons for them. Lopez, 14 F. Supp. 2d

at 421.

Street Beat indeed dominated the production work at the contractor factories that

employed plaintiffs.  For example, one hundred percent of the work at Red Arrow was

for Street Beat. (Fan Dep. at 20, 57-58).  While defendant Fan worked at 1A Fashions,

Street Beat kept 1A Fashions constantly supplied with work. "For example, I would get

five lots of garments to work on.  When I finish three, I would call them, they will pick

up three, and I have two lots left behind.  And then they would send another two lots

over.  Then, in the factory I would have four lots to work on." (Fan Dep. at 130).  Thus,

Street Beat provided a constant stream of work to the SB Factories, preventing them from

accepting work from other manufacturers.  The effects of Street Beat's dominance over

plaintiffs' hours and wages were immediate, as described supra, under the fifth factor.

Plaintiffs also recall that all or almost all of the garments they worked on at the

SB Factories during the periods for which they make their claims were Street Beat

garments (Q. Chen Decl. ¶¶ 2, 8; F. X. Chen Decl. ¶¶ 2, 7; D. Zheng Decl. ¶ 7; H. Chen

Decl. ¶ 3; Q. Liu Decl. ¶ 8; Y. L. Chen Decl. ¶ 2; Y. Zheng Decl. ¶ 7), and the DOL

found that all of the garments produced at Covello were for Street Beat (Exh. 3 to

Kimerling Decl.)

### 7. Other Factors Relevant to the Economic Reality of Joint Employment

Street Beat had a symbiotic relationship with its contractor factories based on the mutual aid that each provided to the other in evading their legal duties. Street Beat evaded its duty to pay the minimum wage and overtime, and the factories evaded tax liabilities.   This mutual assistance is evidence of a subterfuge and of economic dependency.

Street Beat paid its factories every week for their work (Fan Dep. at 128, Papouchado Dep. at 216).  Street Beat rarely issued checks to its contractor factories in amounts over $10,000 unless it received a single invoice in an amount over $10,000, despite the fact that it was common for multiple checks to be issued on the same day, the amounts of which totaled to an amount greater than $10,000.  Of the 243 checks issued in 2000 to 1A Fashion, all but 29 were for less than $10,000.  Only three checks that Street Beat issued to defendant 1A Fashion that year for amounts over $10,000 were in payment of more than one invoice.  Of the 214 checks issued for amounts less than $10,000, 198 of them were issued on the same day as one or more other checks in amounts less than $10,000 but which, if they had been aggregated, would have totaled over $10,000 (Ex. 1 to Kimerling Decl.).

Papouchado and Amar both signed the checks for the factories, and Papouchado admitted that they were both aware that the factories cashed the checks and did not pay taxes on them. (Papouchado Dep. at 230).  Papouchado and Helen Cheung were also both aware that the factories paid their employees in cash, despite the requirement of Street

Beat's agreement with the DOL that it would not work with factories that paid their employees in cash.  See, infra Point VI.

> C.    *Conclusion*

Thus, the undisputed facts on the record support plaintiffs' motion for summary judgment because (1) the Street Beat Defendants had unfettered access to the plaintiffs' workplace, (2) the contractor factories could not shift as a unit from one joint employer to another, (3) plaintiffs' work was part of a discrete line job on Street Beat's production line, and the extent of outsourcing in the industry is a result of widespread evasion of the labor laws, (4) contracts could pass from one contractor to another without material changes, (5) Street Beat's supervised plaintiffs' work and had effective control over plaintiffs' hours and wages, (6) plaintiffs worked exclusively or predominantly manufacturing Street Beat garments during the relevant time periods, and (7) Street Beat assisted the SB factories in evading taxes and thus hiding the factories' violations of the wage and hour laws.  These factors establish the economic reality of plaintiffs' economic dependence on Street Beat as their employer.

## POINT II

### DEFENDANTS AMAR AND PAPOUCHADO ARE INDIVIDUALLY LIABLE FOR STREET BEAT'S VIOLATIONS OF THE FAIR LABOR STANDARDS ACT

Defendants Amar and Papouchado's operational control over Street Beat and its business, which consisted of the manufacture of garments using the contractor factories where plaintiffs worked, is sufficient to establish their individual liability for Street Beat's violations of the FLSA.

A.    *Individuals With Operational Control Over a Company Are Individually Liable To the Company's Employees For Wage and Hour Violations*

The extent of an individual's operational control over a business determines whether he or she is individually liable for the company's violations of the FLSA. Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132 (2d Cir. 1999). This liability extends to violations in the company's capacity as joint employer. Lopez v. Silverman, 14 F. Supp. 2d 405, 412 (S.D.N.Y. 1998) (finding garment manufacturer's owner individually liable to contractor factory's workers for FLSA violations where he had a dominant role in most aspects of the company, including the marketing, design and sketching of garments; business decisions, hiring and firing; setting salaries of direct employees; and negotiating with contractor factories). Lopez stands for the proposition that individuals who operate companies that are joint employers have the same obligations under the FLSA as individuals who operate companies that are direct employers. To hold otherwise would permit individuals to avoid personal liability for labor law violations simply by causing the company which they control to insert a third party between the company and its workers, thus rendering the company a joint employer rather than a direct employer.

The Second Circuit in Herman used a four-factor test to measure an individual's operational control over a company for purposes of determining his individual liability for violations of the FLSA. That test examined whether an individual (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Herman, 172 F.3d at 139. In Herman, security guards employed by the defendant company, RSR Security Services Ltd., asserted that the

31

individual defendant, Murray Portnoy, was individually liable for the violations. Portnoy, who was a 50% shareholder in the company, did not directly hire and fire the security guards, although he hired a manager who did so. The manager was also responsible for setting the rates for the guards' services, assigning them work, monitoring their performance, and preparing payroll. Id. at 136. However, Portnoy did have financial control over the company, hired sales people, and sometimes assigned guards and set the rates that clients would be charged. Id. at 137.

Significantly, the Court in Herman found it not dispositive that Portnoy did not have direct control over the security guards. The Court held that a focus on direct control over the plaintiff employees "ignores the relevance of the totality of the circumstances in determining Portnoy's operational control of RSR's employment of the guards." Id. at 140 (citing Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991); Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983); Donovan v. Sabine Irrigation Co., 695 F.2d 190, 194-95 (5th Cir. 1983)). In addition, the Court held that the fact that Herman had hired the manager who was directly responsible for hiring and firing the plaintiff security guards was a strong indication of control under the first factor, while the fact that the fourth factor was entirely absent did not prevent the finding that Portnoy was the guards' employer. Herman, 172 F.3d at 140.

When plaintiff employees bring a claim against a joint employer, the Herman factors need only apply to the individual defendant's operational control over one of the companies that is alleged to be a joint employer. Lopez, 14 F. Supp. 2d at 412. This is because the very nature of the joint employment relationship is such that the joint employer uses a third party to perform some of the employment functions. In

32

Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184 (S.D.N.Y. 2003), the Court examined a joint employment relationship in which delivery workers for Duane Reade stores were paid as independent contractors by an independent staffing company but largely supervised by Duane Reade. When the individual owners of the staffing service argued that they were not individually liable to plaintiffs because Duane Reade had direct control over the plaintiffs, the Court explained that "this argument misses the point; . . . the FLSA recognizes joint employment, meaning that more than one employer can be responsible for FLSA obligations." Id. at 193 (citing United States Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 778 (6th Cir. 1995)). It was not necessary for the individual defendants to exercise direct supervision over the workers in a joint employment case. Id, at 193 (citing Herman).

B.     *The Record Demonstrates that Defendants Amar and Papouchado Are Individually Liable for Street Beat's Violations of the FLSA*

The undisputed facts in the record establish that plaintiffs are entitled to summary judgment on the issue of whether defendants Amar and Papouchado are individually liable to plaintiffs for Street Beat's violations of the FLSA. Defendants Amar and Papouchado, the sole, co-equal owners of Street Beat, had shared authority to hire and fire its employees. (Papouchado Dep. at 25-26; Amar Dep. at 81). Both had authority over the wages and scheduling of Street Beat employees. (Amar Dep. at 83-84). All employees reported to them. (Papouchado Aff. ¶ 4). They shared operational control over Street Beat and were responsible for causing Street Beat to use the contractor factories as part of its integrated production process. While Papouchado directly managed the production process, Amar managed customer relationships. (Papouchado

33

Dep. at 13-14).   Yet even Amar's sales department involved itself in production when necessary to meet a customer's demand for a rush order. (Mui Certif. ¶ 8).  Also, Amar's sales department established the prices to customers that set the basis for Street Beat's payments to its factories. (Papouchado Dep. at 64).

In addition, Defendants Amar and Papouchado controlled every aspect of Street Beat's relationship with the contractor factories that, as described above, established Street Beat as plaintiffs' joint employer.  Thus, because Street Beat was plaintiffs' joint employer, and defendants Amar and Papouchado had operational control of Street Beat, Amar and Papouchado are individually liable to plaintiffs for Street Beat's FLSA violations.

## POINT III

### DEFENDANT STREET BEAT IS PLAINTIFFS' EMPLOYER UNDER NEW YORK LABOR LAW

Plaintiffs also qualify as employees of Street Beat pursuant to the New York Labor Law, thus Street Beat is liable to plaintiffs under New York state law for minimum wage, overtime, and spread of hours payments.

A.    *Street Beat Suffered or Permitted Plaintiffs To Work in Its Business, and Failed to Take Reasonable Measures to Discover or Prevent Violations*

The New York Labor Law defines "employed" to include "suffered or permitted to work." Labor Law § 2(7).  The rules enacted pursuant to the Labor Law define an "employee" as "any individual employed, suffered or permitted to work by an employer." 12 NYCRR § 142-2.14(a).  The New York Court of Appeals, interpreting the concept of "permit" in an analogous section of the Labor Law, concluded that the statute extends the

34

definition of employee to cover indirect employment.  People ex rel. Price v. Sheffield

Farms-Slawson-Decker Co., 225 N.Y. 25, 121 N.E. 474 (1918).  In Sheffield, defendant

milk company's truck driver illegally hired a minor to guard the milk truck.  Despite

having made some efforts to enforce its policy against such violations of the provisions of

the Labor Law prohibiting the employment of minors, the milk company was not

absolved of liability despite the fact that it was not aware of the violation and did not hire

or pay the minor itself.   The Court commented that an employer "must neither create nor

suffer in his business the prohibited conditions.  The command is addressed to him.

Since the duty is his, he may not escape it by delegating it to others."  225 N.Y. at 29,

121 N.E. at 476 (citations omitted).

When an indirect employer could reasonably have discovered the labor law

violations with regard to those it "suffers or permits" to work "in [its] business," it is

liable regardless of its lack of knowledge of the violation, regardless of whether the work

was not conducted on its premises, and regardless of the fact that the plaintiff was paid

and supervised by a third party.  The employer's liability is triggered by its opportunity to

supervise the employment and discover the violations, which occurred in the conduct of

its main business.  In Sheffield, the Court held that because the milk company was aware

of past violations by its drivers and failed to dismiss them or adequately supervise them,

it was liable when they continued to break the law.   The Court held that any violation

that could have been discovered with reasonable supervision "will be taken as suffered."

225 N.Y. at 31, 121 N.E. at 476.  Thus, the Court reasoned, the greater the opportunity

for supervision of the direct employer, the more likely the joint employer is to be found

the plaintiff's employer.  "[T]he cases must be rare where prohibited work can be done

within the plant, and knowledge or the consequences of knowledge avoided. But where work is done away from the plant, the inference of sufferance weakens as the opportunity for supervision lessens." Id.

New York courts interpret the joint employer concept even more broadly than federal courts have interpreted the FLSA. The New York courts have long recognized that when an employer hires contractors to provide laborers, it is still the employer of the contractor's laborers within the meaning of the Labor Law even though the employer does not pay the laborers directly. Green v. McMullen, Snare & Triest, Inc., 177 A.D. 771, 772, 164 N.Y.S. 948, 950 (1st Dep't 1917) ("It is quite obvious that the plaintiff was employed by the defendant, although he received no wages directly from it. But he did receive wages for the work he performed for the defendant, and the defendant was the source of those wages. Is it essential that he should receive his wages directly from the defendant in order to make him an employee for hire within the intent of the Labor Law? To hold that, would make the existence of the relation of employer and employee depend not upon whether the plaintiff was working for hire, but solely upon the question of who paid him the hire, a result which, we think, the Legislature never intended.").

New York courts have extended this analysis into the garment industry. The historical evolution of garment manufacturers' use of contractor sewing factories, see supra, Point I, persuaded the New York courts that the employees of contractor factories are also employees of the garment manufacturer. In re Larry Jay, Inc., 3 A.D.2d 386, 390, 160 N.Y.S.2d 790, 794 (1st Dep't 1957) (the history of the labor struggles in the garment industry since the turn of the 20th century sheds light on the unique relationship between garment manufacturer and contractor factory), aff'd, 4 N.Y.2d 912, 151 N.E.2d

36

93, 174 N.Y.S.2d (1958). In Larry Jay, the operation of a provision of the Debtor and Creditor Law turned upon the definition of "employee." In finding that the contractor factory's workers were employees of the garment manufacturer, the Court observed that "It is not the traditional law of master and servant that inspires statutes of this nature, but a very real and practical legislative concern that the employer discharge his social and economic obligations. . . . Among other things, we ask whether the jobber obtained the same type of direct, ascertainable benefit from the work product of these employees as did the contractor." 3 A.D.2d at 392-93, 160 N.Y.S.2d at 796. The Court's analysis took into account the contractual arrangements between the manufacturer and contractor, their close unity of interest, integrated production effort and financial arrangements, as well as the exclusivity of the contractor's services and the resulting fact that the work product created by the contractor factory's workers flowed directly and entirely to the manufacturer. 3 A.D.2d at 393-94, 160 N.Y.S.2d at 796.

Thus, the concept of employment under New York law is even broader than the concept of joint employment under the FLSA. Alternatively, several Federal courts have held that the same test can be used to determine liability for violations of the New York Labor Law as is applied to determine a joint employer's liability under the FLSA. Liberty Apparel, 355 F.3d at 78; Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184 (S.D.N.Y. 2003); Lopez v. Silverman, 14 F. Supp. 2d 405, 411 n.4 (S.D.N.Y. 1998).

B. *The Record Establishes That Street Beat Was Plaintiffs' Employer Pursuant to New York Labor Law*

The undisputed facts in the record establish that plaintiffs are entitled to summary judgment on the issue of whether Street Beat was liable to Plaintiffs for violations of the New York Labor Law. Street Beat suffered or permitted plaintiffs to work in its business as part of its integrated production effort in manufacturing garments. Street Beat not only had the opportunity to discover Labor Law violations because of its free and frequent access to the factories, but it willfully ignored blatant evidence of such violations.

Plaintiffs effectively worked in Street Beat's business because of the unusually close relationship between Street Beat and its contractor factories, in which Street Beat dominated the factories and had de facto control over plaintiffs' working conditions. See supra, Point I.

Furthermore, the Street Beat defendants knew or reasonably could have discovered the labor law violations committed by its factories, see infra Point VI, and thus were liable for suffering or permitting those conditions in its business. As the Court in Sheffield reasoned, the greater the opportunity for supervision of the direct employer, the more culpable the joint employer for its labor law violations. Sheffield, 225 N.Y. at 31, 121 N.E. at 476.

As described more thoroughly supra, in Point I, the relationship between Street Beat and its contractor factories presented factors similar to those that led to the finding of an employment relationship between a garment manufacturer and the workers in its contractor sewing factory in Larry Jay: special contractual arrangements (to the point of not needing a written contract), close unity of interest, an integrated production effort,

38

integrated financial arrangements, exclusivity of the contractor's services, and the resulting fact that the work product created by the contractor factory's workers flowed directly and entirely to the manufacturer. Larry Jay, 3 A.D.2d at 393-94, 160 N.Y.S.2d at 796.

## POINT IV

### DEFENDANTS AMAR AND PAPOUCHADO ARE INDIVIDUALLY LIABLE FOR STREET BEAT'S VIOLATIONS OF THE NEW YORK LABOR LAW

The legal standard for assessing Amar's and Papouchado's individual liability for Street Beat's violations of the New York Labor Law is the same as the test for individual liability for employers under the FLSA.

A.    *Individuals With Operational Control Over a Company Are Individually Liable To the Company's Employees For Violations Of the New York Labor Law*

New York Labor Law § 663 provides that, "If any employee is paid by his employer less than the wage to which he is entitled under the provisions of this article, he may recover in a civil action the amount of any such underpayments . . .." According to Labor Law § 2(6), the term "'employer' means the person employing any such mechanic, workingman or laborer, whether the owner, proprietor, agent, superintendent, foreman or other subordinate." For purposes of Article 19, the definition of "employer" provided in Labor Law § 650 is expanded to include several types of organizations, still expressly including "any individual" acting as an employer. Thus, the plain language of the statute provides plaintiffs a right of action against defendants Papouchado and Amar in their individual capacities as employers.

39

An individual owner of a company is an employer of the company's employees under the New York Labor Law if he or she exercises operational control over the company. Patrowich v. Chem. Bank, 63 N.Y.2d 541, 544, 473 N.E.2d 11, 13, 483 N.Y.S.2d 659, 661 (1984) (citing Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 14 (2d Cir. 1984) for the economic reality test applied in Herman); cf. Wing Wong v. King Sung Yee, 257 A.D.2d 452, 653 N.Y.S.2d 259 (1st Dep't 1999) (holding that defendant, even as a stockholder, could be found to be plaintiff's employer). Contrary to defendants' mischaracterization, plaintiffs do not seek to hold defendants Amar and Papouchado vicariously liable for Street Beat's violations of the New York Labor Laws. Rather, plaintiffs seek to apply the well-developed law establishing an individual's liability in his capacity as an employer of a company's employees. See also Zeng Liu v. Jen Chu Fashion Corp., 00 Civ. 4221 (RJH), 2004 U.S. Dist. LEXIS 35 (S.D.N.Y. Jan. 7, 2004) (finding individuals liable for wage and hour violations pursuant to N.Y. Labor Law §§ 2(5)-(6)); Chu Chung v. New Silver Palace Rest, Inc., 272 F. Supp. 2d 314, 318 (S.D.N.Y. 2003) (holding that in order to find individual defendants liable as employers, plaintiffs would have to prove the factors set forth in Herman). Defendants cite Stoganovic v. Dinolfo, 92 A.D.2d 729, 461 N.Y.S.2d 121 (4th Dep't 1983), aff'd, 61 N.Y.2d 812, 462 N.E.2d 149, 473 N.Y.S.2d 972 (1984), to no avail. Stoganovic is not apposite, because in Stoganovic, plaintiffs asserted that defendants were liable merely because they were officers or shareholders. By contrast, here, as in Chu Chung, "plaintiffs bring suit against defendants, not as corporate officers or shareholders, but as employers. The difference is dispositive." Chu Chung, 272 F. Supp. 2d at 318.

B.    *The Record Demonstrates that Defendants Amar and Papouchado Are Individually Liable for Street Beat's Violations of the New York Labor Law*

The undisputed facts in the record demonstrate that defendants Amar and

Papouchado exercised operational control over Street Beat, and thus are liable to

plaintiffs for Street Beat's violations of the New York Labor Law.  See supra, Point II.

POINT V

PLAINTIFFS ARE THIRD PARTY BENEFICIARIES OF THE ACPA AND
PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE QUESTION
OF WHETHER DEFENDANTS MATERIALLY BREACHED THE ACPA AND
THAT PLAINTIFFS ARE THUS ENTITLED TO RECOVER DAMAGES

This Court has already ruled as a matter of law that "plaintiffs may enforce the

terms of the ACPA."  Chen v. Street Beat Sportswear, Inc., 226 F. Supp. 2d 355, 366

(E.D.N.Y. 2002).  This Court, upon examination of the terms of the ACPA, ruled that

plaintiffs had properly asserted a claim against Street Beat for breach of the Augmented

Compliance Program Agreement ("ACPA") between the United States Department of

Labor and Street Beat because 1) the ACPA is a valid and binding agreement, 2) the

ACPA was intended to benefit plaintiffs, and 3) the benefit of the ACPA is immediate

and expressly sets forth the compensation to which plaintiffs are entitled under the

contract.

Defendants now attack that ruling, but they should not be permitted to revisit what

is now the law of the case.  Neither the facts in the record nor any of the argumentation in

defendants' brief raise any issue of law or fact that would justify this Court's reversing its

January, 2002 ruling that plaintiffs have standing as third party beneficiaries to enforce

the ACPA.

41

Nonetheless, plaintiffs respond below to defendants' arguments in addition to making their application for summary judgment on their third party beneficiary claims. All that plaintiffs need to show to prove their third party beneficiary claims is that Street Beat breached its obligations under the ACPA and that, as a result, plaintiffs were denied the benefits of the contract. To prevail on their third party beneficiary claims, plaintiffs do not need to prove that Street Beat violated the Hot Goods provision (see infra, Point VI), because the source of plaintiffs' rights and remedies is in the contract itself.

A.    *The Undisputed Facts Demonstrate That Street Beat Breached Its Obligations Under The ACPA, and Plaintiffs Were Damaged As A Result*

The undisputed facts on the record demonstrate that plaintiffs should be granted summary judgment on their third party beneficiary claim under the ACPA. Street Beat materially breached the terms of the ACPA which would have ensured the plaintiffs received proper minimum wage and overtime pay. The ACPA required Street Beat to take all reasonable steps, including any additional steps not identified in the ACPA, to ensure that it complied with the Hot Goods provision of the Fair Labor Standards Act ("FLSA") Section 15(a)(1) (ACPA ¶ 1(a)-(c), attached as Ex. 9 to Kimerling Decl.). Street Beat was not permitted to contract with any factory that did not agree to comply with the terms of the Employer Compliance Program ("ECP") (ECP ¶ 1(d), Attachment 1 to the ACPA, Ex. 9 to Kimerling Decl.). The ACPA also required Street Beat to monitor and enforce full compliance with FLSA and ECP by all of its contractors (ACPA ¶ 3(a)(iv) and ¶ 4(d), Ex. 9 to Kimerling Decl.) .

Street Beat was required to make semi-annual reports to the DOL of Street Beat's monitoring activities, documenting any problems found and the efforts made to remedy

those problems (ACPA ¶ 5(g), Ex. 9 to Kimerling Decl.). Street Beat was also required to report all of its contractor factories' violations of the minimum wage and overtime provisions to the DOL (ACPA ¶ 6, Ex. 9 to Kimerling Decl.). When it discovered a violation, Street Beat was also required to demand that its contractors make the appropriate payments, and if the contractor failed to do so within 30 days, Street Beat was required to make the payments itself, either to the DOL for distribution to the workers, or to the workers directly (ACPA ¶ 8(a)(ii), Exh. 9 to Kimerling Decl.).

    1.    Economic Feasibility of Payments to Contractor Factories

Each time Street Beat made a purchase from a contractor factory or approved a subcontract in writing, Street Beat was required to review "the economic feasibility of the price terms that are involved, in light of the compliance with the Act and the ECP required of the Contractor and in light of the calculations and expectations of the parties to the purchase," and to document calculations of the economic feasibility of the price terms. Street Beat was also required to make adjustments to price after the award of the contract, if necessary to cover overtime payments (ACPA §§ 3(a) and 3(a)(iii), Ex. 9 to Kimerling Decl.; Ex. 18 to Kimerling Decl.).

Street Beat failed to make any prospective evaluation of whether its prices were sufficient to cover overtime payments for its work. Defendant Papouchado did not take the amount of overtime into account when he set the price that he would pay the factories for their work (Papouchado Dep. at 13, 141; Papouchado Decl. ¶ 10). Street Beat has produced no documentation of any evaluation of the economic feasibility of the prices it paid the SB Factories. Nor has it produced any economic feasibility studies done by any of the SB Factories pursuant to the ECP. Helen Cheung, who was Street Beat's

43

compliance monitor pursuant to the ACPA, never stated that she reviewed any economic feasibility studies prepared by Street Beat contractors or by Street Beat (Cheung Dep.). Allen Smith, who had responsibility for Street Beat's compliance with the ACPA, did not even believe Street Beat had a responsibility to try to determine whether the prices paid to contractor factories were profitable, given the factories' labor costs under the FLSA (Smith Dep. at 63-64, 72-73).

Street Beat also failed to make retroactive adjustments when its prices were insufficient for its contractors to cover their costs and make a reasonable profit while remaining in compliance with the FLSA. Mr. Smith, Street Beat's CFO, never made retroactive adjustments to the prices paid to contractor factories after the work was finished in order to cover overtime (Smith Dep. at 60-62). If defendant Papouchado made such adjustments, it was extremely rare, even when the factories informed him that the payments were insufficient to cover costs because the garment was "complicated," and even though he knew that at times, the contractor factories took a loss on orders that they sewed for Street Beat, because the price was insufficient to cover the costs (Papouchado Dep. at 65-67; Fan Dep. at 126). At most, Papouchado would inform the customer that future orders would have to be made at a higher price (Papouchado Dep. at 65-67). Instead, Street Beat sometimes retroactively reduced the price for the work the factories had already completed, paying the factories less than they invoiced See supra Point I.

When questioned about their efforts to comply with the ACPA, Street Beat's witnesses made much of the two meetings they held to inform contractors of the requirements of the labor laws, in which they showed the contractor factories how to

44

calculate the minimum wage and overtime payments for piece workers (see, e.g., Affidavit of Allen Smith, submitted by defendants attached to the Affirmation of Alan Pearl ("Smith Aff.") ¶ 16). However, these meetings were insufficient and ineffective, not least because during at least one meeting, Street Beat did not provide translation into the languages spoken by all of the contractors (Fan Dep. at 139-141, 203-204). Also, contractor factories were never taught how to calculate the spread of hours payments required by the New York Labor Law (Fan Dep. at 181). The ACPA required more than Street Beat showing its contractors how to pay the minimum wage and overtime—it required Street Beat to ensure that it paid the factories enough to cover their actual overtime costs.

    2.    Written Purchase Agreements With Contractor Factories

The terms of the ACPA required Street Beat to reduce every purchase agreement with a contractor to a writing containing all the essential terms and conditions of the transaction. (ACPA ¶ 4(a), Ex. 9 to Kimerling Decl.).

Street Beat did not make written contracts for its transactions with its contractor factories (Fan Dep. at 128-129). Often the price that would be paid for the work was not even discussed beforehand (Fan Dep. at 124-126). To the extent that price was discussed, Street Beat often did not adhere to the factories' expectations. (Ex. 12 to Kimerling Decl.). See generally supra, Point I;.

    3.    Monitoring and Enforcement Requirements

The terms of the ACPA required Street Beat to "monitor and enforce full compliance with the Act and the ECP by all Contractors in all activities connected with any purchase by the FIRM, by using all reasonable measures (including all those

specified in the attached Program to Monitor Compliance (called the PCM))" (ACPA ¶ 4(d), Ex. 9 to Kimerling Decl.).   The ECP, in turn, required the contractor factories to keep complete and accurate wage and hour records for its workers, (ECP ¶ 6(a), Ex. 9 to Kimerling Decl.); to report on time cards punched by the employee the time each worker's work day begins and ends, breaks longer than 30 minutes, and the total elapsed time between the beginning and end of the work day, (ECP ¶ 7(b), Ex. 9 to Kimerling Decl.); to pay all wages by check only, not cash, (ECP ¶ 8 (d), Ex. 9 to Kimerling Decl.); and to perform all work on each purchase itself and on its own premises unless written approval for a subcontract had been received from Street Beat and all terms of the ECP were adhered to (ECP ¶ 13(b), Ex. 9 to Kimerling Decl.).

The Street Beat Defendants failed to use all reasonable measures to comply with the ACPA.  They failed to satisfy substantially the monitoring components of the ACPA and continued to do business with factories that it knew to be in violation of the ECP. Both of Street Beat's principals, defendants Papouchado and Amar, completely delegated monitoring responsibility to Street Beat's controller, Allen Smith, aside from attending the two workshops for contractors. (Amar Dep. at 30-31, 58-59, 73-74; Papouchado Dep. at 71-72).

Further, defendant Papouchado was aware that some of the factories to which he assigned work were fronts for other factories which subcontracted the work, but Street Beat had produced no evidence that it made any effort to try to monitor those factories. (Papouchado Dep. at 178).  Street Beat hired a monitoring company, Apparel Resources Inc. ("ARI") once in 1998, which submitted one report about Covello and one report about XMG.  Despite serious questions and inconsistencies raised by the reports, Street

46

Beat continued to work with those factories for several more months, but soon stopped working with ARI. (Ex. 10 to Kimerling Decl.). See also Point IX.

Approximately one and a half years after receiving the ARI reports, Street Beat assigned one of its own quality control monitors to handle compliance monitoring. Helen Cheung only monitored the factories from approximately mid-2000 through July of 2001. When she stopped going to the factories, nobody replaced her—instead, Allen Smith simply reviewed the payroll records that the factories sent to him. (Cheung Dep. at 46-47, 53-54).

The compliance monitoring conducted by Helen Cheung was not sufficient to meet Street Beat's obligations pursuant to the ACPA. She was too overburdened to write complete or accurate reports, and she informed Street Beat of this fact at the time she was asked to take on her compliance monitoring responsibilities. (Cheung Dep. at 80). Ms. Cheung conducted compliance monitoring between once every three months and once every six months (Cheung Dep. at 18, 39), for a half to two hours between the hours of 9:00 a.m. and 5:00 p.m., Monday through Friday. (Cheung Dep. at 16, 20-21, 75-76). Street Beat did not supervise Ms. Cheung adequately to ensure that she fulfilled Street Beat's duties pursuant to the ACPA. Allen Smith, Ms. Cheung's supervisor with respect to compliance monitoring, reviewed one of her reports only once before she turned them all in at the end of the year she spent monitoring. Even on that occasion, he did not check the accuracy of its details. (Cheung Dep. at 20, 22-23, 70, 85, Smith Dep. at 34-35).

Ms. Cheung's reports contained facial inconsistencies which should have raised questions about their accuracy and about compliance by the factories involved. (Papouchado Dep. at 220-221; Smith Dep. at 35-36, 48-51, 77-78). For example, where

47

space was left to record the number of days worked per week, her reports often stated "40 hours," and sometimes she reported wage payment amounts which did not amount to the minimum wage. (Amar Dep. at 72-73; Cheung Dep. at 77; Ex. 13, 17 to Kimerling Decl.). Her reports sometimes showed a total number of hours worked that was unlikely given the worker's reported starting and finishing times (Ex. 17 to Kimerling Decl.). Additionally, they revealed that questions about whether a worker worked on Saturdays and Sundays were sometimes answered "yes," and then crossed out and answered "no" (Exh. 13 to Kimerling Decl.; Papouchado Dep. at 208-209).

Allen Smith's attitude was that it was not important to determine whether the workers worked overtime and were paid according to the overtime provisions. Instead, Mr. Smith focused only on whether the workers felt they had been paid on time and as promised. (Smith Dep. at 39-42, 63, 82-83). Ms. Cheung's attitude toward monitoring naturally reflected her supervisor's attitude. (Cheung Dep. at 49-50). Ms. Cheung only conducted compliance monitoring between the hours of 9:00 a.m. and 5:00 p.m., Monday through Friday, which would not have allowed her to verify the factories' hours of work. (Cheung Dep. at 16, 76). Ms. Cheung's efforts were directed mostly toward determining whether the workers were paid the piece rates they were promised, such as by occasionally examining their piece cards, which were not produced by defendants in this action. Occasionally she checked the piece cards to see if they matched the totals reflected in the factories' payroll records. However, even when the apparently falsified payroll records showed some overtime payments, the totals still only added up to the totals reflected on the piece cards. (Cheung Dep. at 51, 54-55, 82-83). This meant that that the workers were not in fact paid overtime at their piece rate plus 50%, even if they

48

truly had only worked the number of overtime hours reflected in the factory's inaccurate records.

Mr. Smith and Ms. Cheung each either assumed or knew that the payroll records kept by the factories were falsified, in violation of ¶ 6(a) of the ECP, which required the contractor factories to keep complete and accurate wage and hour records for its workers. (Cheung Dep. at 66-69; Smith Dep. at 35-36, 119; Ex. 9 to Kimerling Decl.) The factories were required to indicate piece rates and hourly rates on the workers' pay stubs (ECP ¶ 9(f), Ex. 9 to Kimerling Decl.). Yet none of the check stubs produced by plaintiffs listed piece rate earnings as the source of the plaintiffs' income, although most of the plaintiffs were piece rate workers (Exh. 1 to F. X. Chen Decl; Exh. 1 to Q. Chen Decl.; Exh. 1 to Y. Q. Chen Decl.; Ex. 1 to Y. L. Chen Decl; Exh. 1 to K. Huang Decl.; Ex. 1 to Q. Liu Decl.; Ex. 1 to D. Zheng Decl.). On some of the stubs there is not even a listing of the "regular rate." (Exh. 1 to Y. Q. Chen Decl.). The payroll records should have reflected the number of pieces completed on a daily and weekly basis, but they did not. Further, Ms. Cheung was shown payroll records that reflected payments below the minimum wage, but never took any action because she assumed they reflected only the part of the workers' wages that were paid by check. (Cheung Dep. at 66-69). Mr. Smith made the same assumption, and never took action when he received unsigned payroll records from the factories. (Smith Dep. at 35-36, 119).

Also, neither Mr. Smith nor Ms. Cheung ever tried to determine whether the hours the employees reported in their interviews matched the factory's payroll records. (Cheung Dep. at 72; Smith Dep. at 54-55). In fact, Helen Cheung conceded that she did not write what the factory workers told her in her report. Instead, she "estimated" the total amount

49

of their wages whenever what they told her was less than what she thought they should be paid. (Cheung Dep. at 65, 70; Ex. 17 to Kimerling Decl.). When some workers told her that they were not paid at all, she assumed those workers were undocumented immigrants who were paid only in cash. (Cheung Dep. at 67-68).

Street Beat also knew that the factories paid their employees partly in cash, which was prohibited by ¶ 8 (d) of the ECP. Ms. Cheung, defendant Papouchado, and Allen Smith all knew that the factories' workers were paid partly in cash, although only one factory ever showed Ms. Cheung any records reflecting the cash payments. (Cheung Dep. at 64-70; Papouchado Dep. at 120-122; Papouchado Aff. ¶ 34; Smith Dep. at 36; Smith Aff. ¶ 28; Amar Aff. ¶ 30). The testimony of defendant Fan, who operated two SB Factories, confirms that the factories paid part of the workers' wages in cash (Fan Dep. at 33, 183), in contravention of the ECP.

Street Beat was also aware that the time-recording mechanisms for the factories were not up to the standards of ECP ¶ 7(b). Cheung knew that workers could not clock out and then back in during the day. (Cheung Dep. at 72-73). Defendant Liang conceded that he did not have a time clock, but kept only handwritten records of his workers' hours, which he never showed to Street Beat (Deposition of Jian Wen Liang dated June 27, 2003 ("Liang Dep.") at 126-127).

Despite these flagrant violations of the ECP, Street Beat continued doing business with the SB Factories and made no effort to enforce the provisions of the ECP, as was required under the ACPA. Had Street Beat compelled the SB Factories to comply with the ECP, the factories' failure to pay the minimum wage and overtime would have been corrected, and the factories would have been compelled to stop violating the law.

4.    Frequency of Monitoring Pursuant to the PMC

Street Beat failed to take the steps that were required of it when it discovered the

violations listed supra. The PMC provided a tiered schedule for Street Beat's compliance

monitoring, requiring more frequent monitoring and interviews with more employees

each time a violation of the ECP or a potential violation of the FLSA was discovered.

Despite Street Beat's knowledge of violations of the PMC and the overtime laws,

Street Beat never increased the frequency of monitoring its contractor factories as

required by the ACPA.  In fact, Ms. Cheung did not make even the number of

compliance audits required under minimum intensity monitoring, allowing up to six

months to pass between monitoring audits, despite the fact that she was in the factories

several times per week. (Cheung Dep. at 18, 39).  Allen Smith never discovered that Ms.

Cheung was not monitoring for compliance with the ACPA as frequently as required by

the ACPA, because he reviewed one of her reports only once before she turned them all

in at the end of the year she spent monitoring. (Cheung Dep. at 20, 22-23, 70, 85; Smith,

Dep. at 34-35).

5.    Payments to Workers in Contractor Factories

Street Beat has produced no documentation of the required semi-annual reports to

the DOL of its monitoring activities or of the problems of it was aware, in violation of ¶

5(g) of the ACPA.  Street Beat also failed to report its contractor factories' violations of

the minimum wage and hour laws to the DOL as required by ¶ 6 of the ACPA.  Even if

Street Beat asserts that it lacked knowledge of violations, Street Beat's gross failure to

take the necessary steps to discover those violations, which are readily apparent in the

51

record evidence cited above, establishes that it failed to report violations of which it should have known, and would have known had it complied with the ACPA.

If Street Beat had reported the problems of which it was aware and the factories' labor law violations to the DOL, plaintiffs would have been made whole for the contractor factories' underpayments. The terms of the ACPA required Street Beat to make payments to the DOL in an amount determined by the DOL sufficient to cover underpayments to workers in Street Beat's contractor factories. ACPA § 8.

Thus, the undisputed evidence on the record establishes that Street Beat is liable to plaintiffs for its breach of the ACPA, in the amount of underpayment by its contractor factories.

B.    *The FLSA Does Not "Preempt" Plaintiffs' Cause of Action As Third Party Beneficiaries of the ACPA*

There is no legal theory under which the FLSA preempts plaintiffs' third party beneficiary claim to enforce the ACPA, and plaintiffs are aware of no court that has ever held a valid contract claim to be preempted by the FLSA. Parties are free to contract on any subject matter they wish, as long as such a contract is not illegal. The FLSA certainly does not prohibit contracts such as the ACPA, and indeed the DOL entered into the ACPA under the authority of the FLSA. Congress certainly did not intend to preempt the entire field of contract law when it passed the FLSA, nor is enforcement of the contract contrary to the purpose of the FLSA. See analysis supra, Point V. Defendants appear to make the ludicrous argument that enforcement of a contract that was entered into by the Department of Labor pursuant to its authority under the FLSA is somehow

contrary to the purposes of the FLSA.  Clearly, enforcement of the contract by plaintiffs, as third party beneficiaries, is entirely consistent with the purpose of the statute.

C.    *The Purpose of the ACPA Was To Ensure That Factories Hired By Street Beat Paid Their Workers In Compliance With The FLSA*

This Court has already ruled, based on the contents of the ACPA, that its clear purpose was to benefit plaintiffs and all other employees who worked in factories hired by Street Beat to sew its garments.  Street Beat, 226 F. Supp. 2d at 363.  The quote from Louis Vanegas, plaintiffs' expert, cited by the Street Beat Defendants in their brief is perfectly consistent with this purpose and with this Court's analysis of the terms of the agreement.  Mr. Vanegas's statement indicates that the immediate purpose of the agreement was to ensure compliance with the Hot Goods provision of the FLSA.

As this Court noted in its last ruling on this question, the ACPA cites the Hot Goods provision of the FLSA in its preamble.  The Hot Goods provision makes unlawful any commerce in goods that have been produced under conditions that violate the minimum wage and overtime provisions of the FLSA, and thus, "the ACPA explains from the onset, as evidenced in its introductory paragraph, that its purpose is to ensure that factories hired by Street Beat for the production of its garments pay their employees minimum wage and overtime." Street Beat, 226 F. Supp. 2d at 363.  Mr. Vanegas's Declaration, Report and statements in his deposition also set forth the means by which the ACPA was intended to protect Street Beat's garment factory workers in general, and plaintiffs in particular, from violations of the FLSA. (Vanegas Decl. ¶ 10; Vanegas Report at 3., attached as Ex. 1 to Vanegas Decl.;  Vanegas Dep. at 52).

Discovery has confirmed this Court's original interpretation of the purpose of the ACPA. Both of Street Beat's owners testified in their depositions that their purpose in causing Street Beat to enter into the ACPA was to settle a claim with the DOL that two of their contractor factories had failed to pay minimum wages and overtime, and to arrange for Street Beat to pay the workers in those factories to compensate for those violations. (Papouchado Dep. at 149; Amar Dep. at 30). Defendant Amar conceded at his deposition that the intent of the DOL and Street Beat, upon entering the ACPA, was to ensure that workers in the contractor factories were paid the minimum wage and overtime as required by law and that the ACPA gave Street Beat shared responsibility for ensuring that the factory workers, including plaintiffs, were paid minimum wage and overtime. (Amar Dep. at 62-63, 77). Defendant Papouchado conceded that the ACPA required Street Beat to monitor the factories for compliance with labor laws. (Papouchado Dep. at 149-150; Vanegas Dep. at 52). Thus, defendants have raised no triable issue of fact as to the purpose of the ACPA, and this Court's prior ruling on the issue stands as a matter of law.

D.    *Plaintiffs Are Not Affected By The DOL's Agreement Not To Bring Legal Action Except Under Certain Conditions, And If They Are, Those Conditions Have Been Satisfied*

The provisions of the ACPA cited by defendants in their brief as conditions precedent which must be met prior to the DOL's taking legal action against Street Beat are merely that—they apply only to the DOL, and do not affect plaintiffs' rights to recover as third party beneficiaries for Street Beat's failure to perform its obligations under the ACPA. Further, even if plaintiffs were only able to bring suit to enforce the

54

agreement under circumstances in which the DOL could bring legal action, those circumstances were satisfied.

Plaintiffs are not required to make the DOL satisfy the conditions of paragraph 10(a) of the ACPA as a condition precedent to plaintiffs' bringing their claim. Paragraph 10(a) states that the DOL will not initiate litigation against Street Beat without notice and an opportunity to meet and confer. This provision applies only to the DOL's right to bring suit, not to plaintiffs' rights to bring suit. Third party beneficiaries are not required to obtain the permission or cooperation of one of the parties to the contract before pursuing their claim—such a requirement would completely gut their rights as third party beneficiaries. Plaintiffs have no control over the DOL and need not petition the DOL for its cooperation in enforcing their rights. The DOL may chose to enforce or not to enforce the ACPA and the Hot Goods provision against Street Beat for any number of reasons, including resource limitations. Plaintiffs' legal rights can not be made to depend upon the vicissitudes and constraints of a bureaucratic government agency.

Plaintiffs right to bring suit is not limited to circumstances that satisfy the conditions, set forth in paragraph 10(d) of the ACPA, under which the DOL may seek injunctive relief or criminal prosecution against Street Beat. This provision applies only to the DOL and not to plaintiffs, who are not bringing suit for injunctive relief and could not bring a criminal action even if they wanted to.

Contrary to defendants' assertion in their brief, the ACPA does not cloak Street Beat with the rebuttable presumption of compliance with the Hot Goods provision, even in suits brought by the DOL, unless Street Beat shows that "it substantially complied with

all the steps called for by this ACPA." § 10(b); § 1(b).  Street Beat failed to substantially

comply with those steps, as set forth above.

## POINT VI

## ALTERNATIVELY, PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CAUSES OF ACTION FOR NEGLIGENCE UNDER NEW YORK STATE LAW, WHICH ARE NOT PREEMPTED BY THE FLSA

Plaintiffs alternatively are entitled to summary judgment on their causes of action

for negligence, even if this Court were to determine that the Street Beat Defendants are

not plaintiffs' employers.  Plaintiffs' Fourth, Fifth and Sixth Claims for Relief allege

common law negligence claims against Street Beat.  These claims are discussed together

in this section as the legal and factual issues substantially overlap each other.  Defendants

have moved to dismiss these claims based on theories of preemption by FLSA.  Plaintiffs

address this argument at the end of this section.

A.    *Negligent Hiring and Negligent Supervision*

Plaintiffs' Fourth and Fifth Claims are based on Street Beat's role as a contractor

and not as an employer.[8]  Street Beat negligently failed to exert due care in its hiring and

monitoring of its subcontractors, even though it had an obligation to do so under the

circumstances.  Thus, Street Beat is responsible for the actions of the SB Factories for the

latter's economic injuries to plaintiffs.  As this Court has already found, Street Beat can

be held liable as "general contractor" in its hiring and supervision of the Factory

Defendants.  Chen v. Street Beat Sportswear, Inc., 226 F. Supp. 2d 355, 361 (E.D.N.Y.

---

[8] Plaintiffs have pled these claims against Street Beat, Papouchado and Amar.  However, because only Street Beat was the "contractor," and not the individuals, plaintiffs seek relief for these claims only against Street Beat.

2002) (citing <u>Arcure v. Annie Liebovitz Studios, Inc.</u>, No. 98 CV 9127, 2001 WL 262736 (S.D.N.Y. Mar. 15, 2001)).

While the general rule is that a contractor is not liable for actions of its subcontractors, it is a rule that is now overwhelmed by its exceptions. <u>Kleeman v. Rheingold</u>, 81 N.Y.2d 270, 274, 614 N.E.2d 712, 715, 598 N.Y.S.2d 149, 152 (1993). Among the exceptions applicable here are that:

(1) Street Beat was negligent in hiring and supervising the factories. <u>Id.</u>;

(2) Street Beat had "[c]ontrol of the method and means by which the work is to be performed," <u>Arcure</u> at *2, (quoting <u>Melbourne v. New York Lite Ins. Co.</u>, 271 A.D.2d 296, 297, 707 N.Y.S.2d 64, 66 (1st Dep't 2000));

(3) Street Beat Defendants "directed the act from which the injury resulted or [took] an affirmative, active part in its commission," <u>Arcure</u> at *2, (quoting <u>Cubby, Inc. v. Compuserve, Inc.</u>, 776 F. Supp. 135, 143 (S.D.N.Y. 1991)); and

(4) The Street Beat Defendants owed a non-delegable duty to Plaintiffs. <u>Id.</u>; <u>see</u> <u>People ex rel. Price v. Sheffield</u>, 225 N.Y. 25, 29, 121 N.E. 474, 476 (1918)) ("since the duty is his, he cannot escape it by delegating it to others"). As discussed below, under any of these exceptions, Defendants are liable for the contractor factories' failure to make overtime and spread of hours payments.

B.     *Negligence Based Upon Violation Of a Statutory Standard*

The Street Beat Defendants owed plaintiffs a cognizable duty of care set forth by statute, they failed to exercise that duty, and plaintiffs suffered injury as a proximate result. <u>Akins v. Glens Falls City Sch. Dist.</u>, 53 N.Y.2d 325, 333, 424 N.E.2d 531, 535, 441 N.Y.S.2d 644, 648 (1981).

The Street Beat Defendants' duty of care is set forth in the Hot Goods provisions of the FLSA and New York Labor Law.  In order for plaintiffs to state a claim for negligence per se based on a statutory violation, plaintiffs must be a member of the class intended to be protected.  Carlock v. Westchester Lighting Co., 268 N.Y. 345, 349, 197 N.E. 306, 308 (1935).   This requirement has been satisfied, because plaintiff sweatshop workers were intended to be protected by the Hot Goods provisions of the state and federal law. 29 U.S.C. §§ 202, 215(a) and 217; New York Labor Law § 345(10); Bureerong v. Uvawas, 959 F. Supp. 1231, 1238 (C.D. Cal. 1997); Chu Chung v. New Silver Palace Rest., Inc., 272 F. Supp. 2d 314, 317 (2003) 317.   The mere fact that the Hot Goods provision of the FLSA does not provide for a private cause of action does not mean that it cannot provide the relevant standard of care in a negligence cause of action. Bureerong at 1237.   Additionally, New York Labor Law § 345-a expressly imposes liability for violations, providing conclusive evidence of negligence.  Ling Nan Zheng v. Liberty Apparel Co., 99 Civ. 9033 (RCC), 2002 U.S. Dist. LEXIS 4226, at *22-27 (S.D.N.Y. Mar. 12, 2002), rev'd on other grounds, 355 F.3d 61 (2d Cir. 2003)); cf. Joyce v. Rumsey Realty Corp., 17 N.Y.2d 118, 216 N.E.2d 317, 269 N.Y.S.2d 105 (1966) (finding conclusive evidence of negligence where defendant violated N.Y. Labor Law § 241(1)); Mack v. Altmans Stage Lighting Co., 98 A.D.2d, 470 N.Y.S.2d 664 (2d Dep't 1984) (finding conclusive evidence of negligence where defendant violated N.Y. Labor Law § 240(1)).

C.    *The Undisputed Evidence On the Record Establishes That The Street Beat Defendants Failed to Satisfy Their Duties To Plaintiffs*

The record contains undisputed evidence establishing that defendants failed to meet their duties of care (1) in hiring the contractors, (2) in supervising the contractors, and (3) in meeting the requirements of the Hot Goods provisions. The undisputed evidence in the record demonstrates that a reasonable person in the Street Beat Defendants' situation, with the exercise of reasonable diligence, would have known that Street Beat was permitting its garments to be sewn under conditions that violated both federal and state wage and hour provisions.

In high risk endeavors, there is a duty to fully investigate the abilities of a subcontractor. New York law holds a contractor liable for actions of its subcontractor in completing work that it "knows or has reason to know involves special dangers inherent in the work or dangers which should have been anticipated by the employer." Becker v. Poling Transp. Corp. 356 F.3d 381, 388-89 (2d Cir. 2004) (quoting Rosenberg v. Equitable Life Assurance Soc'y, 79 N.Y.2d 663, 668, 584 N.Y.S.2d 765, 768, 595 N.E.2d 840, 843 (1992).

Given the prevalence of sweatshops in the garment industry, the risk that a worker will be injured through the nonpayment of the minimum wage and/or overtime pay is substantial. Plaintiffs' expert Louis Vanegas estimates that 80 to 90% of the garments produced in New York City are produced in violation of the labor laws. (Vanegas Decl. ¶ 9k). The DOL also made a significant effort to publicize the frequency of violations among garment factories. Also, as set forth supra in Point I, Street Beat had a history of working with factories that violated the labor laws.

Despite the high risk of which Street Beat was aware, Street Beat negligently selected subcontractors who it should have known were likely to injure plaintiffs through the non-payment of minimum wages and overtime pay. It continued to subcontract with these factories after its own investigator of labor conditions found indicia, including the payment of cash, that these factories were sweatshops. See supra Point V. It also continued to give work to factories that it was aware were associated with defendant Liang, despite his past labor law violations and violations by factories with which he was associated (Exs. 3, 5-7 to Kimerling Decl.). See also supra, Point I.

Street Beat's dominance of the SB Factories was tantamount to making the factories the agents of Street Beat, thus imposing the duties of due care in hiring and supervision required by law. Lopez, 14 F. Supp. 2d at 421 ("Here, it is established that Renaissance [the manufacturer] contracted on a consistent basis with both Woo and Han [the factories], with the latter relationship becoming so extensive and regular as to approach one of exclusive agency."). As described supra in Points I and V, The Street Beat defendants also failed to take adequate measures to ensure that the workers who sewed its garments were paid the minimum wage and overtime as required by the Hot Goods provisions, because it made no effort to pay the factories prices that accounted for the overtime work that it knew would be required to fulfill Street Beat's orders within its deadlines.

Finally, plaintiffs' injuries were proximately caused by the Street Beat Defendants' failure to provide sufficient compensation to the factories so that they could pay plaintiffs the minimum wage and overtime. Through its control of the volume of work in the factories and the prices it paid for that work, Street Beat directly caused the

factories to have insufficient funds to pay the workers appropriately for their overtime. See supra, Point I.

Street Beat was complicit in the SB Factories' non-payment of lawful wages because Street Beat provided the cash that enabled the factories to hide these violations and enabled the factories to avoid the tax laws, as set forth above in Point I. And the use of cash to avoid taxes is a good indicator that a factory is a sweatshop ("How to Identify Garment Sweatshops," Apparel Industry Task Force, New York State Department of Labor, at p. 4, attached as Ex. 11 to Kimerling Decl; ECP at ¶ 8(d), attached as Ex. 9 to Kimerling Decl.). Thus, Street Beat knew that it was aiding the factories in avoiding the labor laws.

These undisputed facts establish that Street Beat failed to meet its duties of care with respect to the hiring and supervision of its contractors, and failed to meet its duty of care set forth in the Hot Goods provisions to ensure that its goods were not manufactured in violation of the minimum wage and overtime provisions. As a result, plaintiffs suffered nonpayment of the minimum wage, overtime, and spread of hours payments. Thus, plaintiffs are entitled to summary judgment against Street Beat on plaintiffs' negligence claims.

D.    *Plaintiffs' Negligence Claims Are Not "Preempted" By the FLSA*

Moving Defendants belatedly seek to have plaintiffs' negligence claims dismissed as a matter of law as preempted by the FLSA, after this court rejected their efforts to have these claims dismissed as preempted by the New York Workers Compensation Law. However, plaintiffs have adequately pled their negligence claims in the alternative to their claims under the FLSA and the New York Labor Law. It is the law of this case that,

61

if defendants Street Beat, Amar, and Papouchado are not plaintiffs' employers, plaintiffs may maintain an action for negligent hiring and negligent supervision against them. Memorandum and Order dated Jan. 22, 2002 (Glasser, U.S.D.J.). Plaintiffs also have properly asserted a claim of negligence per se for the Street Beat Defendants' violation of the statutory standards set forth in the FLSA and the New York Labor Law. As this Court reasoned in Street Beat, 226 F. Supp. 2d at 361, if defendants are not plaintiffs' employers, then statutes regulating the relationship between employers and employees cannot logically preempt plaintiffs' claims.

The FLSA does not preempt tort claims that are not covered by its terms. Williamson v. Gen. Dynamics Corp., 208 F.3d 1144, 1153 (9th Cir. 2000). In order to determine whether a federal statute preempts state law, courts must consider Congressional intent. Absent explicit preemptive language, a federal statute preempts state law only pursuant to the doctrines of (1) field preemption, where the federal regulatory scheme is "'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it'" and (2) conflict preemption, where "'compliance with both federal and state regulations is a physical impossibility or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88, 98 (1992) (citations omitted).

The FLSA does not preempt plaintiffs' negligence claims under either a field preemption or a conflict preemption theory. Congress clearly did not intend that the FLSA preempt the entire field of wage and hour regulation. Congress's insertion of a "savings clause" into the FLSA expressly permitting states and municipalities to enact

62

stricter wage and hour laws is evidence that it did not intend to cover the entire field. 29 U.S.C. § 218(a); Williamson, 208 F.3d at 1151. Thus, only state laws that conflict with the FLSA are preempted by it. However, recognition of a cause of action in negligence for violation of the terms of the FLSA is not in conflict with the statute unless the statute itself covers the claim. Id. at 1152-1153 (finding plaintiffs' fraud claim not preempted because the allegedly fraudulent conduct was not covered by the FLSA); cf. Bureerong v. Uvawas, 959 F. Supp. 1231, 1238 (C.D. Cal. 1997) (permitting a cause of action for negligence based upon violations of the FLSA hot goods provision).

  In the case at hand, if the Court rejects plaintiffs' arguments that the moving defendants are plaintiffs' employers, then plaintiffs' claims against them would not be covered by the Act and plaintiffs would have no access to the statute's remedial scheme. Thus, it would be appropriate to entertain plaintiffs' negligence claims based on violations of the act. The cases cited by defendants are inapposite because in those cases, the common law claims asserted were covered by the FLSA, because the FLSA both prohibited the conduct and provided the remedy. Petras v. Johnson, 92 Civ. 8298 (CSH), 1993 U.S. Dist. LEXIS 8464, at *10-11 (S.D.N.Y. Jun. 16, 1992) (fraud claim); Alexander v. Vesta Ins. Group, Inc., 147 F. Supp. 2d 1223, 1240-41 (N.D. Ala. 2001) (fraud claim); Johnston v. Davis Sec., Inc., 217 F. Supp. 2d 1224, 1227-28 (D. Utah 2002) (fraud claim); Jarmoc v. Consol. Elec. Distribs., Inc., 92 C3697, 1992 U.S. Dist. LEXIS 12717, at *5 (N.D. Ill. Aug. 25, 1992) (retaliation claim); Tombrello v. USX Corp., 763 F. Supp. 541, 545 (N.D. Ala. 1991) (claim for failure to pay wages required by the FLSA); Nettles v. Techplan Corp., 704 F. Supp. 95, 100 (D.S.C. 1988) (claim for failure to pay wages required by the FLSA).

## POINT VII

### PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER DEFENDANTS VIOLATIONS WERE WILLFUL, AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

The record contains overwhelming and undisputed evidence that defendants knew or showed reckless disregard that their conduct violated the law. Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 141 (2d Cir. 1998). As set forth supra, Street Beat had actual knowledge that the factories were not paying overtime, through Helen Cheung's examination of their payroll records and her comparison between those payroll records and the factory workers' piece cards. Additionally, Street Beat knew that the factories evaded the tax laws and assisted in their evasions of tax laws by providing checks in amounts less than $10,000. Street Beat also demonstrated reckless disregard by hiring factories associated with Defendants Liang and Fan, despite their knowledge of Liang's past violations of the labor laws. Id. at 141-142. Thus, the Street Beat Defendants are not entitled to summary judgment on the issue of whether their violations of the FLSA were willful. On the contrary, plaintiffs respectfully move for summary judgment on the issue of willfulness of the Street Beat defendants' actions, as recounted supra.

## POINT VIII

### THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CAUSES OF ACTION

Plaintiffs respectfully submit that the Court should deny defendants' motion to dismiss plaintiffs Kun Huang and Qi Liu's causes of action and the state law claims of other plaintiffs that fall outside the statutory period of their FLSA claims. Plaintiffs Kun Huang and Qi Liu, along with the other plaintiffs, move for summary judgment on their

claims under the New York Labor Law, on their negligence theories, and as third party beneficiaries of the ACPA for the reasons cited above. This court has jurisdiction over these claims as part of the same case or controversy as the FLSA claims. 28 U.S.C. § 1367. Furthermore, plaintiffs' New York state law claims do not raise a novel or complex issue of State law. 28 U.S.C. § 1367 (c)(1). As more fully explained supra, New York law has fully developed jurisprudence regarding the analysis of employer and individual liability under the Labor Law, theories of negligence, and third party beneficiary rights under contracts. Thus, the Court should not dismiss these claims.

POINT IX

MINIMUM WAGE AND OVERTIME VIOLATIONS

Plaintiffs seek summary judgment on the amount of damages they are due for unpaid wages. The FLSA requires that workers be compensated at a rate of not less than $4.25 per hour for the period ending on September 30, 1996, not less than $4.75 per hour for the period beginning October 1, 1996, and not less than $5.15 per hour beginning September 1, 1997. 29 U.S.C. § 206(a)(1). The FLSA also requires that workers be paid one and a half times their ordinary rate of pay for each hour worked in excess of 40 hours in a single week. 29 U.S.C. § 207(a). The New York Labor Law and regulations enacted pursuant to it establish a minimum wage and incorporate the requirements of the federal minimum wage and overtime statutes into state law. N.Y. Labor Law §§ 21, 652; 12 NYCRR §§ 142-2.1(a), 142-3.2. The New York regulations also require an additional hour's worth of pay on any day in which the time from the beginning of the employee's workday to the end is greater than 10 hours, including time off, or in which a split shift occurs, or both. 12 NYCRR § 142-2.4; N.Y. Labor Law § 21.

65

In the absence of proper employment records kept by the defendants, plaintiffs may prove the extent of their work performed and the inadequate compensation for their work through their personal records and estimates. Reich v. Southern New Eng. Telecomms. Corp., 121 F.3d 58, 66-67 (2d Cir. 1997) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-88 (1946)). Under New York law, there is a statutory presumption in favor of plaintiffs' estimates where the employer has failed to keep adequate records. New York Labor Law § 196-a.

The undisputed facts on the record demonstrate that plaintiffs are entitled to summary judgment on their claim that they were not properly compensated for overtime work by their respective employers. Some plaintiffs have also demonstrated that they were not compensated at the minimum wage. Plaintiffs were able to obtain only a few time and pay records from any of the Defendants. While there were time clocks in most of the factories, the time records that were maintained were false. (F. X. Chen Decl. ¶ 13; Q. Chen Decl. ¶ 13). The payroll records were also false, as established supra in Point V. As a result, to a large extent Plaintiffs have relied on their own records, if they have them, or on their recollections of their general work hours. These are set forth in plaintiffs' declarations submitted with this motion for summary judgment. Where specific information is lacking, average hours and wages were used. In some instances, the averages were based on the more specific records if they were not complete.

Similarly, in the absence of accurate wage records, Plaintiffs rely on their own records and/or estimates of their weekly wages. Again, in some instances, averages were used based on less than complete plaintiffs' records. Plaintiffs have submitted comprehensive declarations that set forth their recollections of their weekly work hours

66

as well their weekly wages, and damage charts were created for each of the plaintiffs (Damages Exhibit to Kimerling Decl). When there are plaintiff records that are relied upon, a page of these records are attached to the plaintiff's affirmation. The full copies of the plaintiffs' records have been provided to defendants in discovery and can be provided to the Court if requested. Plaintiffs request that the Court treat the information taken from plaintiffs' handwritten records which are set forth in the Damages Exhibit as summaries and calculations under Rule 1006 of the Federal Rules of Evidence. The method of calculation of the damages in these charts is set forth more fully in the declaration of Kenneth Kimerling, Esq., attached.

Plaintiffs request liquidated damages for the willful and intentional acts committed by the Street Beat Defendants in the course of their violations of the minimum wage and overtime provisions, as well as prejudgment interest at an uncompounded rate of 9% per annum, pursuant to CPLR §§ 5001-5004.

## CONCLUSION

For the reasons stated above, summary judgment should be issued against defendants Street Beat, Amar, and Papouchado on plaintiffs' First, Second, and Third Claims For Relief and against Defendant Street Beat on plaintiffs' Seventh Claim For Relief; or alternatively against Defendant Street Beat on plaintiffs' Fourth, Fifth, and Seventh Claims For Relief and against defendants Street Beat, Amar, and Papouchado on plaintiffs' Sixth Claim For Relief.

Dated:   New York, New York
         October 22, 2004

DAVIS POLK & WARDWELL

By: _Monica Lamb_

James H. R. Windels
Sarah Haan
Monica Lamb (ML-6096)

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

ASIAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND

Kenneth Kimerling, Legal Director
99 Hudson Street
New York, NY 10013

Attorneys for Plaintiffs