UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FEN X. CHEN, QIU CHEN, YU ZHENG, CHAI CHEN, DANG ZHENG, HUA CHEN, YONG CHEN, KUN HUANG, and QI LIU,

Plaintiffs,

- against -

STREET BEAT SPORTSWEAR, INC., ALBERT PAPOUCHADO, MICHEL AMAR, JIAN WEN LIANG a.k.a. RAYMOND LIANG, FEN CHEN a.k.a. HUA FEN CHEN, LUN WEI FAN, 1A FASHIONS INC., and RED ARROW INC.,

Defendants.

01 Civ. 0792 (ILG) (RML)

**Declaration of Monica Lamb In Support of Plaintiffs' Motion Pursuant to Fed. R. Civ. P. 15(a) For Leave to Amend and File the Second Amended Complaint and Pursuant to Fed. R. Civ. P. 15(c) For Order Regarding Relation Back**

MONICA LAMB declares under penalty of perjury:

1. I am a member of the bar of the State of New York and of the bar of this Court. I am an associate at Davis Polk & Wardwell, one of the counsel for Plaintiffs in this action.

2. I submit this Declaration in support of Plaintiffs' Motion Pursuant to Fed. R. Civ. P. 15(a) For Leave to Amend and File the Second Amended Complaint and Pursuant to Fed. R. Civ. P. 15(c) For Order Regarding Relation Back.

3. Attached hereto as Exhibit A is a true and correct copy of the Complaint in this action, filed February 12, 2001.

4. Attached hereto as Exhibit B is a true and correct copy of the Amended Complaint in this action, filed May 18, 2001.

5. Attached hereto as Exhibit C is a true and correct copy of the [Proposed] Second Amended Complaint. The only modification from the Amended Complaint is to add the phrase "along with Jian Wen Liang, Fen Chen, and Lun Wei Fan," to paragraph 7.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
November 4, 2005

Monica Lamb

Monica Lamb (ML-6096)
DAVIS POLK & WARDWELL
450 Lexington Ave.
New York, NY 10017
(212) 450-4000

# EXHIBIT A

2215/1.9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

FEN X. CHEN, QIU CHEN and YU ZHENG,

Plaintiffs,

-against-

STREET BEAT SPORTSWEAR, INC., ALBERT PAPOUCHADO, MICHEL AMAR, JIAN WEN LIANG a.k.a. RAYMOND LIANG, FEN CHEN a.k.a. HUA FEN CHEN, LUN WEI FAN, 1A FASHIONS INC., and RED ARROW INC.

Defendants.

---------------------------------------------------------------X

CV 01 0792

COMPLAINT

GLASSER, J.

LEVY, M.J.

2001 FEB 12 A 11:02

PRELIMINARY STATEMENT

1. This is an action to obtain wages rightfully owed plaintiffs under federal and state labor laws and under common law. At various time in the last two years, plaintiffs worked for defendants often averaging 100 hours of work a week or more and were never paid overtime. Two of the plaintiffs were even asked to work without pay. When they refused and complained, these plaintiffs were fired in retaliation and false charges were filed with the police against one of them.

JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. In addition, the Court has jurisdiction over plaintiffs' claims under the Fair Labor Standards Act pursuant to 29 U.S.C. §216(b). Plaintiffs have consented in writing to become parties to this lawsuit.

2/12/01

3. Venue is vested in the Eastern District of New York pursuant to 28 U.S.C. § 1391 (a) as substantial part of the events giving rise to the claims occurred in this district.

PARTIES

4. Plaintiffs FEN X. CHEN, QUI CHEN, and YU ZHENG are garment workers who worked for the defendants. The Chens are not related to each other nor to defendant Fen Chen.

5. Defendant STREET BEAT SPORTSWEAR, INC. is a manufacturer of women's sportswear and employs defendant Factories to produce such sportswear. Street Beat Sportswear, Inc. was incorporated in Queens County on February 2, 1992.

6. Defendant ALBERT PAPOUCHADO and MICHEL AMAR are officers and owners of defendant Street Beat Sportswear, Inc. They manage defendant Street Beat Sportswear, Inc.

7. Defendant Street Beat Sportswear, Inc. and defendants Albert Papouchado and Michel Amar are hereinafter collectively sometimes referred to as "Street Beat" or "Manufacturers."

8. Defendants 1A FASHIONS INC. and RED ARROW INC. are garment factories owned and/or operated as an "enterprise" by defendants JEN WEN LIANG a.k.a. RAYMOND LIANG, FEN CHEN a.k.a. HUA FEN CHEN, and LUN WEI FAN along with other unnamed garment factories. These defendant factories and the other factories in the enterprise have gone through several corporate names and several addresses over the past several years, but have remained essentially the same, employing many of same employees, using the much of same equipment and doing work for defendant Street Beat Sportswear, Inc.

9. Hereinafter defendants 1A Fashions Inc., Red Arrow Inc., Jian Wen Liang, Fen Chen, and Lun Wei Fan will be sometimes collectively referred to as "Factories."

10. Because of their joint operation and overlapping ownership and control, defendants 1A Fashion Inc. and Red Arrow Inc. and other factories under the ownership or control of defendants Liang, Chen and Fan constitute an "enterprise" as defined by the Fair Labor Standards Act, 29 U.S.C. § 203(r).

11. Defendant Factories and Manufacturers are plaintiffs' employers or joint employers within the meaning of the Fair Labor Standards Act.

12. Defendants are engaged in interstate commerce or the production of goods for interstate commerce.

STATEMENT OF FACTS

13. Plaintiffs are garment workers who worked for defendants in 1999 and 2000. The Chens worked from February 1999 until September 2000. Plaintiff Zheng worked from June 1999 until October 1999.

14. On information and belief, defendant Manufacturers provide the garment design, the sewing instructions, the textiles, the trimmings and other materials to defendant Factories for the preparation of garments. The Factories are fully integrated element of Street Beat's manufacturing operation.

15. The job of plaintiffs was to place the finished garments on hangers along with the tags and protective bagging. They were paid by the piece.

16. During their employment with defendants, plaintiffs worked seven days a week with only one or two days off a year.

17. They regularly worked from early morning until late at night. Very often they worked past midnight into the next morning and after taking a few hours break would begin

again doing their job.

18. In one week in May 2000, the Chens hung 59,476 garments. In that week, the plaintiffs estimate that they worked 140 hours.

19. Plaintiffs and other workers in the Factories were never paid their rightful overtime wages for all their hours of work over 40 hours a week during their employment with defendants.

20. Defendants willfully and intentionally failed to pay plaintiffs and other workers in the Factories their lawful wages. Defendants maliciously and wantonly in their disregard for plaintiffs' rights by making plaintiffs work seven days a week and over a hundred hours of work a week without overtime pay and threatening them with the loss of their jobs if they did not comply.

21. Defendants maintained false employment records, including false time records in an effort to coverup their violations.

22. On information and belief at all times material to the complaint each of the Factories were completely controlled and dominated by the Manufacturers, and each defendant was the alter ego of the other and each defendant aided and abetted the wrongful acts of the others.

23. On information and belief, approximately 90% of the garments that the Factories prepare are produced for defendant Manufacturers.

24. Defendant Manufacturers knew or reasonably should have known that plaintiffs were not properly paid minimum wage and overtime for their work by defendant Factories and that the unlawful Sunday work was taking place.

25. Street Beat had a representatives present in the Factories on the average of three

times a week who among other things monitored the production and quality of plaintiffs' work.

26. Defendant Manufacturers had notice that these violations were likely to be present in the defendant Factories. Street Beat had been sued previously by workers in factories run by some of the same defendants and at some of the same locations. These same factories had been found in violation of the Fair Labor Standards Act by the United States Department of Labor. The owners of these factories including defendant Liang had been found by the New York State Supreme Court to have fired workers in retaliation for complaints about unlawful wage and hour practices. Defendant Liang had also been found guilty of misdemeanor violations by the New York City Criminal Court for violations of the New York state wage and hours law for taking unlawful kick backs. New York Labor Law § 198-b.

27. Defendants had a duty to protect the lives, health and safety of plaintiffs. See, New York Labor Law §200. By forcing plaintiffs to work such long hours, defendants violated that duty and profited from it.

28. On information and belief, defendant Manufacturers contracted with defendant Factories at prices too low and subject to conditions for delivery too onerous to permit for the payment of plaintiffs and other employees of minimum wage and overtime pay. Plaintiffs believe that defendant Manufacturers have similarly contracted with others at such low prices. Defendant Manufacturers profited directly through the unlawful treatment of plaintiffs and others working for defendant Factories.

29. Defendant Manufacturers knew or should have known that their garments were produced by plaintiffs and other workers in violation of the minimum wage and overtime laws, i.e."hot goods." Thus, defendant Manufacturers were barred from transportation and sale of these

garments by the Fair Labor Standards Act, 29 U.S.C. § 215 and New York Labor Law § 345(10). Nevertheless, defendant Manufacturers continued to ship and sell such garments from defendant Factories and profit thereby.

30. Defendant Manufacturers utilize the practice of contracting out the production of their garments to defendant Factories and others similarly situated and thereby entrust defendant Factories with defendant Manufacturers' duties to exercise due care and comply with labor law provisions and common law principles relevant to the production of garments and the treatment of workers, in part to seek to avoid compliance with labor laws and liability for violation of those laws.

31. On February 26, 1997, defendant Manufacturers signed a "Memorandum of Agreement" [Exhibit A] with the United States Department of Labor by which the defendant Manufacturers entered into an ongoing "Augmented Compliance Program Agreement" (the "Agreement") [form agreement attached as Exhibit B]. The Agreement imposed several duties on the Manufacturers, including but not limited to (1) the pre-contract evaluation of the economic feasibility, based on the price terms involved, of a contractor's compliance with the Fair Labor Standards Act, (2) the ongoing monitoring of contractor compliance with the Fair Labor Standards Act, and (3) in the event that violations of the Fair Labor Standards Act by a contractor are detected by the Manufacturers, suspension of shipment of all goods affected by said violations and payment of all unpaid back wages. On information and belief, the Manufacturers breached this contract.

32. On information and belief, each of the defendants was the agent, employee and/or joint venturer of, or working in concert with the co-defendants and was acting within the course

and scope of such agency, employment and/or joint venture or concerted activity. To the extent that said conduct or omissions were perpetrated by certain defendants, the other defendant or defendants confirmed or ratified such conduct and omissions.

SECTION 216(b) "CLASS" CLAIMS

33. Street Beat employs other workers in other factories in New York City under the same or similar circumstances as are found in the defendant Factories. Street Beat provides these factories with the large majority of work done in these factories and dominates and controls these factories and their owners. Street Beat is the joint employer of the workers in these other factories. On information and belief, the workers in these factories are not paid overtime pay.

34. Pursuant to 20 U.S.C. § 216(b), plaintiffs seek to represent all similarly situated workers in factories in New York City that make garments Street Beat and where Street Beat is a joint employer.

RETALIATION

35. On Sunday, September 24, 2000, defendant Lun Wei Fan directed the plaintiffs Fen X. Chen and Qui Chen along with a third worker to move the garments that they had previously hung to the basement for shipping to the manufactufer. This was not part of the Chen's job, and they were not to be paid for this work. This job is usually done by as many as four men and requires a full day because the garments most be moved then re-hung on rolling carriers.

36. The plaintiffs complained that this was not their work and wanted to continue to hang the lot of garments that they were working on and for which they would be paid. Defendant Fan said that they could either do this unpaid work or be fired. Plaintiff Fen X. Chen responded that they would complete their work on the lot of garments that they had begun; then they should be

paid for the work that they had done that week (plaintiffs are paid on a Wednesday to Wednesday basis); and then they would leave the factory. The Chens continued to work hanging garments on Monday and Tuesday. On Wednesday, September 27, 2000, when Mr. Chen returned from lunch, he was met by the police who arrested him based on false assault charges made by defendant Fan.

FIRST CLAIM FOR RELIEF

FEDERAL OVERTIME CLAIMS

37. Plaintiffs allege and reallege all the above paragraphs.

38. Defendants' willful failure to pay plaintiffs overtime pay for work over 40 hours per week violate 29 U.S.C. § 201 et seq. and the supporting federal Department of Labor regulations.

SECOND CLAIM FOR RELIEF

NEW YORK STATE MINIMUM WAGE AND OVERTIME CLAIM

39. Plaintiffs allege and reallege all the above paragraphs..

40. Defendants' willful failure to pay plaintiffs the minimum wage and overtime pay for work over 40 hours per week violate New York Labor Law §§ 190 et seq. and 650 et seq. and the supporting New York State Department of Labor regulations.

THIRD CLAIM FOR RELIEF

NEW YORK STATE SPREAD OF HOURS CLAIM

41. Plaintiffs allege and reallege all the paragraphs above.

42. Defendants intentionally failed to pay plaintiffs an extra hour's pay for every day that plaintiffs worked over 10 hours in violation of New York Labor Law §§ 190 et seq. and 650 et seq.

and the supporting New York State Department of Labor regulations.

FOURTH CLAIM FOR RELIEF

NEGLIGENT SUPERVISION AGAINST MANUFACTURERS

43. Plaintiffs allege and reallege all the above paragraphs.

44. On information and belief, when engaging in the unlawful acts alleged above, defendant Factories were acting as agents of defendant Manufacturers. Defendant Manufacturers exercised control over the operative details of garment production work performed by the Factories.

45. Manufacturers knew or reasonably should have known that the Factories were engaging in the alleged wrongful conduct and that this conduct would directly and proximately result in injury to plaintiffs.

46. Defendant Manufacturers had the authority to supervise, prohibit, control and/or regulate the Factories so as to prevent these acts and omissions from occurring.

47. Defendant Manufacturers knew or reasonably should have known that unless they intervened to protect plaintiffs and properly supervised, controlled and/or regulated the conduct of the Factories that the Factories would perceive their acts and omissions as being ratified and condoned.

48. As a direct and proximate result of the Manufacturers failure to exercise due care and to supervise, control and /or regulate the Factories, plaintiffs have suffered injuries entitling them to damages in an amount to be determined at trial.

FIFTH CLAIM FOR RELIEF

NEGLIGENT HIRING AGAINST MANUFACTURERS

49. Plaintiffs allege and reallege all the paragraphs above.

50. Defendant Manufacturers hired, retained or contracted with the defendant Factories to perform garment manufacturing work for them.

51. Defendant Manufacturers failed to exercise reasonable care in selecting, hiring, retaining or contracting with the Factories to perform this work. At the time that the Manufacturers entered into this relationship with the Factories, they knew or reasonably should have known that the Factories would violate plaintiffs' rights under the federal and state labor laws and that, as a direct and proximate result of these violations, plaintiffs would suffer the injuries alleged herein.

52. As a direct and proximate result of the Manufacturers' negligent selection, hiring, retention and contracting with the Factories, plaintiffs have suffered the injuries alleged herein, entitling the plaintiffs to damages in amounts to proven at trial.

SIXTH CLAIM FOR RELIEF

NEGLIGENCE PER SE: VIOLATION OF FEDERAL AND

STATE HOT GOODS PROVISIONS AGAINST THE MANUFACTURERS

53. Plaintiffs allege and reallege all the paragraphs above.

54. The garments produced for Manufacturers by the Factories using plaintiffs' labor were produced in violation of the wage and hour provisions of the Fair Labor Standards Act and New York Labor Law as alleged above.

55. Defendant Manufacturers knew or should have known about these violations of the wage

and hour provisions of the federal and state labor laws.

56. Defendant Manufacturers nevertheless transported, shipped and sold these illegally produced garments in violation of the "hot goods" provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 215(a) and 217 and New York Labor Law § 345(10). Plaintiffs are among the class of persons that these labor laws were designed to protect.

57. As a direct and proximate result of the Manufacturers' transportation, shipping and sale of said garments, plaintiffs have suffered economic and personal injuries, including the receipt of substandard wages, unduly long hours of work without any day of rest, resulting in injury to the plaintiffs' health and welfare, and damages in an amount nature and degree to be proven at trial.

SEVENTH CLAIM FOR RELIEF

THIRD PARTY BENEFICIARY O F CONTRACT CLAIM AGAINST STREET BEAT

58. Plaintiffs allege and reallege all the paragraphs above.

59. As alleged above, defendant Manufacturers entered into the Agreement with the United States Department of Labor requiring the Manufacturers, among other things, to evaluate the feasibility of contractors' compliance with the Fair Labor Standards Act, monitor said compliance, and suspend shipment of goods affected by violations of the Fair Labor Standards Act in the event that said violations were detected by the Manufacturers' monitoring.

60. On information and belief, defendant Manufacturers materially breached the terms of the Assurances and the Agreement by, among other things, failing to ensure that the defendant Factories complied with the Fair Labor Standards Act, as alleged above.

61. Plaintiffs, as employees of the defendant Factories, were the third party beneficiaries

of the Department of Labor's contract with the defendant Manufacturers. Thus, the defendant Manufacturers are liable to the plaintiffs, as third party beneficiaries, for the Manufacturers' breach of the Assurances and the Agreement.

62. Because of the Manufacturers' breach of the Assurances and the Agreement, plaintiffs have suffered harm and pain and suffering, entitling them to damages in an amount to be determined at trial.

EIGHTH CLAIM FOR RELIEF

FEDERAL AND STATE RETALIATION CLAIM AGAINST THE FACTORIES

63. Plaintiffs allege and reallege all the paragraphs above.

64. The Factory Defendants willful termination of the employment of Fen X. Chen and Qui Chen in retaliation for their complaint about having to work for less than the minimum wage violates 29 U.S.C. § 215 and New York State Labor Law §215.

PRAYER FOR RELIEF

Wherefore plaintiffs respectively request that this Court enter an order and judgment awarding plaintiffs:

a. unpaid wages, including minimum wage, overtime pay and spread of hours pay, plus liquidated damages and/or interest thereon;

b. compensatory damages according to proof;

c. punitive damages according to proof;

d. attorneys' fees and costs;

e. such other relief as this Court shall deem just and proper.

Dated: February 12, 2001

Respectfully submitted,

KENNETH KIMERLING (KK-5762)
Asian American Legal Defense and
Education Fund Inc.
99 Hudson Street
New York, New York 10013
212-966-5932

JAMES H.R. WINDELS (JW-9726)
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
212-450-4000

ATTORNEYS FOR PLAINTIFFS

**MEMORANDUM OF AGREEMENT**
[MOA-ACPA(AM).P5]

This Memorandum of Agreement (hereinafter called MOA) is hereby entered into by

Street Beat Fashions Inc.

hereinafter called the FIRM, and the U.S. Department of Labor, hereinafter called DOL, as follows:

1. The FIRM and the DOL hereby enter into the Augmented Compliance Program Agreement [DOL Form Number ACPA(AM).P5), a copy of which has been furnished to the FIRM by DOL and whose terms and conditions are hereby incorporated by reference into this MOA by this reference], subject to the further terms, conditions, and clarifications set forth in this MOA.

2. ACPA Paragraph 1(a) shall be interpreted to require the FIRM's full compliance with the ACPA as modified by this MOA.

For purposes of the heightened monitoring required by ACPA subparagraph 11(e) with respect to the Contractor firms to be listed in a paragraph A at the start of an ACPA, each of the following Contractor firms are to be deemed to be so listed in the ACPA (notwithstanding the absence of such a paragraph A at the start of the ACPA):

**Excel Fashion Inc., 252 West 37th Street 15/F, New York NY 10018**

For purposes of the backwage payment provisions of ACPA subparagraph 8(a)(i), each of the following firms is to be deemed to be listed in an Attachment No. 3 to the ACPA (notwithstanding the absence of an Attachment No. 3 to the ACPA) for the following backwage amount and period in each instance:

| Contractor's Name: | Period Covered Hereby: | Amount Due: |
|---|---|---|
| Excel Fashion Inc. | W/E 8/24/96 to 11/16/96 | to be determined |
| Monami Fashions Inc. | W/E 2/15/97 to 2/22/97 | $17,507.46 |

said amounts will be paid to the DOL by the FIRM within seven calendar days of the execution of this MOA, by submitting a certified or cashier's check payable to the order of the "Wage & Hour Div., Labor" to the office listed below the signature line for the DOL at the end of this MOA.

3. This MOA shall be subject to the termination provisions of the ACPA; and a termination of the ACPA according to its terms (as modified in this MOA) shall have the same effect on this MOA.

4. For purposes of any notices required or permitted by the ACPA, the initial designation by each party of its address is shown below the signatures at the end of this MOA.

Dated: 2/26, 1997

For the FIRM:

[signature]

Title: President
Its Duly-Authorized Agent
Street Beat Fashions Inc.
142 West 36th Street 4/F
New York, NY 10018

Dated: 3/3, 1997

For the DOL:

[signature]

Its Asst. District Director
Wage & Hour Division
U.S. Department of Labor
26 Federal Plaza, Room 3838
New York, New York 10278

Exh. A

U.S. DEPARTMENT OF LABOR, Wage & Hour Division

AUGMENTED COMPLIANCE

# PROGRAM AGREEMENT

[DOL Form ACPA(AM).P5]

DEPARTMENT OF LABOR
UNITED STATES OF AMERICA

Exh B

AUGMENTED COMPLIANCE PROGRAM AGREEMENT (DOL Form ACPA(AM).P5) Pag

# TABLE OF CONTENTS

[ACPA(AM).P5]

AUGMENTED COMPLIANCE PROGRAM AGREEMENT [ACPA(AM).9]

1. Scope of Agreement; Compliance with Act and Compliance Program . . . . . . . . . . . 3
2. Definitions of Certain Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
3. Pre-Contract Procedures; Evaluation of Contractors . . . . . . . . . . . . . . . . . 4
4. Employer Compliance Program for Contractors; Monitoring Contractor Compliance . . . 4
5. Records to be Kept by FIRM; Reports to Made by FIRM . . . . . . . . . . . . . . . . 5
6. Contractor Violations; Use of Payroll-Reporting Process . . . . . . . . . . . . . . 5
7. Scope of Applicability of Measures Regarding Owners\Managers . . . . . . . . . . . . 6
8. Backwage Payments Guaranteed by the FIRM . . . . . . . . . . . . . . . . . . . . . 6
9. Process for Remediating Contractor Violations . . . . . . . . . . . . . . . . . . . 7
10. Potential Litigation; Impact of this Agreement . . . . . . . . . . . . . . . . . . 8
11. Initial Implementation of this Agreement . . . . . . . . . . . . . . . . . . . . . 8
12. Duration and Termination of the Agreement . . . . . . . . . . . . . . . . . . . . 9
13. Notices Between the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Attachment No. 1: EMPLOYER COMPLIANCE PROGRAM [ECP(AM).6]

1. Purpose, Scope, and Applicability of Employer Compliance Program . . . . . . . . . 10
2. Minimum Wage Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
3. Overtime Pay Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4. Meaning of "Hours Worked" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
5. Child Labor Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
6. Payroll Records and Posting of Posters . . . . . . . . . . . . . . . . . . . . . . 11
7. Counting and Recording Hours Worked; Use of Timecards and Timeclocks . . . . . . . 12
8. Payroll Processes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
9. Information to be on Payroll Checkstubs . . . . . . . . . . . . . . . . . . . . . 13
10. Responsibility to Monitor Compliance . . . . . . . . . . . . . . . . . . . . . . 14
11. Duty to Cooperate with FIRM's Monitoring . . . . . . . . . . . . . . . . . . . . 15
12. Required Notices of Unprofitability . . . . . . . . . . . . . . . . . . . . . . . 15
13. Manner of Contract Performance . . . . . . . . . . . . . . . . . . . . . . . . . 15
14. Consequences of Violations; Reading ECP . . . . . . . . . . . . . . . . . . . . . 15

Attachment No. 2: PROGRAM TO MONITOR CONTRACTORS [PMC(AM).6]

1. Name and Purpose of Document . . . . . . . . . . . . . . . . . . . . . . . . . . 16
2. General Scope and Frequency of Monitoring . . . . . . . . . . . . . . . . . . . . 16
3. Components of Minimum-Intensity Monitoring . . . . . . . . . . . . . . . . . . . . 17
4. Components of Intermediate-Intensity Monitoring . . . . . . . . . . . . . . . . . 17
5. Components of High-Intensity Monitoring . . . . . . . . . . . . . . . . . . . . . 18
6. Integrity and Effectiveness of Monitoring Processes . . . . . . . . . . . . . . . 18
7. Recordkeeping Regarding Monitoring . . . . . . . . . . . . . . . . . . . . . . . . 19

# AUGMENTED COMPLIANCE PROGRAM AGREEMENT

[ACPA(AM).9]

The U.S. Department of Labor (called the DOL) and the signatory firm (called the FIRM), in the interests of promoting compliance by the FIRM with Section 15(a)(1) of the Fair Labor Standards Act, as amended (29 U.S.C. 201, et seq.), called the Act, hereby agree as follows:

## 1. SCOPE OF AGREEMENT; COMPLIANCE WITH ACT AND COMPLIANCE PROGRAM

a) The FIRM will comply in full with this Augmented Compliance Program Agreement (called ACPA) with respect to all of its activities.

b) The FIRM will comply in full with all of the provisions of Section 15(a)(1) of the Act, as interpreted by DOL, and will take all reasonable steps, including all of those specified in this ACPA, to help ensure that it does fully comply with Section 15(a)(1) of the Act.

c) If it comes to the attention of the DOL that the FIRM should undertake steps to ensure compliance with Section 15(a)(1) of the Act by the FIRM during the term of this ACPA in addition to those specifically called for by this ACPA, the DOL will notify the FIRM in writing of what those additional steps are.

d) The FIRM will not act in reliance upon any interpretation of the Act that is at variance with the Act, as interpreted by the DOL, without first giving notice to the DOL in writing of the nature and extent of the different interpretation on which the FIRM proposes to act, provided however that the FIRM will have the right to challenge the correctness of any non-legislative DOL interpretation of the Act when raised by the DOL.

## 2. DEFINITIONS OF CERTAIN TERMS

a) For purposes of this ACPA (including for purposes of this paragraph 2), the definitions set forth in this paragraph 2 are applicable.

b) The term "ACPA" includes this ACPA, including all actual or referenced attachments.

c) The term "DOL" means the United States Department of Labor.

d) The term "commerce" means "commerce" as defined in Section 3(b) of the Act and includes any interstate or foreign commerce.

e) The term "Contractor" includes any one or more persons or firms (other than the FIRM) that supply, directly or indirectly (by way of one or more layers of subcontracts or otherwise), the performance of any service called for to fill any purchase made by the FIRM (and includes any prospective or proposed Contractor, where indicated by the context).

f) The term "ECP" includes the Employer Compliance Program, a copy of which is attached as Attachment No. 1 hereto.

g) The term "execution" refers to the signing of this ACPA (or of some other document agreeing to this ACPA by reference, with or without modifications and\or clarifications) by the parties to this ACPA.

h) The term "firm" includes any one or more proprietorships, partnerships, associations, corporations, trusts, organizations, entities, or organized groups of persons.

i) The term "FIRM" means the firm executing this ACPA.

j) The term "goods" includes any apparel (inclusive of any textile material included or to be included in any apparel) at any stage of manufacture or distribution.

k) The phrase "interpreted by DOL" includes all of the following DOL sources:

i) final DOL regulations and/or interpretative rules that are (before or after execution of this ACPA) published in the Federal Register,

ii) interpretations that are (before or after execution of this ACPA) contained in any public domain opinion letter of the Administrator of DOL's Wage & Hour Division, and

iii) interpretations of which the DOL gives the FIRM notice in writing, in advance of applying the interpretation with respect to the FIRM.

l) The term "person" includes any one or more individuals, organized groups of individuals, firms, or representatives of any person(s).

m) The term "PMC" includes the Program to Monitor Contractors, a copy of which is attached as Attachment No. 2 hereto.

n) The term "purchase" includes any order or contract on which any Contractor performs any work.

o) The term "service" means any service(s) performed on any good(s).

p) The terms "ship (in commerce)" and "shipment (in commerce)" include transporting, offering for transportation, shipping, delivering, or selling (in commerce) and in-

clude shipping, delivering, or selling with knowledge (or reason to believe) that shipment, delivery, or sale (in commerce) is intended.

q) The terms "(work) on goods" and "(worked) on goods" include work on other goods if the latter are not kept segregated (and, in determining whether segregation existed, the presumption in Section 15(b) of the Act will apply).

**3. PRE-CONTRACT PROCEDURES; EVALUATION OF CONTRACTORS**

a) Prior to the FIRM's entering into any particular purchase (and not less frequently than once per calendar quarter in the case of any Contractor involved on an ongoing basis in working on purchases made by the FIRM), a responsible management official of the FIRM will personally review with the owner (or a top management official) of the Contractor:

i) the terms of the attached Employer Compliance Program (called the ECP),

ii) the purposes of the ECP and this underlying ACPA,

iii) the economic feasibility of the price terms that are involved, in light of the compliance with the Act and the ECP required of the Contractor and in light of the calculations and expectations of the parties to the purchase,

iv) the Contractor's willingness and ability, in light of the Contractor's prior involvement (if any) in the industry and the extent of the Contractor's capitalization, to both fully understand and fully comply with the Act and the ECP, and

v) the obligation of the Contractor to promptly advise the FIRM that, with respect to any specific purchase, the Contractor is unable to meet the requirements of the Act, as soon as the Contractor becomes aware that that is the case; and

all topics covered by the review, including any calculations by which the economic feasibility of the price terms was evaluated, will be documented by the FIRM if any purchase is made by the FIRM, if that Contractor is involved in any way.

b) If such a review discloses an unreasonable risk that the Act and/or the ECP will not be fully understood and complied with by the Contractor, then the FIRM will not permit the Contractor to be involved in any purchase by the FIRM.

c) The provisions of this paragraph 3 apply to a decision by the FIRM regarding whether the FIRM will consent to a subcontract with respect to any purchase by the FIRM.

d) In the event that the FIRM undertakes to make purchase contracts by making formal public invitations to bid for the award of such purchases, the FIRM will include in each public invitation a reference to a bid package that communicates all the essential terms to which a Contractor would have to agree to be a successful bidder and its availability for inspection by any person or firm interested in good faith in bidding and apparently qualified to do so; and before awarding any purchase to the apparently successful bidder, the FIRM will comply with all the provisions of this paragraph 3 with that bidder.

**4. EMPLOYER COMPLIANCE PROGRAM FOR CONTRACTORS; MONITORING CONTRACTOR COMPLIANCE**

a) Whenever the FIRM makes any purchase from a Contractor, the purchase will be in writing and include all the essential terms and conditions of the transaction, including specifying that (as a condition of the purchase) the Contractor must (with respect to all the goods involved) comply with all the undertakings specified in the ECP.

b) The FIRM will require the Contractor to sign an ECP prior to the start of any work by the Contractor on the purchase; but this may be accomplished by an appropriate reference to the ECP in a purchase order where the particular Contractor already has a signed ECP with the FIRM on an ongoing basis.

c) The FIRM will furnish to each Contractor (on the occurrence of the Contractor's first involvement with work subject to this ACPA) a copy of such informational materials regarding compliance with the Act as the DOL may prescribe from time to time. In doing so, the DOL will furnish to the FIRM a copy of the materials, on request.

d) Except as provided in subparagraph (e) of this paragraph 4, the FIRM will monitor and enforce full compliance with the Act and the ECP by all Contractors in all activities connected with any purchase by the FIRM, by using all reasonable measures (including all those specified in the attached Program to Monitor Compliance (called the PMC)).

e) A Contractor performing no cutting, sewing, or finishing may be excluded from monitoring required by the PMC if the Contractor enterprise's annual dollar volume of sales made or business done (measured in accordance with Sections 3(r) and 3(s) of the Act) exceeds one million dollars, unless the FIRM is notified in writing by DOL that such monitoring of the Contractor is to be done; provided however that to use the exclusion, the FIRM must in each instance notify the DOL in writing in advance (and annually thereafter) of the name, actual business address,

and approximate annual dollar volume of each Contractor that it excludes.

f) Periodically, not less frequently than once in each four-calendar-quarter period (unless the DOL approves in writing a lesser frequency), the FIRM will provide training:

i) for all Contractors working on purchases by the FIRM, regarding how to comply with the Act and the ECP, and

ii) for those conducting monitoring activities on its behalf, regarding how to meet the monitoring requirements of this ACPA, including the attached PMC; and

all such training will be of types that are provided, sponsored, or otherwise approved by the DOL.

**5. RECORDS TO BE KEPT BY FIRM; REPORTS TO BE MADE BY FIRM**

a) On each purchase by the FIRM, it will supply a copy of the contract or order to the Contractor at the initiation of the purchase; and it will keep a copy in its own records.

b) The FIRM will make, keep, and preserve records on each purchase, including all the following:

i) the nature and extent of the FIRM's activities to monitor and enforce compliance with the Act and the ECP by each Contractor,

ii) all the findings made by the FIRM in the course of doing so (irrespective of whether the finding is a violation finding or a no-violation finding) regarding each Contractor,

iii) the basis of each finding, separately for each Contractor, and

iv) all records required by the PMC.

c) The FIRM will make, keep, and preserve records on each Contractor that identify each purchase made by the FIRM involving that Contractor if:

i) the Contractor is listed in the paragraph A (if any) at the beginning of this ACPA,

ii) work on the purchase is not yet completed when this ACPA is executed, or

iii) the purchase is made after this ACPA is executed.

d) Records required by this paragraph 5 need not be kept by the FIRM in any particular form or format; but they will be kept by the FIRM so that they are readily retrievable by the FIRM by reference to the name of the Contractor in each instance and also by reference to the particular goods involved (by the lot number, size, or other identifying criteria customarily used to identify particular goods in process or already shipped) in the event of any violation finding by the FIRM with respect to those goods.

e) Records required by this ACPA to be made or kept will be preserved for a period of 12 months after completion of all work on the purchase (36 months after such completion if the FIRM finds (or is notified, prior to the expiration of the 12 months, by the DOL in writing that the DOL has found) any violation of the Act by the Contractor with respect to that (or any other) purchase in which the Contractor was or is involved).

f) The FIRM will make available to the DOL all records required by this ACPA to be made, kept, or preserved by the FIRM, for inspection and\or copying by the DOL when the DOL requests the FIRM to do so; and the FIRM will make such reports in writing to the DOL from such records as the DOL may request from time to time.

g) Not less frequently than semiannually, the FIRM will submit to the DOL a written report documenting all its monitoring activities during the semiannual period preceding submission of the report, the problems found, and the steps implemented to remedy those problems; and the first such report will be submitted no later than six months after execution of this ACPA and will cover the entire period since execution of this ACPA. Although no particular form or format is required for such reports, DOL will furnish a sample format, on request.

h) A copy of any annual report of the results of the DOL investigations of Contractor firms in the area covered by the District Office (of the DOL's Wage & Hour Division) referred to below that is prepared by the DOL and available under the Freedom of Information Act will be furnished promptly to the FIRM by DOL, without awaiting a request by the FIRM.

**6. CONTRACTOR VIOLATIONS; USE OF PAYROLL-REPORTING PROCESS**

a) Whenever the FIRM finds that a Contractor subject to an ECP has failed to comply fully with the Act regarding any purchase by the FIRM, the FIRM will notify the DOL and (if requested to do so by the DOL) require that the Contractor submit to the FIRM each workweek (for a period of up to twelve months from the date of the finding) a report to the FIRM covering the particular purchase involved in that finding and any other purchase(s) by the FIRM in which the Contractor is involved. Each report will be due within five business days of the regularly-scheduled payday for the workweek and will include:

i) a copy of the full payroll for the workweek,

ii) a certification by the Contractor (by either its owner or top management personally, under penalty of perjury) that said copy accurately shows for each employee of the Contractor the employee's name, social security number, home address, home phone number (if any), and all information required by the ECP to appear on the employee's checkstub,

iii) a copy of each employee's checkstub (or, at the option of the Contractor if the latter maintains a payroll journal that constitutes a carbon copy of the checkstub, a copy of the portion of the payroll journal that covers said workweek), and

iv) a copy of each employee's payroll check.

b) A copy of the entire report from the Contractor will be sent by the FIRM to the DOL for each workweek, to the extent that the DOL requests the FIRM to do so, from time to time.

c) The FIRM may decline to impose the payroll-reporting measures specified in this paragraph 6, if all of the following conditions are met by the Contractor: there are no willful violations of the Act, there have been no prior violations of the Act (that are known to the FIRM or of which the FIRM has been notified by the DOL in writing), the resulting underpayments do not (for any given workweek) exceed $500.00 or 10 percent of the Contractor payroll (whichever is less) on purchases by the FIRM, the resulting underpayments are paid in full by the Contractor promptly on demand, and there are no omissions or inaccuracies in any of the records required to be kept by the Contractor under the Act that were known to the Contractor (or any responsible official of the Contractor) and were of a nature that might have impaired or impeded the ability of the FIRM and/or the DOL to determine whether the provisions of Sections 6 and/or 7 of the Act were being fully complied with by the Contractor.

7. SCOPE OF APPLICABILITY OF MEASURES REGARDING OWNERS/MANAGERS

a) Whenever the FIRM is required under subparagraph 5(c) and\or paragraph 6 of this ACPA to implement measure(s) regarding a Contractor, the measures will also be implemented with respect to each related Contractor.

b) For purposes of this paragraph 7, a Contractor is a related Contractor whenever a substantial direct or beneficial ownership interest or managerial position is held in the allegedly related Contractor (at the time of a purchase or at any time during performance of any work thereon) by any of the following:

i) the Contractor that triggered a requirement to implement such measures, or

ii) a person or firm that (at the time of events triggering a requirement to implement such measures) held a substantial direct or beneficial ownership interest or any managerial position in the Contractor triggering the requirement to implement such measures; but

the required relatedness will not be deemed to exist where the FIRM has, after reasonable inquiry, no notice of facts that would tend to show such relatedness.

8. BACKWAGE PAYMENTS GUARANTEED BY THE FIRM

a) The FIRM will make payments to the DOL in an amount sufficient to enable the DOL to allocate and disburse monies to the employees of Contractors (or, at the option of the FIRM if authorized by the DOL, to enable the FIRM to do so directly to the employees of the Contractors) in amounts sufficient to compensate the employees for back wages due to them under the Act from the Contractor, as follows:

i) With respect to the Contractors that are listed in the Attachment No. 3 (if any) hereto: to the extent an employing Contractor fails to do so no later than 30 days after execution of this ACPA, the FIRM will (no later than 60 days after execution of this ACPA) pay such an amount with respect to the Contractors so listed in the Attachment No. 3 (if any) hereto for the period and in the amount specified (if any) in said Attachment No. 3 (if any) for each Contractor (as computed by the DOL in each instance), in recognition of the fact that in each instance employees of the Contractor during said period did work on goods for shipment on purchases made by the FIRM.

ii) With respect to any act or omission by a Contractor that constitutes a violation of Section 6 and/or 7 of the Act with respect to work on goods that the FIRM ships during the term of this ACPA: to the extent that an employing Contractor fails to do so no later than 30 days after demand by the FIRM or the DOL, the FIRM will (no later than 60 days after such demand) pay an amount equal to the back wages due to the employees of the Contractor under Sections 6 and/or 7 of the Act for work on goods performed by any employee in any workweek in which that employee worked on goods for shipment on purchases made by the FIRM, determined as specified in this

ACPA.

b) The FIRM's obligation to make payments in amounts sufficient to fund the backwage payments referred to in this paragraph 8 is in each instance subject to the following qualifications:

i) Any amounts paid to the DOL by the FIRM pursuant to this paragraph 8 but not disbursed (within 180 days of the payment to the DOL by the FIRM or final resolution of the amounts due (including any court challenge to a DOL determination) as specified in this ACPA, whichever occurs later) to a person eligible therefor will be returned to the FIRM, except to the extent that the DOL determines that it was unable to so disburse because of a Contractor's failure to comply with the recordkeeping regulations under the Act with respect to adequate identifying and locating information regarding employees.

ii) In the event that one or more customer firms (in addition to the FIRM) of the Contractor pay funds to the DOL to be used for the payment of backwage amounts due to employees of the Contractor for any work performed by the same employees in the same workweeks, a reduction and/or refund in the amount payable to the DOL by the FIRM under this paragraph 8 will be made where necessary to avoid excess backwage disbursements to the employees.

c) The obligation of the FIRM to make payments called for by this paragraph 8 will, with respect to any back wages that have accrued prior to execution of this ACPA or may accrue after execution (but prior to termination) of this APCA, survive termination of this ACPA.

d) Making a backwage payment under this ACPA does not constitute supervision by the DOL for purposes of Section 16 of the Act, absent DOL's express approval in writing to that effect in each instance, obtained in advance of the payment to affected employees.

e) Neither the DOL's approval of backwage amounts or payments nor this ACPA itself constitutes DOL approval for a shipment in commerce of goods produced in violation of Section 6 and/or 7 of the Act, except to the extent expressly provided for in paragraph 9 of this ACPA.

<u>9. PROCESS FOR REMEDIATING CONTRACTOR VIOLATIONS</u>

a) Whenever the FIRM finds any act or omission by a Contractor that violates Sections 6 and/or 7 of the Act with respect to any work on any goods that the FIRM has shipped during the term of this ACPA or will ship during the term of this ACPA, the FIRM will immediately

i) suspend all shipment of goods affected by such violations until all such violations affecting the goods have been remediated in accordance with subparagraph (a)(ii) of this paragraph 9; and

ii) cause, in accordance with the applicable provisions of paragraph 8 of this ACPA, the payment of all unpaid back wages resulting from any violations of Section 6 and/or 7 of the Act by the Contractor (with respect to any work on said goods or other such goods of the FIRM during the term of this ACPA) and do so in an amount approved by DOL (or post funds with the DOL in an amount approved by the DOL, for disposition in accordance with this paragraph 9).

b) Upon complying with the provisions of subparagraph (a) of this paragraph 9, the FIRM may then ship the affected goods, without the DOL seeking further relief against, or criminal prosecution of, the FIRM for the shipment of said goods by virtue of the work on the goods by employees of the Contractor during the term of this ACPA, notwithstanding any possible violation of Section 15(a)(1) of the Act by the FIRM for such shipment by virtue of such work on such goods by employees of the Contractor, so long as the FIRM is in substantial compliance with the provisions of this ACPA during the term of this ACPA and is in full compliance with the provisions of this ACPA guaranteeing the payment of back wages.

c) On each occasion of the type referred to in subparagraph (a) of this paragraph 9, the DOL and the FIRM will attempt to reach an agreement on the total amount to be paid to the affected employees under this paragraph 9; but absent prompt agreement, the DOL will promptly notify the FIRM in writing of the total amount of funds to be posted with the DOL under subparagraph (a)(ii) of this paragraph 9. If a final agreement on the total amount to be paid to affected employees has not been reached within 60 days thereafter, the DOL will issue a written determination of the total amount to be paid by the FIRM. Said determination will constitute the final agency action as to said amount, that will be subject to review (as to the amount of said total amount only, not as to the obligation of the FIRM under this ACPA to pay) in a U.S. District Court of competent jurisdiction, at the instance of the FIRM, under the arbitrary and capricious standard in the Administrative Procedure Act; and, in the absence of a decision by the court (within 60 days of DOL's

.etermination or such longer period as may be .rdered by the court prior to expiration of aid 60 days) overturning DOL's determination s arbitrary and capricious, the DOL (as the gency charged with the responsibility to en- orce the Act) is authorized by this ACPA to llocate and disburse to affected employees as determined by the DOL) the total amount tated in said determination (including using ny funds so posted, to the extent that they re sufficient for that purpose). Said total mount will be the backwage amount that the IRM is obligated to cause to be paid under ubparagraph (a)(ii) of this paragraph 5.

d) Payment of remediation, in accordance ith subparagraph (a)(ii) of this paragraph , with respect to the employees of a named ontractor with respect to alleged violations f Section 6 and\or 7 of the Act by that Con- ractor at a specified establishment for a pecified period (during the term of this CPA) will free the FIRM of any obligation nder this ACPA to pay any additional reme- iation with respect to any alleged viola- ions of Section 6 and\or 7 of the Act by hat Contractor at that establishment during hat period.

e) In the event that the DOL notifies any etailer or other downstream customer of the IRM of any allegedly "hot" goods having been old or shipped by the FIRM to the customer, irectly or indirectly, the DOL will also in- orm that customer of any remediation action aken by the FIRM pursuant to the provisions aragraphs 8 and 9 of this ACPA, to the ex- ent then known to the DOL.

). POTENTIAL LITIGATION; IMPACT OF THIS REEMENT

a) While this ACPA is in effect, the DOL ill not initiate litigation against the FIRM enjoin any violations of Section 15(a)(1) the Act with respect to any violations in- olved in any purchase(s) by the FIRM, unless e DOL first gives the FIRM notice in writ- g and affords to the FIRM an opportunity to et and confer with the DOL with respect to ether litigation is necessary or appropri- e. However, such notice and opportunity-to- et-and-confer processes will not apply if e DOL reasonably concludes that:

i) the FIRM has willfully violated Sec- tion 15(a)(1) of the Act and/or this ACPA, or

ii) such a violation is imminent and cannot be prevented by the DOL unless such litigation is initiated.

b) Any violations of this ACPA, as well as y violations of the Act, may be relied upon any such litigation at any time. In re- sponse, however, the FIRM may show whether the violations (if any) were insubstantial in nature and extent and may show the steps taken by the FIRM to avoid and remedy them; and, in doing so, the FIRM will (as to any events occurring during the term of this ACPA) be entitled to a rebuttable presumption that the FIRM took "all reasonable steps," within the meaning of subparagraph (b) of paragraph 1 of this ACPA, if the FIRM shows that it substantially complied with all the steps called for by this ACPA.

c) The activities that the FIRM undertakes by this ACPA to engage in are subject to en- forcement by specific performance during the term of this ACPA at the instance of the DOL, in addition to any of the other rights or remedies available to the DOL not inconsis- tent with the terms of this ACPA; but the FIRM reserves the right to cease at any time doing business, direct or indirect, with any Contractor.

d) The DOL will not seek injunctive relief against, or criminal prosecution of, the FIRM for any alleged violation(s) of the provi- sions of Section 15(a)(1) of the Act that

i) predate execution of this ACPA, or

ii) occur during the term of this ACPA,

and

arise out of acts or omissions of any Con- tractor in violation of Section 6 and/or 7 of the Act, provided that the FIRM remains dur- ing the term of this ACPA in substantial com- pliance with this ACPA and remains in full compliance with paragraphs 8 and 9 of this ACPA.

e) Nothing done or to be done by the FIRM pursuant to the express terms of this ACPA will be interpreted by the DOL as constitut- ing a violation of the Act by the FIRM during the term of this ACPA nor as sufficient, in and of themselves, to make the FIRM an em- ployer or joint employer of any employee of any Contractor for purposes of the Act during the term of this ACPA.

11. INITIAL IMPLEMENTATION OF THIS AGREEMENT

a) This ACPA will be fully implemented in accordance with its terms no later than 60 days after execution, except as is otherwise specified in this paragraph 11.

b) In the event that the FIRM has at work on goods of the FIRM (at the time of execu- tion of this ACPA) more than 50 Contractors and\or more than 1,000 Contractor employees, the implementation of the monitoring provi- sions of this ACPA may (at the option of the FIRM) be phased in over a period longer than 60 days, as further specified by subpara- graphs (c) and (d) of this paragraph 11.

c) Contractors that are at work on goods of the FIRM at the time of execution (or any time within 60 days prior to execution) of this ACPA will be brought within the monitoring provisions of this ACPA, as follows: 50 such Contractors or a sufficient number of such Contractors to account, in the aggregate, for 1,000 employees (to whom the monitoring provisions of this ACPA are applicable), whichever number of Contractors is greater, will be brought under the monitoring provisions of this ACPA during the first 60 days following execution and during each 30 days thereafter until all of such Contractors have been brought under said provisions, with all such Contractors to have been brought under said provisions no later than 120 days following execution; and, within five days after the start of each such portion of the phase-in period, the FIRM will provide to the DOL in writing a list of all such Contractors to be covered by that portion of the phase-in period.

d) Neither heightened monitoring under the PMC nor imposition of special payroll-reporting processes (as provided for in paragraph 6 of this ACPA) will be required on the basis of any non-willful violations of the Act found by the FIRM to have been committed by a Contractor in the phase-in period (or portion thereof applicable to that Contractor under subparagraph (c) of this paragraph 11) so long as the FIRM conducts additional monitoring, within 30 days, that discloses that no violations of the Act and\or the ECP have taken place since the monitoring resulting in that violation finding.

e) Notwithstanding any other provision of this paragraph 11: whenever a Contractor listed in the paragraph A (if any) at the start of this ACPA is involved in any existing or future (in the 12-month period after the DOL violation finding triggering that listing) purchase by the FIRM, the FIRM will immediately utilize, with respect to that Contractor, at least the intermediate-intensity monitoring provided for in the PMC until no fewer than two consecutive monitoring visits by the FIRM required by the PMC verify full correction continuously throughout a 180-day period since the problem was (at any time and by any means) last noted; and the monitoring will be continued thereafter as in the case of any other Contractor, at an intermediate or high-intensity level if monitoring conducted during that period so indicates under the criteria set forth in the PMC for determining the intensity of monitoring.

12. DURATION AND TERMINATION OF THE AGREEMENT

a) This ACPA is effective upon execution.

b) This ACPA will remain in effect for 60 days from execution or until it is terminated (by the DOL or the FIRM), whichever occurs later. Any such termination must be in writing by certified mail, return receipt requested, to the other party to this ACPA; and any such termination will take effect ten days after such notice is so mailed or such later date as is specified in the termination notice itself.

c) This ACPA can be modified only in writing and only in a writing that undertakes by its express terms to modify this ACPA and is signed by the parties to this ACPA.

d) If the execution of this ACPA is accomplished by the execution of a Memorandum of Agreement that agrees to this ACPA by reference (with or without modifications and\or clarifications), the Memorandum of Agreement will be subject to the termination provisions of this ACPA; and a termination (of this ACPA according to its terms) will also have the same effect on the Memorandum of Agreement.

13. NOTICES BETWEEN THE PARTIES

a) Whenever this ACPA (inclusive of any attachment(s)) requires notice by a party to this ACPA to the other party to this ACPA in writing, the notice will be sent or delivered to the address furnished by the addressee party at the time of the execution of this ACPA by the addressee party (or such other address as the addressee party may thereafter designate for such purposes by giving written notice thereof to the other party to this ACPA in writing by certified mail, return receipt requested).

b) A notice to a party to this ACPA is deemed received if it is actually received or a certified mail return receipt indicating receipt is executed at said address.

# Attachment No.1: EMPLOYER COMPLIANCE PROGRAM

[ECP(AM).6]

The signatory firm (called the Contractor) and ______________________ (called the FIRM) hereby agree as follows:

**1. PURPOSE, SCOPE, & APPLICABILITY OF EMPLOYER COMPLIANCE PROGRAM**

a) This document is an Employer Compliance Program (called an ECP). It is designed to help ensure compliance with the Fair Labor Standards Act (called the Act), a federal law.

b) Among other things, the Act prohibits any person or firm from transporting, offering for transportation, shipping, delivering, or selling in interstate or foreign commerce (called commerce) any goods produced in violation of the minimum wage and/or overtime pay provisions of the Act. The Act also prohibits shipping, delivering, or selling such goods with knowledge (or reason to believe) that anyone else intends to ship, deliver, or sell them in commerce.

c) To help ensure that the FIRM fully complies with these provisions of the Act, the FIRM and the U.S. Department of Labor (called the DOL) entered into an agreement. Under the terms of that agreement, the FIRM requires compliance with this ECP by each person or firm from which the FIRM makes, directly or indirectly, any purchase of any goods and/or services (to be performed on any goods); and any such purchase is called a purchase in this ECP.

d) Compliance with this ECP by each Contractor is an express condition of any purchase; and any person or firm from which any purchase is made, directly or indirectly, is a Contractor.

e) The signatory firm is a Contractor, by virtue of such a purchase by the FIRM. This ECP is a part of the contract for that purchase, regardless of whether the contract has been reduced to writing in any other way.

f) The Contractor agrees to fully comply with this ECP as a condition of each purchase that the FIRM makes from the Contractor or in which the Contractor is involved, directly or indirectly, even if no ECP is signed by any Contractor regarding the particular purchase.

g) The Contractor agrees to comply fully with the provisions of the Act, as interpreted by DOL; and its compliance with this ECP will be tested in that light.

**2. MINIMUM WAGE COMPLIANCE**

a) The Contractor will comply fully with all the requirements of the minimum wage provisions of the Act, including those explained below in this paragraph 2.

b) In any given workweek, the total gross pay of an employee must not be less than the total number of hours worked by the employee multiplied by the federal minimum wage in effect during the workweek in which the work is performed by the employee. The current federal minimum wage, as of the date this ECP form was prepared, is $4.25 per hour.

c) The minimum wage provisions of the Act apply to employees paid (in whole or in part) on the basis of piecework earnings. If the total earnings do not equal (or exceed) the number of hours worked in a workweek multiplied by the federal minimum wage, then the difference must be paid to the employee in addition to the other earnings.

d) The minimum wage provisions of the Act apply to each workweek separately. Earnings from one workweek cannot be used to meet the minimum wage requirements for any other workweek; nor can earnings be averaged over a period longer than a workweek for purposes of determining whether minimum wage requirements have been met.

**3. OVERTIME PAY COMPLIANCE**

a) The Contractor will comply fully with all the requirements of the overtime pay provisions of the Act, including those explained below in this paragraph 3.

b) Each employee must be compensated for each hour worked in excess of 40 hours in any workweek at a rate not less than one and one-half times that employee's regular rate of pay.

c) An employee's regular rate of pay cannot lawfully be lower than the federal minimum wage rate (nor can it be lower than any other minimum rate required by law, such as a State law).

d) The overtime pay provisions apply to employees paid (in whole or in part) on the basis of piecework earnings. An employee paid piecework earnings must be paid extra pay when the employee works in excess of 40 hours in a workweek. Generally, the extra pay must be computed as follows: divide the employee's total piecework earnings by the total hours worked by the employee in the workweek to

compute the employee's regular rate for the workweek, and the employee is due one half of this regular rate of pay for each hour worked in excess of 40 hours in the workweek (in addition to the piecework earnings of that employee for that workweek).

e) The overtime pay provisions apply to most employees paid (in whole or part) on the basis of a salary for all hours worked. Such an employee must be paid extra pay when the employee works in excess of 40 hours in any workweek. The extra pay due on the salary is to be computed as follows: divide the weekly salary by the total hours worked by that employee in the workweek to compute that employee's regular rate for the workweek, and the employee is due one half of this regular rate for each hour worked in excess of 40 hours in that workweek (in addition to the salary). Some States (including California) have laws requiring the extra pay to be computed at one and one-half times a rate computed by dividing the weekly salary by 40 hours.

f) The Act does not require overtime pay for the hours worked in excess of 8 hours in a workday. Some States (including California) have laws requiring overtime pay for such hours.

4. MEANING OF "HOURS WORKED"

a) The minimum wage and overtime pay provisions of the Act (as well as the Act's recordkeeping requirements) depend on the use of the term "hours worked," as interpreted by DOL. The Contractor will comply fully with this correct use of the term "hours worked" in counting, recording, and paying for the hours worked by employees, including complying with the provisions of the rest of this paragraph 4 and the provisions of paragraph 7 of this ECP.

b) All time that an employee spends actively working or otherwise gives over to the use of an employer (as in the case of being required to be present on the premises of the employer) is to be included in "hours worked" for purposes of complying with the Act and this ECP.

c) A meal break may be excluded from hours worked only if it is not less than 30 minutes in length and the employee is, in advance, completely relieved of all responsibilities and duties and performs no work during the break; but such an exclusion must be for all purposes.

d) Short breaks are hours worked and cannot be excluded from hours worked for purposes of counting, recording, or paying for hours worked by employees.

5. CHILD LABOR COMPLIANCE

a) The Contractor will comply fully with the requirements of the child labor provisions of the Act, including those explained below in this paragraph 5.

b) Generally no child under 16 years of age may work in any manufacturing establishment, including any contract sewing establishment.

c) Children between 16 and 18 years of age may not engage in any occupation determined by DOL to be particularly hazardous for them, including (but are not limited to) the following:

i) the occupation of motor vehicle driver (and the occupation of outside helper) on any public road or highway, except to the extent specifically exempted by DOL regulations;

ii) work of operating an elevator (except operating an unattended automatic-operation passenger elevator); and

iii) work of operating any high-lift truck.

d) Proof of age must be kept on file by the employer for each person under 19 years of age.

6. PAYROLL RECORDS AND POSTING OF POSTERS

a) The Contractor will make, keep, and preserve (for a period of three years from the date of the last entry in the record) complete and accurate records of the wages, hours, and other conditions and practices of employment maintained, as specified in recordkeeping regulations under the Act (found in Title 29, Code of Federal Regulations, Part 516). The Contractor hereby acknowledges receiving a copy of those regulations.

b) For each employee, a separate individual earnings record (called an IER) will be made, kept, and preserved by the Contractor. All the entries for a workweek will be on a separate line labeled with the workweek ending date, with all of the information for that workweek placed on that line in labeled columns; and the entries will match in both form and content the entries on the payroll checkstub given to that employee with that employee's payroll check for that workweek, under the provisions of paragraph 8 of this ECP. The IER will contain all the other payroll record information required by the recordkeeping regulations under the Act, in spaces thereon that are clearly labeled with the nature of the data entered in the space; and any modifications (such as any changes in the employee's hourly rate from time to time) will be accompanied by an entry showing the date that the modification became effective.

c) The Contractor will prominently post (and will permanently keep prominently posted), in each establishment of the Contractor in which any work subject to the Act is or has been performed within the preceding three calendars years, the following:

i) a copy of a current informational poster regarding the Act, designed by DOL and displaying the current telephone number of the nearest District Office of the Wage & Hour Division of DOL, in English and any other language made necessary by the presence of any employee(s) who cannot read in the English language,

ii) a copy of this ECP, including the Contractor signature on the last page, and

iii) a notice, in each of the above-referenced languages, that notifies employees of the Contractor that they can report to the FIRM, on a confidential basis, any violations of this ECP by the Contractor and that shows the name and telephone number of an authorized agent of the FIRM to whom such complaints can be reported by telephone; and

all these documents will be posted, side by side, at the spot in the establishment where the employees check in at the start of a workday, next to any timeclock.

7. COUNTING AND RECORDING HOURS WORKED; USE OF TIMECARDS AND TIMECLOCKS

a) Each employee will have his or her own separate timecard, for each workweek; and on each timecard, entries will be made as explained in this paragraph 7.

b) For each workday, the following timecard entries will be made:

i) the time of day that the employee's work activities for the workday actually begins;

ii) the time of day when any meal break (of 30 minutes or more) began, if the employee performed no duties during that break and had in advance been relieved of all duties; and the time of day when that break ended;

iii) the time of day when the employee's work activities for the workday actually ended;

iv) the total elapsed time from the time noted in subparagraph (i) to the time noted in subparagraph (iii), in this subparagraph (b) of this paragraph 7; and

v) the elapsed time specified in subparagraph (iv) less the elapsed time (if any) noted in subparagraph (ii), in this subparagraph (b) of this paragraph 7.

c) For each workweek, all of the following entries will be made on each of those timecards:

i) the total of the daily hours-worked totals; and

ii) the signature (or initials) of a person in authority, to certify for the Contractor that all of the entries on the timecard are complete and accurate, as required by this ECP.

iii) In totaling the hours worked, as recorded on a time card for an employee for a workday, the beginning time and the ending time may be rounded to the nearest quarter of an hour (so long as the use of this practice does not have the effect of failing to reflect, over a representative time period, all of the employee's hours worked).

d) All the entries on each time card that signify the time of day will be made by timeclock punches (by utilizing a tamper-proof timeclock that is to be furnished and maintained by the Contractor) subject to the procedures specified below in this paragraph 7.

e) Each employee is to perform all punching of that employee's hours worked on the timeclock, without any exceptions of any kind whatsoever.

f) If one or more punches have been mistakenly made or omitted by an employee, a correct entry will be entered in pen by the employee for each missing or incorrect punch, accompanied by the employee's clearly-readable initials and the date the employee made the correction.

g) If the Contractor (or the Contractor's authorized agent) finds that any timeclock entry or handmade entry made by the employee is not accurate, a non-obliterating line is to be drawn through the entry in pen and a corrected entry entered in pen next to it, accompanied by the clearly-readable initials of the Contractor (or the Contractor's authorized agent) who made the correction and the date that that correction was made by that person.

h) In each situation of a type referred to in subparagraph (f) and\or (g) of this paragraph 7, the following additional procedures will be followed:

i) the employee will be counseled on the importance of making timely and accurate entries on the timecards and doing so properly by properly using the timeclock (and the employee will be suitably disciplined if the employee fails to come into compliance);

ii) the employee will be consulted as to what the correct entry should have been;

iii) when the Contractor (or the Con-

tractor's authorized agent) and the employee are in agreement as to what the entry should have been, the corrected entry will be made by the employee, accompanied by the employee's clearly-readable initials and the date that the corrected entry is made by the employee; but if there is any disagreement, the corrected entry will be made by the Contractor (or the Contractor's authorized agent), accompanied by: the clearly-readable initials of the Contractor (or the Contractor's authorized agent), the date when the corrected entry is made, and an explanation by the Contractor (or the Contractor's authorized agent) regarding the nature and extent of the disagreement; and

iv) all corrected entries will be made promptly and will be made no later than the payday for the particular workweek that is involved (in the absence of extraordinary circumstances preventing promptness).

8. PAYROLL PROCESSES

a) The workweek, for purposes of complying with the Act, will end at the same time on the same day of each calendar week for all employees.

b) Each employee will be paid weekly, for all hours worked by the employee in the workweek covered by the payment.

c) The payday for any workweek for any employee will be not more than seven calendar days following the end of the workweek and will be the same day of the calendar week for all of the employees for each workweek.

d) All wages will be paid by using a payroll check and will be paid free and clear. No wages will be paid in cash or by any means other than a payroll check. In the event that any error is detected which needs to be corrected after the single payroll check for the workweek involved in that error has already been given to the employee, an additional payroll check will be issued for each of the workweeks for which a correction is to be made; and each check will be accompanied by a check stub as described in this ECP, identifying the workweek for which the correction is being made. If the number of corrections being made for a single employee on a single occasion make it impractical to issue an additional check for each workweek involved and/or correction(s) are being made more than 10 days after the regular pay day for any workweek involved, the corrections will then be treated as a backwage payment and the FIRM (plus the employee involved) will be promptly notified of all the details of the payment.

e) No payroll check will be cashed or otherwise negotiated, in whole or in part, by the Contractor or by any of its owners, officers, agents, or supervisory employees.

f) All payroll checks will be drawn on a single payroll account at a single establishment of a single bank or other financial institution (except as may be necessary from time to time to transfer all accounts of the Contractor from one such establishment to another, with the intent that that change be permanent).

g) No non-payroll transactions will be drawn on the payroll account (except as may be necessary to transfer funds not needed for payroll purposes, from time to time, directly from that account to the Contractor's general account).

h) Lawful deductions from wages, such as those made for the withholding and social security taxes (employee portion only) due on said wages and withheld from the pay of the employees, may be treated as payroll transactions for purposes of the subparagraph (g) of this paragraph 8, if consistently so treated and processed out of said payroll account regarding all employees.

9. INFORMATION TO BE ON PAYROLL CHECKSTUBS

a) Each payroll check will be accompanied by a detailed breakdown on a payroll checkstub, showing each item of information (for the particular employee for the particular workweek covered by the payment) specified in this paragraph 9.

b) Total hours worked (which is to equal the sum of the entries referred to in subparagraphs (c) and (d) of this paragraph 9).

c) Regular hours worked.

d) Overtime hours worked, if any;

e) Total gross compensation (which is to equal the sum of the entries referred to in subparagraphs (f) through (h) of this paragraph 9).

f) Gross regular-rate earnings, stating the portion attributable to each of the following:

i) the gross piecework earnings, if any,

ii) the gross make-up pay, if any, paid to bring the pay for work compensated on the basis of piecework rate(s) up to the applicable minimum wage rate for the workweek,

iii) the gross hourly earnings, if any, specifying the amount computed at each hourly rate (if there is more than one such rate for the employee) and identifying which hours were worked at each such rate, and

iv) other gross regular-rate earnings, if any, stating type and rate in each instance;

g) The premium-rated portion of the pay for overtime hours, if any;

h) Other gross earnings, if any, specifying type and rate in each instance;

i) Legal deductions made from the total gross earnings to arrive at total net earnings, specifying the portion which is for each of the following: federal withholding taxes; employee portion of the Social Security taxes; State withholding taxes, if any; local withholding taxes, if any; and disability income taxes, if any; and

j) Any other deductions, itemizing both the nature and amount of each one separately.

10. RESPONSIBILITY TO MONITOR COMPLIANCE

a) On an ongoing basis, the Contractor will monitor that the Act and this ECP are being fully complied with, including doing all the monitoring specified in this paragraph 10.

b) The Contractor (its principal owner or other top management official if the Contractor is an organization) will personally monitor that this ECP is fully complied with. The extent of that personal involvement will be sufficient (even if some of the monitoring required by this ECP is delegated) to ensure that no noncompliance with the Act and/or this ECP occurs.

c) The monitoring will be done by the Contractor in accordance with a schedule of daily, weekly, and monthly checks that include all the measures specified in this paragraph 10.

d) On a no-less-than-once-a-day basis, the Contractor will do all of the following monitoring:

i) check, with respect to each person, that all of the employees present have punched the timeclock and that no person is underage or doing any work without being on the payroll.

ii) check, with respect to all employees in general, whether (near the start of the workday) the number of timecards that are punched in matches the number of employees present and whether (near the end of the workday) the number of timecards that are still punched in matches the number of employees who are still present.

iii) check further (on the occasion of any monitoring) whenever any discrepancies are found by use of any technique, to determine the full extent of the discrepancies.

e) On a no-less-than-once-a-week basis, the Contractor will do all of the following monitoring:

i) check, with respect to each employee, that the timeclock has been properly used to record all hours worked (and, if not, check that the employee was correctly counseled and that correct procedures were used to correct the missed or incorrect timecard punches).

ii) check, with respect to all employees (by checking a random sample), whether the hours worked recorded on the time cards have been correctly totaled and whether each component of the total gross pay (including the computation of piecework earnings, if the employee is paid in whole or in part on a piecework basis) has been correctly computed.

iii) check further (on the occasion of any monitoring) whenever any discrepancies are found by use of any technique, to determine the full extent of the discrepancies.

f) On a no-less-than-once-a-month basis, the Contractor will do all of the following monitoring:

i) check, with respect to each employee, whether hours worked and wages paid were correct in the opinion of the employee (by asking the employee personally) and whether the methodology used to compute the wages paid the employee is correct.

ii) checking, with respect to all employees generally (by checking a random sample), whether the methodology used to compute the wages paid the employee is correct.

iii) check further (on the occasion of any monitoring) whenever any discrepancies are found by use of any technique, to determine the full extent of the discrepancies.

g) Whenever a problem is detected, prompt corrective action will be taken; and a heightened state of monitoring of the problem areas will be used by the Contractor for as long as necessary to verify that the corrective actions taken have eliminated all the problems.

h) The Contractor will make, keep, and preserve complete and detailed records of all monitoring activities, conducted to comply with this ECP or otherwise. Such records will, at a minimum, detail the nature and extent of each of the following:

i) the date and extent of each monitoring activity that was conducted,

ii) the name and position of the person who did the actual monitoring,

iii) the nature and extent of any dis-

crepancies or other problems noted,

iv) the details of each corrective action taken to correct each problem that was noted,

v) the heightened monitoring to be implemented and continued until additional monitoring confirms that the corrective actions have eliminated all of the problems, and

vi) the details of the heightened monitoring actually conducted; and

all of the records required by this subparagraph (h) will be retained for at least one year.

**11. DUTY TO COOPERATE WITH FIRM'S MONITORING**

a) The Contractor will cooperate fully with all efforts by the FIRM (or its duly-authorized agents) to monitor whether the Contractor is fully complying with the Act and this ECP, including keeping the FIRM fully informed at all times as to where any and all work subject to this ECP is being performed.

b) To help ensure such monitoring is effective, the Contractor will allow (on demand and without any prior notice or other limitations) any agent of the FIRM or DOL to have full and immediate access to any premises, any records (including the right to copy the records), and any employees (including the right to privately interview each employee) that are (or may be or may have been) relevant to determining compliance with the Act and/or this ECP by the Contractor at any time.

c) The Contractor will supply certified copies of records of the Contractor as demanded by the FIRM pursuant to any agreement between the FIRM and the DOL.

**12. REQUIRED NOTICES OF UNPROFITABILITY**

a) If at any time it appears to the Contractor that, due to the price terms, the Contractor is or will be unable to make a profit on the Contractor's participation in any purchase by the FIRM while still complying fully with the Act, as interpreted by DOL, the Contractor will immediately write to the FIRM to tell the FIRM of that fact.

b) As soon thereafter as possible, the Contractor will again write to the FIRM to report to the FIRM the Contractor's findings as to the following matters:

i) the results of a time and cost study (demonstrating the payroll costs needed to continue such participation while still complying with the Act), plus reasonable overhead, and

ii) the Contractor's own estimate of the changes in the price terms needed for the Contractor to make a profit on the continuation of such participation while still complying with the Act.

c) If more than 10 days passes after the Contractor has written to the FIRM a letter of the type referred to in subparagraph (b) of this paragraph 12 without the FIRM agreeing in writing to adjust the price terms, as proposed in that letter from the Contractor, the Contractor will notify the DOL in writing of that fact (and furnish to the DOL a copy of each of the letters on the subject on the particular purchase involved).

**13. MANNER OF CONTRACT PERFORMANCE**

a) The Contractor will comply with all regulations, restrictions, and prohibitions on the use of homework, as prescribed by DOL's homework regulations (Title 29, Code of Federal Regulations, at Part 530). Homework on women's garments is prohibited by those regulations.

b) All work on each purchase will be performed by employees of the Contractor, unless the FIRM's prior written approval has been granted for a particular subcontract. No approval will be effective until the subcontractor has agreed in writing that all of the terms and conditions of this ECP apply equally to the subcontractor and that the term Contractor as used in this ECP will be deemed to also include the subcontractor for all purposes.

c) All work performed in any establishment will be subject to this ECP if any of the work in connection with a purchase by the FIRM is done in that establishment, unless (with the prior written approval of the FIRM) the Contractor does all work on the purchase in a separate department of that establishment with a work force doing work only on that purchase (and/or on other purchases by the FIRM).

**14. CONSEQUENCES OF VIOLATIONS; READING ECP**

a) The Contractor acknowledges and agrees that any failure to fully comply with this ECP may result in the FIRM terminating all purchases from or involving the Contractor and may result in the FIRM refusing to make any further purchases from or involving the Contractor (or its owners and\or management).

b) By signing this ECP, the Contractor certifies that the Contractor has read this entire ECP and certifies that the Contractor agrees to the terms and conditions of this ECP and that the Contractor will fully comply with this ECP.

# Attachment No. 2: PROGRAM TO MONITOR CONTRACTORS

[PMC(AM).6]

**1. NAME AND PURPOSE OF DOCUMENT**

a) This document is a Program To Monitor Contractors (called PMC), for use by a shipper to help to ensure full compliance by the shipper with Section 15(a)(1) of the Fair Labor Standards Act (called the Act); and, for purposes of this PMC, the term "shipper" includes any person or firm engaging in any of the activities that are regulated by Section 15(a)(1) of the Act.

b) Section 15(a)(1) of the Act generally prohibits any person or firm from transporting, offering for transportation, shipping, delivering, or selling in interstate or foreign commerce (called commerce) any goods produced in violation of the minimum wage and/or overtime pay provisions of the Act, without regard to whether the underpaid employees are employees of that particular person or firm. It also prohibits any person or firm from shipping, delivering, or selling such goods with knowledge (or reason to believe) that any other person or firm intends to ship, deliver, or sell the goods in commerce.

c) This PMC is designed to help the executing firm (called the FIRM) to comply with all these provisions of the Act. It does so by specifying a schedule for monitoring and enforcing compliance with the minimum wage and overtime pay provisions of the Act by each person or firm from which the FIRM makes, directly or indirectly, any purchase of any goods (and/or services, to be performed on any goods); and any such purchase is called a purchase in this PMC.

**2. GENERAL SCOPE AND FREQUENCY OF MONITORING**

a) Monitoring will be conducted by the FIRM with respect to each Contractor involved in any purchase. This PMC describes the various levels of monitoring that will, at a minimum, be conducted by the FIRM. Monitoring will cover all aspects of the Contractor's compliance with the minimum wage and overtime pay provisions of the Act and with the Employer Compliance Program (called ECP), including the child labor provisions and the recordkeeping, posting, and reporting provisions.

b) Three levels of intensity of monitoring activity will be established and applied to Contractors by the FIRM, as set forth in this paragraph 2.

c) Minimum-intensity monitoring (as defined in paragraph 3 of this PMC) will be the minimum level of such monitoring from which no Contractor will be excused at any time.

d) Intermediate-intensity monitoring (as defined in paragraph 4 of this PMC) will become applicable to a Contractor if the FIRM finds (or has found) at any time any act or omission by the Contractor at any time on any purchase made by the FIRM in violation of:

i) the minimum wage and/or overtime pay provisions of the Act, or

ii) the recordkeeping requirements of the Act (or the implementing regulations at Title 29, Code of Federal Regulations, Part 516) or the ECP, if the act or omission has occurred before or may have impaired the ability of the FIRM and\or the DOL to detect violation(s) of the minimum wage and\or overtime pay provisions of the Act by the Contractor.

e) High-intensity monitoring (as defined in paragraph 5 of this PMC) will become applicable to a Contractor if:

i) the Contractor is required to comply with any certified payroll reporting procedures pursuant to any agreement between the DOL and the FIRM,

ii) the Contractor is found by the FIRM to have committed any act or omission of the types referred to in subparagraph (d) of this paragraph 2 while subject to ongoing intermediate-intensity or high-intensity monitoring, or

iii) the DOL hereafter finds that the Contractor willfully and/or repeatedly violated the minimum wage and/or overtime pay provisions of the Act (regardless of whether any direct or indirect purchase from the Contractor by the FIRM was involved in the violations found by the DOL), provided that the FIRM is notified in writing by the DOL of the DOL finding and the resulting applicability of high-intensity monitoring under this PMC.

f) Where there is an ongoing relationship between the FIRM and a Contractor, all the monitoring called for by this paragraph 2 will be ongoing and in accordance with the provisions of this PMC. Where there is no such relationship, the same will be done; but such monitoring will commence shortly after commencement of contract performance (but not before completion of a full payroll cycle or the passage of 20 days, whichever first occurs).

3. COMPONENTS OF MINIMUM-INTENSITY MONITORING

a) In all instances, minimum-intensity monitoring will include, at a minimum, all of the features specified in this paragraph 3.

b) Visits to each Contractor establishment involved in any purchase will be conducted, to check whether the Act and the ECP are being fully complied with. Such a visit will be made to each establishment at least once each 90 days (or at least once each 180 days in the case of an establishment where the FIRM's monitoring of that Contractor at that establishment in accordance with this PMC over the preceding one-year period has resulted in no violations of the Act or the ECP being noted, provided that

i) the Contractor uses a tamper-proof timeclock to record all the hours worked by each employee of the Contractor and uses a reputable independent payroll service to compute from the timecards the wages due and to prepare the paychecks (including the paystubs) to pay such wages, and

ii) the FIRM notifies the DOL in writing in advance (and annually thereafter) of the name and actual business address of each such Contractor without DOL promptly notifying the FIRM that the DOL objects to such lessening of the frequency of monitoring by the FIRM).

c) Each such visit will include both checking that is general in nature and checking to determine whether each established or potential problem previously found by the FIRM during any prior monitoring activity involving the Contractor has been fully corrected, including:

i) reviewing with the Contractor personally (and with any person to whom the Contractor has delegated any monitoring responsibilities) the provisions of the ECP and questioning the Contractor as to whether the ECP is being fully complied with, including correction of each such problem previously found,

ii) an inspection of the time and payroll records for facial compliance with the Act and the ECP, and

iii) personal interviews of 5 percent of the Contractor's workforce, but no fewer than three such employees in any event.

d) Monitoring to be done on that particular visit will be expanded to the level required for an intermediate-intensity monitoring visit (as specified in paragraph 4 of this PMC) if any reason to believe that the Contractor may not have complied in full with the Act and/or the ECP is noted.

e) The intensity of monitoring to be done thereafter on an ongoing basis will be reclassified to the intermediate-intensity level if the FIRM finds, as a result of monitoring (scheduled or unscheduled, initial or expanded), any act or omission of the types referred to in subparagraph (d) of paragraph 2 of this PMC.

f) At the conclusion of each monitoring visit, a closeout conference will be conducted, as called for in subparagraph (g) of paragraph 6 of this PMC.

4. COMPONENTS OF INTERMEDIATE-INTENSITY MONITORING

a) In all instances, intermediate-intensity monitoring will, at a minimum, include all of the features specified in this paragraph 4.

b) Visits to each Contractor establishment involved in any purchase will be conducted, to check whether the Act and the ECP are being fully complied with. Such a visit will be made to each establishment at least once each 30 days.

c) Each such visit will include both checking that is general in nature and checking to determine whether each established or potential problem previously noted by the FIRM during any prior monitoring activity has been fully corrected, including:

i) reviewing with the Contractor personally (and with any person to whom the Contractor has delegated any monitoring responsibilities) the provisions of the ECP and questioning the Contractor as to whether the ECP is being fully complied with, including correction of each such problem previously found and each problem that causes the Contractor to be subject to such heightened monitoring,

ii) an inspection of the time and payroll records for facial compliance with the Act and the ECP, including an inspection of all such records for at least one full workweek, and

iii) personal interviews of 10 percent of the Contractor's workforce, but no fewer than five such employees in any event.

d) Monitoring to be done on that particular visit will be expanded to the level required for a high-intensity monitoring visit (as specified in paragraph 5 of this PMC) if any reason to believe that the Contractor may not have complied in full with the Act and/or the ECP is noted.

e) The intensity of monitoring to be done thereafter on an ongoing basis will be reclassified to the high-intensity level if the FIRM finds, as a result of monitoring (scheduled or unscheduled, initial or expanded), any violation of the Act or the ECP.

f) Whenever a Contractor has become subject to ongoing intermediate-intensity monitoring, monitoring at that level will be continued until correction of each problem triggering the applicability of such monitoring has been verified in accordance with subparagraph (f) of paragraph 6 of this PMC.

g) At the conclusion of each monitoring visit, a closeout conference will be conducted, as called for in subparagraph (g) of paragraph 6 of this PMC.

5. COMPONENTS OF HIGH-INTENSITY MONITORING

a) In all instances, high-intensity monitoring will, at a minimum, include all of the features specified in this paragraph 5.

b) Visits to each Contractor establishment involved in any purchase will be conducted, to check whether the Act and the ECP are being fully complied with. Such a visit will be made to each establishment at least once each workweek.

c) Each such visit will include both checking that is general in nature and checking to determine whether each established or potential problem previously noted by the FIRM during any prior monitoring activity has been fully corrected, including:

i) reviewing with the Contractor personally (and with any person to whom the Contractor has delegated any monitoring responsibilities) the provisions of the ECP and questioning the Contractor as to whether the ECP is being fully complied with, including correction of each such problem previously found and each problem that causes the Contractor to be subject to such heightened monitoring;

ii) an inspection of the time and payroll records for facial compliance with the Act and the ECP, including an inspection of **all** such records for the entire period since the preceding monitoring visit called for by this PMC.

iii) personal interviews of 10 percent of the Contractor's workforce, but no fewer than ten such employees in any event.

d) Monitoring to be done on that particular visit will be expanded in intensity and scope (including employee interviews that are greater in number and scope and are sufficiently detailed to uncover both the full nature and scope of any problems) if any reason to believe that the Contractor may not have complied in full with the Act and/or the ECP is noted.

e) Whenever a Contractor has become subject to ongoing high-intensity monitoring, monitoring at that level will be continued until correction of each problem triggering the applicability of such monitoring has been verified in accordance with subparagraph (f) of paragraph 6 of this PMC.

f) At the conclusion of each monitoring visit, a closeout conference will be conducted, as called for in subparagraph (g) of paragraph 6 of this PMC.

6. INTEGRITY AND EFFECTIVENESS OF MONITORING PROCESSES

a) To help ensure that the monitoring processes called for by this PMC serve the intended purposes of this PMC, the measures specified in this paragraph 6 will be, without any exceptions, observed by the FIRM with respect to all monitoring activities.

b) All monitoring visits called for by this PMC will be conducted by unannounced visits, without any prior notice to any Contractor. Upon arrival at an establishment for such a monitoring visit, the FIRM will demand full and immediate access to any premises where any work in connection with any purchase is (or may be or may have been) being performed, immediate access (and the right to inspect and/or copy) any records that are or may be relevant to compliance with the Act and/or the ECP, and the immediate opportunity to interview privately any employee(s) who are (or may be or may have been) performing any work in connection with any purchase, for purposes of checking for full compliance with the Act and the ECP.

c) Each monitoring visit called for by this PMC will address the entire period since the preceding monitoring visit called for by this PMC or the start of the involvement of the Contractor (unless interrupted by one or more periods in excess of 180 days during which there was no such involvement) in any purchase(s), whichever is later, in addition to addressing any established or potential problem found on any prior monitoring visit (until correction of the problem has been verified in accordance with subparagraph (f) of this paragraph 6).

d) In conducting employee interviews, each interview will be conducted in private (with only the FIRM and the employee being interviewed present), each employee to be interviewed will both be selected by the FIRM and selected at random from among those affected by purchase(s), and each interview will (at a minimum) be designed and conducted to determine whether the employee has any information about the Contractor (or any sub-Contractor) that tends to show that:

i) time and payroll records are not complete and accurate as to all employees,

ii) there have been any acts or omis-

sions that violate the minimum wage, overtime pay, child labor, and/or homeworker provisions of the Act,

iii) there have been any acts or omissions that violate the ECP, or

iv) there has been any failure to correct any problems previously noted.

e) In selecting records to be reviewed by the FIRM in its monitoring activities, the selection will be made by the FIRM and will be made at random from among those affected by purchase(s) and from among those needed to verify correction of any type of problem(s) previously noted.

f) Whenever this PMC specifies that monitoring of a given intensity or type is to be conducted until correction of a problem has been verified, that monitoring will (at a minimum) be conducted until all monitoring visits by the FIRM required by this PMC (but no fewer than the two most recent such visits in any event) verify that full correction had been effected prior to the particular visit and had been continuously maintained throughout:

i) a 180-day period, if the problem involves any violation of the minimum wage and\or overtime pay provisions of the Act, or

ii) a 90-day period, if the problem is of some other type; and

the 180-day or 90-day period referred to in this subparagraph (f) is the period of that length that immediately precedes the lessening in the intensity or type of monitoring to be done thereafter.

g) The closeout conference to be held at the end of each monitoring visit called for by this PMC will, at a minimum, include all of the following with respect to each problem or potential problem that was noted as a result of that visit or was previously noted but has not been verified to have been corrected:

i) confer with the Contractor personally to get a commitment from the Contractor that the Contractor will immediately take effective corrective action to eliminate the problem, and

ii) make notes of the problem and the promised corrective action, so that appropriate follow-up action can be taken (including follow-up action at the time of the next monitoring visit).

h) Whenever a Contractor is required to comply with certified payroll-reporting procedures pursuant to any agreement between the FIRM and the DOL, the FIRM will, each pay period, verify receipt of the report and review it for any indications that the Contractor may not be complying fully with the Act and the ECP, so that the results of the review can be considered in conducting monitoring of the Contractor (including scheduling monitoring).

7. RECORDKEEPING REGARDING MONITORING

a) The FIRM will (separately for each Contractor) make, keep, and preserve detailed records of all monitoring activity conducted by the FIRM, problems found, corrective action and heightened monitoring to be undertaken by the Contractor(s) as to each, and heightened monitoring to be conducted by the FIRM to verify that corrective action is taken by each Contractor and that it is effective in eliminating each problem.

b) All such records will, on demand, be made available to the DOL by the FIRM, for inspection and copying by the DOL.

# EXHIBIT B

2215/1 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
FEN X. CHEN, QIU CHEN, YU ZHENG, CHAI CHEN, DANG ZHENG, HUA CHEN, YONG CHEN, KUN HUANG, and QI LIU,

Plaintiffs,

-against-

STREET BEAT SPORTSWEAR, INC., ALBERT PAPOUCHADO, MICHEL AMAR, JIAN WEN LIANG a.k.a. RAYMOND LIANG, FEN CHEN a.k.a. HUA FEN CHEN, LUN WEI FAN, 1A FASHIONS INC., and RED ARROW INC.

Defendants.
-----------------------------------------------------------X

01 Civ. 0792 (ILG) (RML)

**AMENDED**
**COMPLAINT**

PRELIMINARY STATEMENT

1. This is an action to obtain wages rightfully owed Plaintiffs under federal and state labor laws and under common law. At various time in the last few years, Plaintiffs worked for defendants often averaging 100 hours or more of work per week and were never paid overtime. Two of the Plaintiffs were even asked to work without pay. When they refused and complained, these Plaintiffs were fired in retaliation and false charges were filed with the police against one of them.

JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. In addition, the Court has

5/18/01

jurisdiction over Plaintiffs' claims under the Fair Labor Standards Act pursuant to 29 U.S.C. §216(b). Plaintiffs have consented in writing to become parties to this lawsuit.

3. Venue is vested in the Eastern District of New York pursuant to 28 U.S.C. § 1391 (a) as substantial part of the events giving rise to the claims occurred in this district.

PARTIES

4. Plaintiffs FEN X. CHEN, QUI CHEN, YU ZHENG, CHAI CHEN, DANG ZHENG, HUA CHEN, YONG CHEN, KUN HUANG, and QI LIU are garment workers who worked for the Defendants. The Chens are not related to Defendant Fen Chen.

5. Defendants 1A FASHIONS INC. and RED ARROW INC. are garment factories owned and/or operated as an "enterprise" by Defendants JIAN WEN LIANG a.k.a. RAYMOND LIANG, FEN CHEN a.k.a. HUA FEN CHEN, and LUN WEI FAN along with other unnamed garment factories. These defendant factories and the other factories in the enterprise have gone through several corporate names and several addresses over the past several years, but have remained essentially the same, employing many of same employees, using the much of same equipment and doing work for Defendant Street Beat Sportswear, Inc. The earlier corporate names included Hua Great Procetech, Inc., Covello, Inc., XMG Fashion, Inc., New Port Fashions, Inc., Kam Fai Fashion Inc., and CCY New Worktech, Inc. More recently, Red Arrow Inc. has been succeeded and replaced by Hunter Fashion, Inc. and later City Garment, Inc.

6. Because of their joint operation and overlapping ownership and control, Defendants 1A Fashion Inc. and Red Arrow Inc. and other factories under the ownership or control of Defendants Liang, Chen and Fan constitute an "enterprise" as defined by the Fair Labor

Standards Act, 29 U.S.C. § 203(r).

7. Hereinafter the factory enterprises run and controlled by Jian Wen Liang, Fen Chen, and Lun Wei Fan which includes Defendants 1A Fashions Inc. and Red Arrow Inc. as well as their other corporate factories will be sometimes collectively referred to as "Factories" or "Factory Defendants."

8. Defendant STREET BEAT SPORTSWEAR, INC. is a manufacturer of women's sportswear and employs Factory Defendants to produce such sportswear. Street Beat Sportswear, Inc. was incorporated in Queens County on February 2, 1992.

9. Defendants ALBERT PAPOUCHADO and MICHEL AMAR are officers and owners of Defendant Street Beat Sportswear, Inc. They manage Defendant Street Beat Sportswear, Inc.

10. Defendant Street Beat Sportswear, Inc. and Defendants Albert Papouchado and Michel Amar are hereinafter collectively sometimes referred to as "Street Beat" or "Manufacturer Defendants."

11. Factory Defendants and Manufacturer Defendants are Plaintiffs' employers or joint employers within the meaning of the Fair Labor Standards Act.

12. Defendants are engaged in interstate commerce or the production of goods for interstate commerce.

STATEMENT OF FACTS

13. Plaintiffs are garment workers who worked for Defendants from 1996 until 2000.

(a) Fen X. Chen and Qui Chen worked as hangers from July 1999 until September 2000.

(b) Plaintiff Yu Zheng worked as a garment inspector from June 1999 until October 1999 and as a hanger from August 2000 until November 2000.

(c) Plaintiff Chai Chen worked as a button sewer from November 1998 until July 1999.

(d) Plaintiff Dang Zheng worked as a hanger and later as button sewer from June 1996 until July 1999.

(e) Plaintiff Hua Chen worked as an iron presser from August 1999 until November 1999.

(f) Plaintiff Yong Chen worked as a hanger from July 1999 until August 1999, and then again from March 2000 until August 2000.

(g) Plaintiff Kun Huang worked as a general helper from March 1997 until July 1997.

(h) Plaintiff Qi Liu worked as a garment inspector from November 1996 until July 1997.

14. On information and belief, Manufacturer Defendants provide the garment design, the sewing instructions, the textiles, the trimmings and other materials to Factory Defendants for the preparation of garments. The Factory Defendants are a fully integrated element of Street Beat's manufacturing operation.

15. Some of the Plaintiffs were paid by the piece and others by the hour.

16. During their employment with Defendants, Plaintiffs worked seven days a week with only one or two days off a year.

17. They regularly worked from early morning until late at night. Very often they worked past midnight into the next morning and after taking a short break of a few hours, would resume working.

18. For example, in one week in May 2000, Fen X. Chen and Qiu Chen hung 59,476 garments. In that week, Plaintiffs estimate that they worked 140 hours.

19. Plaintiffs and other workers at the Factories were never paid their rightful overtime wages for all their hours of work over 40 hours a week during their employment with Defendants.

20. Defendants willfully and intentionally failed to pay Plaintiffs and other workers in the Factories their lawful wages. Defendants acted maliciously and wantonly in their disregard for Plaintiffs' rights by making Plaintiffs work seven days a week and over a hundred hours of work a week without overtime pay and threatening them with the loss of their jobs if they did not comply.

21. Defendants maintained false employment records, including false time records in an effort to cover up their violations.

22. On information and belief at all times material to the complaint, each of the Factories was completely controlled and dominated by the Manufacturer Defendants, and each Defendant aided and abetted the wrongful acts of the others.

23. On information and belief, approximately 90% of the garments that the Factories prepare are produced for Manufacturer Defendants.

24. The Manufacturer Defendants knew or should have reasonably known that Plaintiffs

were not properly paid minimum wage and overtime for their work by Factory Defendants and that unlawful Sunday work was taking place.

25. Street Beat had a representative present in the Factories on an average of three times a week who among other things monitored the production and quality of Plaintiffs' work.

26. The Manufacturer Defendants had notice that these violations were likely to be present in the Factories. Street Beat had been sued previously by workers in factories run by some of the same Defendants and at some of the same locations. These same factories had been found in violation of the Fair Labor Standards Act by the United States Department of Labor. The owners of these factories including Defendant Liang had been found by the New York State Supreme Court to have fired workers in retaliation for complaints about unlawful wage and hour practices. Defendant Liang had also been found guilty of misdemeanor violations by the New York City Criminal Court for taking unlawful kick backs in violation of the New York state wage and hours law. New York Labor Law § 198-b.

27. Defendants had a duty to protect the lives, health and safety of Plaintiffs. See, New York Labor Law §200. By forcing Plaintiffs to work such long hours, Defendants violated that duty and profited from it.

28. On information and belief, the Manufacturer Defendants contracted with the Factory Defendants at prices too low and subject to conditions for delivery too onerous to allow for the payment of minimum wage and overtime pay to Plaintiffs and other employees. Plaintiffs believe that Manufacturer Defendants have similarly contracted with others at such low prices. Manufacturer Defendants profited directly through the unlawful treatment of Plaintiffs and others

working for Factory Defendants.

29. Manufacturer Defendants knew or should have known that their garments were produced by Plaintiffs and other workers in violation of the minimum wage and overtime laws, i.e. "hot goods." Thus, Manufacturer Defendants were barred from transporting or selling these garments by the Fair Labor Standards Act, 29 U.S.C. § 215 and New York Labor Law § 345(10). Nevertheless, Manufacturer Defendants continued to ship and sell such garments from the Factory Defendants and profited from doing so.

30. Manufacturer Defendants utilize the practice of contracting out the production of their garments to Factory Defendants and others similarly situated, thereby entrusting Factory Defendants with the Manufacturer Defendants' duty to exercise due care and to comply with labor law provisions and common law principles relevant to the production of garments and the treatment of workers, in part to seek to avoid compliance with labor laws and liability for violation of those laws.

31. On February 26, 1997, Manufacturer Defendants signed a "Memorandum of Agreement" [Exhibit A] with the United States Department of Labor by which the Manufacturer Defendants entered into an ongoing "Augmented Compliance Program Agreement" (the "Agreement") [form agreement attached as Exhibit B]. The Agreement imposed several duties on the Manufacturer Defendants, including but not limited to (1) the pre-contract evaluation of the economic feasibility, based on the price terms involved, of a contractor's compliance with the Fair Labor Standards Act, (2) the ongoing monitoring of contractor compliance with the Fair Labor Standards Act, and (3) in the event that violations of the Fair Labor Standards Act by a

contractor are detected by the Manufacturer Defendants, a suspension of shipment of all goods affected by said violations and payment of all unpaid back wages. On information and belief, the Manufacturer Defendants breached this contract.

32. On information and belief, each of the Defendants was the agent, employee and/or joint venture partner of, or was working in concert with the co-defendants and was acting within the course and scope of such agency, employment and/or joint venture or concerted activity. To the extent that said conduct or omissions were perpetrated by certain defendants, the other defendant or defendants confirmed or ratified such conduct and omissions.

SECTION 216(b) "CLASS" CLAIMS

33. Manufacturer Defendants employ other workers in other factories in New York City under the same or similar circumstances as are found in the Factories. Manufacturer Defendants provide these factories with the large majority of work done in these factories and dominate and control these factories and their owners. Manufacturer Defendants are the joint employers of the workers in these other factories. On information and belief, the workers in these factories are not paid overtime pay.

34. Pursuant to 20 U.S.C. § 216(b), Plaintiffs seek to represent all similarly situated workers in factories in New York City that make garments Street Beat and where Street Beat is a joint employer.

RETALIATION

35. On Sunday, September 24, 2000, Defendant Lun Wei Fan directed the Plaintiffs Fen X. Chen and Qui Chen along with a third worker to move the garments that they had previously

hung to the basement for shipping to the manufacturer. This was not part of the Chen's job, and they were not to be paid for this work. This job is usually done by as many as four men and requires a full day because the garments must be moved, and then re-hung on rolling carriers.

36. Plaintiffs Fen X. Chen and Qui Chen complained that this was not their work and wanted to continue hanging the lot of garments that they were working on and for which they would be paid. Defendant Fan said that they could either do this unpaid work or be fired. Plaintiff Fen X. Chen responded that they would complete their work on the lot of garments they had begun, and then after being paid for that work plus the work that they had done the prior three weeks, they would leave. The Plaintiffs are paid on a Wednesday to Wednesday basis, but Factory Defendants had a two week lag in payments such that on Wednesday, Plaintiffs and other employees were paid for work that had begun three weeks earlier. The Chens continued to work hanging garments on Monday and Tuesday. On Wednesday, September 26, 2000, when Plaintiff Fen X. Chen returned from lunch, he was met by the police who arrested him based on false assault charges made by Defendant Fan.

FALSE ARREST

37. On or about September 24, 2000, Plaintiff Fen X. Chen was in a dispute about the size of the button holes in the garments with Bi Wu Wu, a button sewer,. Plaintiff Fen X. Chen believed that Bi Wu Wu was making the button holes too small, at the direction of Defendant Lun Wei Fan, in order to slow down Fen X. Chen in his employment duties.

38. During this dispute, Bi Wu Wu picked up a chair and threatened Plaintiff Fen X. Chen. Plaintiff Fen X. Chen, in an effort to defend himself, picked up a small bottle of sauce.

39. There was no physical contact between Bi Wu Wu and Plaintiff Fen X. Chen.

40. Defendant Lun Wei Fan directed Bi Wu Wu to complain about Plaintiff Fen X. Chen's actions to police officers of the City of New York and to represent to those officers that Plaintiff Fen X. Chen had hit Bi Wu Wu with the bottle. Defendant Lun Wei Fan and Bi Wu Wu were both aware that this representation was false.

41. On or about September 25, 2000, Bi Wu Wu and Defendant Lun Wei Fan, accompanied by a Street Beat quality control employee, complained to police officers of the City of New York, accusing Plaintiff Fen X. Chen of having committed the crimes of assault in the third degree, menacing in the second degree, harassment in the second degree, and criminal possession of a weapon in the fourth degree under the laws of the State of New York. These accusations included false statements of fact including the statement, made by Bi Wu Wu at the direction of Defendant Lun Wei Fan, that Plaintiff Fen X. Chen had struck Bi Wu Wu with a bottle, and a statement by Defendant Lun Wei Fan that Plaintiff Fen X. Chen had threatened Defendant Lun Wei Fan.

42. On or about September 26, 2000, at approximately 2:00 p.m., these police officers arrested Plaintiff Fen X. Chen, and restrained him of his liberty until he was discharged.

43. The police officers arrested Plaintiff Fen X. Chen based upon the false charges cited above, and upon the request, counsel, command and procurement of Defendant Lun Wei Fan.

44. In doing all the acts and things aforesaid, Defendant Lun Wei Fan acted willfully and maliciously.

45. After having been arrested, Plaintiff Fen X. Chen was held in custody and restrained

of his liberty for approximately twelve hours. While under arrest and deprived of his liberty, Plaintiff Fen X. Chen was taken to a police station, finger printed, and "booked." Plaintiff Fen X. Chen's name and pedigree were entered on the police records according to the police practice on the arrest of criminals, and a charge was entered that he had been arrested for assault.

46. Plaintiff Fen X. Chen was brought before the Criminal Court of the City of New York the next day, September 27, 2000, and he was released without bail. The Court also issued Orders of Protection against Plaintiff Fen X. Chen, ordering him, inter alia, to stay away from the person, home, school, business, and place of employment of Bi Wu Wu and of Defendant Lun Wei Fan.

47. The charges against Plaintiff Fen X. Chen were adjourned in contemplation of dismissal under New York C.P.L. § 170.55.

48. Prior to the arrest, Plaintiff Fen X. Chen had enjoyed a good reputation in his community.

49. As a result of all the acts of Defendant Lun Wei Fan, Plaintiff Fen X. Chen was greatly humiliated, subjected to mental and bodily distress, and suffered additional costs and expenses, including legal fees.

FIRST CLAIM FOR RELIEF

FEDERAL OVERTIME CLAIMS

50. Plaintiffs allege and reallege all the above paragraphs.

51. Defendants' willful failure to pay Plaintiffs overtime pay for work over 40 hours per

week violates 29 U.S.C. § 201 et seq. and the supporting federal Department of Labor regulations.

SECOND CLAIM FOR RELIEF

NEW YORK STATE MINIMUM WAGE AND OVERTIME CLAIM

52. Plaintiffs allege and reallege all the above paragraphs..

53. Defendants' willful failure to pay Plaintiffs the minimum wage and overtime pay for work over 40 hours per week violate New York Labor Law §§ 190 et seq. and 650 et seq. and the supporting New York State Department of Labor regulations.

THIRD CLAIM FOR RELIEF

NEW YORK STATE SPREAD OF HOURS CLAIM

54. Plaintiffs allege and reallege all the paragraphs above.

55. Defendants intentionally failed to pay Plaintiffs an extra hour's pay for every day that Plaintiffs worked over 10 hours in violation of New York Labor Law §§ 190 et seq. and 650 et seq. and the supporting New York State Department of Labor regulations.

FOURTH CLAIM FOR RELIEF

NEGLIGENT SUPERVISION AGAINST MANUFACTURERS

56. Plaintiffs allege and reallege all the above paragraphs.

57. Manufacturer Defendants hired, retained or contracted with the Factory Defendants to perform garment manufacturing work for them. Manufacturer Defendants exercised control over

the operative details of garment production work performed by the Factory Defendants.

58. Manufacturer Defendants knew or should have reasonably known that the Factory Defendants were engaging in the alleged wrongful conduct and that this conduct would directly and proximately result in injury to Plaintiffs.

59. Manufacturer Defendants had the authority to supervise, prohibit, control and/or regulate the Factory Defendants so as to prevent these acts and omissions from occurring.

60. Manufacturer Defendants knew or should have reasonably known that unless they intervened to protect Plaintiffs and properly supervised, controlled and/or regulated the conduct of the Factory Defendants, that the Factory Defendants would perceive their acts and omissions as being ratified and condoned.

61. As a direct and proximate result of the Manufacturer Defendants failure to exercise due care and to supervise, control and /or regulate the Factory Defendants, Plaintiffs have suffered injuries entitling them to damages in an amount to be determined at trial.

FIFTH CLAIM FOR RELIEF

NEGLIGENT HIRING AGAINST MANUFACTURERS

62. Plaintiffs allege and reallege all the paragraphs above.

63. Manufacturer Defendants hired, retained or contracted with the Factory Defendants to perform garment manufacturing work for them.

64. Manufacturer Defendants failed to exercise reasonable care in selecting, hiring, retaining or contracting with the Factory Defendants to perform this work. At the time that the Manufacturer

Defendants entered into this relationship with the Factories, they knew or should have reasonably known that the Factory Defendants would violate Plaintiffs' rights under the federal and state labor laws and that, as a direct and proximate result of these violations, Plaintiffs would suffer the injuries alleged herein.

65. As a direct and proximate result of the Manufacturer Defendants' negligent selection, hiring, retention and contracting with the Factory Defendants, Plaintiffs have suffered the injuries alleged herein, entitling the Plaintiffs to damages in amounts to be proven at trial.

SIXTH CLAIM FOR RELIEF

NEGLIGENCE PER SE: VIOLATION OF FEDERAL AND

STATE "HOT GOODS" PROVISIONS AGAINST THE MANUFACTURERS

66. Plaintiffs allege and reallege all the paragraphs above.

67. Manufacturer Defendants hired, retained or contracted with the Factory Defendants to perform garment manufacturing work for them. The garments produced for Manufacturer Defendants by the Factory Defendants using Plaintiffs' labor were produced in violation of the wage and hour provisions of the Fair Labor Standards Act and New York Labor Law as alleged above.

68. Manufacturer Defendants knew or should have known about these violations of the wage and hour provisions of the federal and state labor laws.

69. Manufacturer Defendants nevertheless transported, shipped and sold these illegally produced garments in violation of the "hot goods" provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 215(a) and 217 and New York Labor Law § 345(10). Plaintiffs are among the class of

persons that these labor laws were designed to protect.

70. As a direct and proximate result of the Manufacturer Defendants' transportation, shipping and sale of said garments, Plaintiffs have suffered economic and personal injuries, including the receipt of substandard wages, unduly long hours of work without any day of rest, resulting in injury to the Plaintiffs' health and welfare, and damages in an amount nature and degree to be proven at trial.

SEVENTH CLAIM FOR RELIEF

THIRD PARTY BENEFICIARY OF CONTRACT CLAIM AGAINST MANUFACTURERS

71. Plaintiffs allege and reallege all the paragraphs above.

72. As alleged above, Manufacturer Defendants entered into an Agreement with the United States Department of Labor requiring the Manufacturer Defendants, among other things, to evaluate the feasibility of contractors' compliance with the Fair Labor Standards Act, monitor said compliance, and suspend shipment of goods affected by violations of the Fair Labor Standards Act in the event that said violations were detected by the Manufacturer Defendants' monitoring.

73. On information and belief, Manufacturer Defendants materially breached the terms of the Assurances and the Agreement by, among other things, failing to ensure that the Factory Defendants complied with the Fair Labor Standards Act, as alleged above.

74. Plaintiffs, as employees of the Factory Defendants, were the third party beneficiaries of the Department of Labor's contract with the Manufacturer Defendants. Thus, the Manufacturer Defendants are liable to the Plaintiffs, as third party beneficiaries, for the Manufacturer Defendants'

breach of the Assurances and the Agreement.

75. Because of the Manufacturer Defendants' breach of the Assurances and the Agreement, Plaintiffs have suffered harm and pain and suffering, entitling them to damages in an amount to be determined at trial.

EIGHTH CLAIM FOR RELIEF

FEDERAL AND STATE RETALIATION CLAIM AGAINST THE FACTORIES

76. Plaintiffs allege and reallege all the paragraphs above.

77. The Factory Defendants willful termination of the employment of Fen X. Chen and Qui Chen in retaliation for their complaint about having to work for less than the minimum wage violates 29 U.S.C. § 215 and New York State Labor Law §215.

NINTH CLAIM FOR RELIEF

FALSE ARREST AGAINST LUN WEI FAN

78. Plaintiffs allege and reallege all paragraphs above.

79. Defendant Lun Wei Fan committed the common law tort of false arrest.

PRAYER FOR RELIEF

Wherefore Plaintiffs respectively request that this Court enter an order and judgment awarding Plaintiffs:

(a) unpaid wages, including minimum wage, overtime pay and spread of hours pay, plus

liquidated damages and/or interest thereon;

(b) compensatory damages according to proof;

(c) punitive damages according to proof;

(d) attorneys' fees and costs; and

(e) such other relief as this Court shall deem just and proper.

Dated: May 18, 2001

Respectfully submitted,

KENNETH KIMERLING (KK-5762)
Asian American Legal Defense and
Education Fund Inc.
99 Hudson Street
New York, New York 10013
212-966-5932

James HR Windels
JAMES H.R. WINDELS (JW-9726)
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
212-450-4000

ATTORNEYS FOR Plaintiffs

**Exhibit A**

**MEMORANDUM OF AGREEMENT**
[MOA-ACPA(AM).P5]

This Memorandum of Agreement (hereinafter called MOA) is hereby entered into by

Street Beat Fashions Inc.

hereinafter called the FIRM, and the U.S. Department of Labor, hereinafter called DOL, as follows:

1. The FIRM and the DOL hereby enter into the Augmented Compliance Program Agreement [DOL Form Number ACPA(AM).P5), a copy of which has been furnished to the FIRM by DOL and whose terms and conditions are hereby incorporated by reference into this MOA by this reference], subject to the further terms, conditions, and clarifications set forth in this MOA.

2. ACPA Paragraph 1(a) shall be interpreted to require the FIRM's full compliance with the ACPA as modified by this MOA.

For purposes of the heightened monitoring required by ACPA subparagraph 11(e) with respect to the Contractor firms to be listed in a paragraph A at the start of an ACPA, each of the following Contractor firms are to be deemed to be so listed in the ACPA (notwithstanding the absence of such a paragraph A at the start of the ACPA):

Excel Fashion Inc., 252 West 37th Street 15/F, New York NY 10018

For purposes of the backwage payment provisions of ACPA subparagraph 8(a)(i), each of the following firms is to be deemed to be listed in an Attachment No. 3 to the ACPA (notwithstanding the absence of an Attachment No. 3 to the ACPA) for the following backwage amount and period in each instance:

| Contractor's Name: | Period Covered Hereby: | Amount Due: |
|---|---|---|
| Excel Fashion Inc. | W/E 8/24/96 to 11/16/96 | to be determined |
| Monami Fashions Inc. | W/E 2/15/97 to 2/22/97 | $17,507.46 |

said amounts will be paid to the DOL by the FIRM within seven calendar days of the execution of this MOA, by submitting a certified or cashier's check payable to the order of the "Wage & Hour Div., Labor" to the office listed below the signature line for the DOL at the end of this MOA.

3. This MOA shall be subject to the termination provisions of the ACPA; and a termination of the ACPA according to its terms (as modified in this MOA) shall have the same effect on this MOA.

4. For purposes of any notices required or permitted by the ACPA, the initial designation by each party of its address is shown below the signatures at the end of this MOA.

Dated: 2/26, 1997

For the FIRM:

[signature]

Title: President
Its Duly-Authorized Agent
Street Beat Fashions Inc.
142 West 36th Street 4/F
New York, NY 10018

Dated: 3/3, 1997

For the DOL:

[signature: Joseph Hellman]

Its Asst. District Director
Wage & Hour Division
U.S. Department of Labor
26 Federal Plaza, Room 3838
New York, New York 10278

Exh. A

Exhibit B

U.S. DEPARTMENT OF LABOR, Wage & Hour Division

AUGMENTED COMPLIANCE

# PROGRAM AGREEMENT

[DOL Form ACPA(AM).P5]

DEPARTMENT OF LABOR
UNITED STATES OF AMERICA

Exh B

AUGMENTED COMPLIANCE PROGRAM AGREEMENT (DOL Form ACPA(AM).P5) Pag

# TABLE OF CONTENTS
[ACPA(AM).P5]

AUGMENTED COMPLIANCE PROGRAM AGREEMENT [ACPA(AM).9]

1. Scope of Agreement; Compliance with Act and Compliance Program . . . . . . . . . . . 3
2. Definitions of Certain Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
3. Pre-Contract Procedures; Evaluation of Contractors . . . . . . . . . . . . . . . . . 4
4. Employer Compliance Program for Contractors; Monitoring Contractor Compliance . . . 4
5. Records to be Kept by FIRM; Reports to Made by FIRM . . . . . . . . . . . . . . . . 5
6. Contractor Violations; Use of Payroll-Reporting Process . . . . . . . . . . . . . . 5
7. Scope of Applicability of Measures Regarding Owners\Managers . . . . . . . . . . . 6
8. Backwage Payments Guaranteed by the FIRM . . . . . . . . . . . . . . . . . . . . . 6
9. Process for Remediating Contractor Violations . . . . . . . . . . . . . . . . . . . 7
10. Potential Litigation; Impact of this Agreement . . . . . . . . . . . . . . . . . . 8
11. Initial Implementation of this Agreement . . . . . . . . . . . . . . . . . . . . . 8
12. Duration and Termination of the Agreement . . . . . . . . . . . . . . . . . . . . 9
13. Notices Between the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Attachment No. 1: EMPLOYER COMPLIANCE PROGRAM [ECP(AM).6]

1. Purpose, Scope, and Applicability of Employer Compliance Program . . . . . . . . . 10
2. Minimum Wage Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
3. Overtime Pay Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4. Meaning of "Hours Worked" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
5. Child Labor Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
6. Payroll Records and Posting of Posters . . . . . . . . . . . . . . . . . . . . . . 11
7. Counting and Recording Hours Worked; Use of Timecards and Timeclocks . . . . . . . 12
8. Payroll Processes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
9. Information to be on Payroll Checkstubs . . . . . . . . . . . . . . . . . . . . . 13
10. Responsibility to Monitor Compliance . . . . . . . . . . . . . . . . . . . . . . 14
11. Duty to Cooperate with FIRM's Monitoring . . . . . . . . . . . . . . . . . . . . 15
12. Required Notices of Unprofitability . . . . . . . . . . . . . . . . . . . . . . . 15
13. Manner of Contract Performance . . . . . . . . . . . . . . . . . . . . . . . . . 15
14. Consequences of Violations; Reading ECP . . . . . . . . . . . . . . . . . . . . . 15

Attachment No. 2: PROGRAM TO MONITOR CONTRACTORS [PMC(AM).6]

1. Name and Purpose of Document . . . . . . . . . . . . . . . . . . . . . . . . . . 16
2. General Scope and Frequency of Monitoring . . . . . . . . . . . . . . . . . . . . 16
3. Components of Minimum-Intensity Monitoring . . . . . . . . . . . . . . . . . . . 17
4. Components of Intermediate-Intensity Monitoring . . . . . . . . . . . . . . . . . 17
5. Components of High-Intensity Monitoring . . . . . . . . . . . . . . . . . . . . . 18
6. Integrity and Effectiveness of Monitoring Processes . . . . . . . . . . . . . . . 18
7. Recordkeeping Regarding Monitoring . . . . . . . . . . . . . . . . . . . . . . . 19

# AUGMENTED COMPLIANCE PROGRAM AGREEMENT

[ACPA(AM).9]

The U.S. Department of Labor (called the DOL) and the signatory firm (called the FIRM), in the interests of promoting compliance by the FIRM with Section 15(a)(1) of the Fair Labor Standards Act, as amended (29 U.S.C. 201, et seq.), called the Act, hereby agree as follows:

**1. SCOPE OF AGREEMENT; COMPLIANCE WITH ACT AND COMPLIANCE PROGRAM**

a) The FIRM will comply in full with this Augmented Compliance Program Agreement (called ACPA) with respect to all of its activities.

b) The FIRM will comply in full with all of the provisions of Section 15(a)(1) of the Act, as interpreted by DOL, and will take all reasonable steps, including all of those specified in this ACPA, to help ensure that it does fully comply with Section 15(a)(1) of the Act.

c) If it comes to the attention of the DOL that the FIRM should undertake steps to ensure compliance with Section 15(a)(1) of the Act by the FIRM during the term of this ACPA in addition to those specifically called for by this ACPA, the DOL will notify the FIRM in writing of what those additional steps are.

d) The FIRM will not act in reliance upon any interpretation of the Act that is at variance with the Act, as interpreted by the DOL, without first giving notice to the DOL in writing of the nature and extent of the different interpretation on which the FIRM proposes to act, provided however that the FIRM will have the right to challenge the correctness of any non-legislative DOL interpretation of the Act when raised by the DOL.

**2. DEFINITIONS OF CERTAIN TERMS**

a) For purposes of this ACPA (including for purposes of this paragraph 2), the definitions set forth in this paragraph 2 are applicable.

b) The term "ACPA" includes this ACPA, including all actual or referenced attachments.

c) The term "DOL" means the United States Department of Labor.

d) The term "commerce" means "commerce" as defined in Section 3(b) of the Act and includes any interstate or foreign commerce.

e) The term "Contractor" includes any one or more persons or firms (other than the FIRM) that supply, directly or indirectly (by way of one or more layers of subcontracts or otherwise), the performance of any service called for to fill any purchase made by the FIRM (and includes any prospective or proposed Contractor, where indicated by the context).

f) The term "ECP" includes the Employer Compliance Program, a copy of which is attached as Attachment No. 1 hereto.

g) The term "execution" refers to the signing of this ACPA (or of some other document agreeing to this ACPA by reference, with or without modifications and\or clarifications) by the parties to this ACPA.

h) The term "firm" includes any one or more proprietorships, partnerships, associations, corporations, trusts, organizations, entities, or organized groups of persons.

i) The term "FIRM" means the firm executing this ACPA.

j) The term "goods" includes any apparel (inclusive of any textile material included or to be included in any apparel) at any stage of manufacture or distribution.

k) The phrase "interpreted by DOL" includes all of the following DOL sources:

i) final DOL regulations and/or interpretative rules that are (before or after execution of this ACPA) published in the Federal Register,

ii) interpretations that are (before or after execution of this ACPA) contained in any public domain opinion letter of the Administrator of DOL's Wage & Hour Division, and

iii) interpretations of which the DOL gives the FIRM notice in writing, in advance of applying the interpretation with respect to the FIRM.

l) The term "person" includes any one or more individuals, organized groups of individuals, firms, or representatives of any person(s).

m) The term "PMC" includes the Program to Monitor Contractors, a copy of which is attached as Attachment No. 2 hereto.

n) The term "purchase" includes any order or contract on which any Contractor performs any work.

o) The term "service" means any service(s) performed on any good(s).

p) The terms "ship (in commerce)" and "shipment (in commerce)" include transporting, offering for transportation, shipping, delivering, or selling (in commerce) and in-

clude shipping, delivering, or selling with knowledge (or reason to believe) that shipment, delivery, or sale (in commerce) is intended.

q) The terms "(work) on goods" and "(worked) on goods" include work on other goods if the latter are not kept segregated (and, in determining whether segregation existed, the presumption in Section 15(b) of the Act will apply).

3. PRE-CONTRACT PROCEDURES; EVALUATION OF CONTRACTORS

a) Prior to the FIRM's entering into any particular purchase (and not less frequently than once per calendar quarter in the case of any Contractor involved on an ongoing basis in working on purchases made by the FIRM), a responsible management official of the FIRM will personally review with the owner (or a top management official) of the Contractor:

i) the terms of the attached Employer Compliance Program (called the ECP),

ii) the purposes of the ECP and this underlying ACPA,

iii) the economic feasibility of the price terms that are involved, in light of the compliance with the Act and the ECP required of the Contractor and in light of the calculations and expectations of the parties to the purchase,

iv) the Contractor's willingness and ability, in light of the Contractor's prior involvement (if any) in the industry and the extent of the Contractor's capitalization, to both fully understand and fully comply with the Act and the ECP, and

v) the obligation of the Contractor to promptly advise the FIRM that, with respect to any specific purchase, the Contractor is unable to meet the requirements of the Act, as soon as the Contractor becomes aware that that is the case; and

all topics covered by the review, including any calculations by which the economic feasibility of the price terms was evaluated, will be documented by the FIRM if any purchase is made by the FIRM, if that Contractor is involved in any way.

b) If such a review discloses an unreasonable risk that the Act and/or the ECP will not be fully understood and complied with by the Contractor, then the FIRM will not permit the Contractor to be involved in any purchase by the FIRM.

c) The provisions of this paragraph 3 apply to a decision by the FIRM regarding whether the FIRM will consent to a subcontract with respect to any purchase by the FIRM.

d) In the event that the FIRM undertakes to make purchase contracts by making formal public invitations to bid for the award of such purchases, the FIRM will include in each public invitation a reference to a bid package that communicates all the essential terms to which a Contractor would have to agree to be a successful bidder and its availability for inspection by any person or firm interested in good faith in bidding and apparently qualified to do so; and before awarding any purchase to the apparently successful bidder, the FIRM will comply with all the provisions of this paragraph 3 with that bidder.

4. EMPLOYER COMPLIANCE PROGRAM FOR CONTRACTORS; MONITORING CONTRACTOR COMPLIANCE

a) Whenever the FIRM makes any purchase from a Contractor, the purchase will be in writing and include all the essential terms and conditions of the transaction, including specifying that (as a condition of the purchase) the Contractor must (with respect to all the goods involved) comply with all the undertakings specified in the ECP.

b) The FIRM will require the Contractor to sign an ECP prior to the start of any work by the Contractor on the purchase; but this may be accomplished by an appropriate reference to the ECP in a purchase order where the particular Contractor already has a signed ECP with the FIRM on an ongoing basis.

c) The FIRM will furnish to each Contractor (on the occurrence of the Contractor's first involvement with work subject to this ACPA) a copy of such informational materials regarding compliance with the Act as the DOL may prescribe from time to time. In doing so, the DOL will furnish to the FIRM a copy of the materials, on request.

d) Except as provided in subparagraph (e) of this paragraph 4, the FIRM will monitor and enforce full compliance with the Act and the ECP by all Contractors in all activities connected with any purchase by the FIRM, by using all reasonable measures (including all those specified in the attached Program to Monitor Compliance (called the PMC)).

e) A Contractor performing no cutting, sewing, or finishing may be excluded from monitoring required by the PMC if the Contractor enterprise's annual dollar volume of sales made or business done (measured in accordance with Sections 3(r) and 3(s) of the Act) exceeds one million dollars, unless the FIRM is notified in writing by DOL that such monitoring of the Contractor is to be done; provided however that to use the exclusion, the FIRM must in each instance notify the DOL in writing in advance (and annually thereafter) of the name, actual business address,

and approximate annual dollar volume of each Contractor that it excludes.

f) Periodically, not less frequently than once in each four-calendar-quarter period (unless the DOL approves in writing a lesser frequency), the FIRM will provide training:

i) for all Contractors working on purchases by the FIRM, regarding how to comply with the Act and the ECP, and

ii) for those conducting monitoring activities on its behalf, regarding how to meet the monitoring requirements of this ACPA, including the attached PMC; and

all such training will be of types that are provided, sponsored, or otherwise approved by the DOL.

5. RECORDS TO BE KEPT BY FIRM; REPORTS TO BE MADE BY FIRM

a) On each purchase by the FIRM, it will supply a copy of the contract or order to the Contractor at the initiation of the purchase; and it will keep a copy in its own records.

b) The FIRM will make, keep, and preserve records on each purchase, including all the following:

i) the nature and extent of the FIRM's activities to monitor and enforce compliance with the Act and the ECP by each Contractor,

ii) all the findings made by the FIRM in the course of doing so (irrespective of whether the finding is a violation finding or a no-violation finding) regarding each Contractor,

iii) the basis of each finding, separately for each Contractor, and

iv) all records required by the PMC.

c) The FIRM will make, keep, and preserve records on each Contractor that identify each purchase made by the FIRM involving that Contractor if:

i) the Contractor is listed in the paragraph A (if any) at the beginning of this ACPA,

ii) work on the purchase is not yet completed when this ACPA is executed, or

iii) the purchase is made after this ACPA is executed.

d) Records required by this paragraph 5 need not be kept by the FIRM in any particular form or format; but they will be kept by the FIRM so that they are readily retrievable by the FIRM by reference to the name of the Contractor in each instance and also by reference to the particular goods involved (by the lot number, size, or other identifying criteria customarily used to identify particular goods in process or already shipped) in the event of any violation finding by the FIRM with respect to those goods.

e) Records required by this ACPA to be made or kept will be preserved for a period of 12 months after completion of all work on the purchase (36 months after such completion if the FIRM finds (or is notified, prior to the expiration of the 12 months, by the DOL in writing that the DOL has found) any violation of the Act by the Contractor with respect to that (or any other) purchase in which the Contractor was or is involved).

f) The FIRM will make available to the DOL all records required by this ACPA to be made, kept, or preserved by the FIRM, for inspection and\or copying by the DOL when the DOL requests the FIRM to do so; and the FIRM will make such reports in writing to the DOL from such records as the DOL may request from time to time.

g) Not less frequently than semiannually, the FIRM will submit to the DOL a written report documenting all its monitoring activities during the semiannual period preceding submission of the report, the problems found, and the steps implemented to remedy those problems; and the first such report will be submitted no later than six months after execution of this ACPA and will cover the entire period since execution of this ACPA. Although no particular form or format is required for such reports, DOL will furnish a sample format, on request.

h) A copy of any annual report of the results of the DOL investigations of Contractor firms in the area covered by the District Office (of the DOL's Wage & Hour Division) referred to below that is prepared by the DOL and available under the Freedom of Information Act will be furnished promptly to the FIRM by DOL, without awaiting a request by the FIRM.

6. CONTRACTOR VIOLATIONS; USE OF PAYROLL-REPORTING PROCESS

a) Whenever the FIRM finds that a Contractor subject to an ECP has failed to comply fully with the Act regarding any purchase by the FIRM, the FIRM will notify the DOL and (if requested to do so by the DOL) require that the Contractor submit to the FIRM each workweek (for a period of up to twelve months from the date of the finding) a report to the FIRM covering the particular purchase involved in that finding and any other purchase(s) by the FIRM in which the Contractor is involved. Each report will be due within five business days of the regularly-scheduled payday for the workweek and will include:

i) a copy of the full payroll for the workweek,

ii) a certification by the Contractor (by either its owner or top management personally, under penalty of perjury) that said copy accurately shows for each employee of the Contractor the employee's name, social security number, home address, home phone number (if any), and all information required by the ECP to appear on the employee's checkstub,

iii) a copy of each employee's checkstub (or, at the option of the Contractor if the latter maintains a payroll journal that constitutes a carbon copy of the checkstub, a copy of the portion of the payroll journal that covers said workweek), and

iv) a copy of each employee's payroll check.

b) A copy of the entire report from the ntractor will be sent by the FIRM to the L for each workweek, to the extent that the L requests the FIRM to do so, from time to me.

c) The FIRM may decline to impose the pay-ll-reporting measures specified in this ragraph 6, if all of the following condions are met by the Contractor: there are no llful violations of the Act, there have en no prior violations of the Act (that are own to the FIRM or of which the FIRM has en notified by the DOL in writing), the relting underpayments do not (for any given rkweek) exceed $500.00 or 10 percent of the ntractor payroll (whichever is less) on rchases by the FIRM, the resulting underyments are paid in full by the Contractor omptly on demand, and there are no omisons or inaccuracies in any of the records quired to be kept by the Contractor under e Act that were known to the Contractor (or y responsible official of the Contractor) d were of a nature that might have impaired impeded the ability of the FIRM and/or the L to determine whether the provisions of ctions 6 and/or 7 of the Act were being lly complied with by the Contractor.

SCOPE OF APPLICABILITY OF MEASURES REGARD- 3 OWNERS/MANAGERS

a) Whenever the FIRM is required under bparagraph 5(c) and\or paragraph 6 of this PA to implement measure(s) regarding a Conactor, the measures will also be implemend with respect to each related Contractor.

b) For purposes of this paragraph 7, a ntractor is a related Contractor whenever substantial direct or beneficial ownership terest or managerial position is held in e allegedly related Contractor (at the time a purchase or at any time during performance of any work thereon) by any of the following:

i) the Contractor that triggered a requirement to implement such measures, or

ii) a person or firm that (at the time of events triggering a requirement to implement such measures) held a substantial direct or beneficial ownership interest or any managerial position in the Contractor triggering the requirement to implement such measures; but

the required relatedness will not be deemed to exist where the FIRM has, after reasonable inquiry, no notice of facts that would tend to show such relatedness.

8. BACKWAGE PAYMENTS GUARANTEED BY THE FIRM

a) The FIRM will make payments to the DOL in an amount sufficient to enable the DOL to allocate and disburse monies to the employees of Contractors (or, at the option of the FIRM if authorized by the DOL, to enable the FIRM to do so directly to the employees of the Contractors) in amounts sufficient to compensate the employees for back wages due to them under the Act from the Contractor, as follows:

i) With respect to the Contractors that are listed in the Attachment No. 3 (if any) hereto: to the extent an employing Contractor fails to do so no later than 30 days after execution of this ACPA, the FIRM will (no later than 60 days after execution of this ACPA) pay such an amount with respect to the Contractors so listed in the Attachment No. 3 (if any) hereto for the period and in the amount specified (if any) in said Attachment No. 3 (if any) for each Contractor (as computed by the DOL in each instance), in recognition of the fact that in each instance employees of the Contractor during said period did work on goods for shipment on purchases made by the FIRM.

ii) With respect to any act or omission by a Contractor that constitutes a violation of Section 6 and/or 7 of the Act with respect to work on goods that the FIRM ships during the term of this ACPA: to the extent that an employing Contractor fails to do so no later than 30 days after demand by the FIRM or the DOL, the FIRM will (no later than 60 days after such demand) pay an amount equal to the back wages due to the employees of the Contractor under Sections 6 and/or 7 of the Act for work on goods performed by any employee in any workweek in which that employee worked on goods for shipment on purchases made by the FIRM, determined as specified in this

ACPA.

b) The FIRM's obligation to make payments in amounts sufficient to fund the backwage payments referred to in this paragraph 8 is in each instance subject to the following qualifications:

i) Any amounts paid to the DOL by the FIRM pursuant to this paragraph 8 but not disbursed (within 180 days of the payment to the DOL by the FIRM or final resolution of the amounts due (including any court challenge to a DOL determination) as specified in this ACPA, whichever occurs later) to a person eligible therefor will be returned to the FIRM, except to the extent that the DOL determines that it was unable to so disburse because of a Contractor's failure to comply with the recordkeeping regulations under the Act with respect to adequate identifying and locating information regarding employees.

ii) In the event that one or more customer firms (in addition to the FIRM) of the Contractor pay funds to the DOL to be used for the payment of backwage amounts due to employees of the Contractor for any work performed by the same employees in the same workweeks, a reduction and/or refund in the amount payable to the DOL by the FIRM under this paragraph 8 will be made where necessary to avoid excess backwage disbursements to the employees.

c) The obligation of the FIRM to make payments called for by this paragraph 8 will, with respect to any back wages that have accrued prior to execution of this ACPA or may accrue after execution (but prior to termination) of this APCA, survive termination of this ACPA.

d) Making a backwage payment under this ACPA does not constitute supervision by the DOL for purposes of Section 16 of the Act, absent DOL's express approval in writing to that effect in each instance, obtained in advance of the payment to affected employees.

e) Neither the DOL's approval of backwage amounts or payments nor this ACPA itself constitutes DOL approval for a shipment in commerce of goods produced in violation of Section 6 and/or 7 of the Act, except to the extent expressly provided for in paragraph 9 of this ACPA.

9. PROCESS FOR REMEDIATING CONTRACTOR VIOLATIONS

a) Whenever the FIRM finds any act or omission by a Contractor that violates Sections 6 and/or 7 of the Act with respect to any work on any goods that the FIRM has shipped during the term of this ACPA or will ship during the term of this ACPA, the FIRM will immediately

i) suspend all shipment of goods affected by such violations until all such violations affecting the goods have been remediated in accordance with subparagraph (a)(ii) of this paragraph 9; and

ii) cause, in accordance with the applicable provisions of paragraph 8 of this ACPA, the payment of all unpaid back wages resulting from any violations of Section 6 and/or 7 of the Act by the Contractor (with respect to any work on said goods or other such goods of the FIRM during the term of this ACPA) and do so in an amount approved by DOL (or post funds with the DOL in an amount approved by the DOL, for disposition in accordance with this paragraph 9).

b) Upon complying with the provisions of subparagraph (a) of this paragraph 9, the FIRM may then ship the affected goods, without the DOL seeking further relief against, or criminal prosecution of, the FIRM for the shipment of said goods by virtue of the work on the goods by employees of the Contractor during the term of this ACPA, notwithstanding any possible violation of Section 15(a)(1) of the Act by the FIRM for such shipment by virtue of such work on such goods by employees of the Contractor, so long as the FIRM is in substantial compliance with the provisions of this ACPA during the term of this ACPA and is in full compliance with the provisions of this ACPA guaranteeing the payment of back wages.

c) On each occasion of the type referred to in subparagraph (a) of this paragraph 9, the DOL and the FIRM will attempt to reach an agreement on the total amount to be paid to the affected employees under this paragraph 9; but absent prompt agreement, the DOL will promptly notify the FIRM in writing of the total amount of funds to be posted with the DOL under subparagraph (a)(ii) of this paragraph 9. If a final agreement on the total amount to be paid to affected employees has not been reached within 60 days thereafter, the DOL will issue a written determination of the total amount to be paid by the FIRM. Said determination will constitute the final agency action as to said amount, that will be subject to review (as to the amount of said total amount only, not as to the obligation of the FIRM under this ACPA to pay) in a U.S. District Court of competent jurisdiction, at the instance of the FIRM, under the arbitrary and capricious standard in the Administrative Procedure Act; and, in the absence of a decision by the court (within 60 days of DOL's

termination or such longer period as may be dared by the court prior to expiration of id 60 days) overturning DOL's determination arbitrary and capricious, the DOL (as the ency charged with the responsibility to en- rce the Act) is authorized by this ACPA to locate and disburse to affected employees s determined by the DOL) the total amount ited in said determination (including using funds so posted, to the extent that they sufficient for that purpose). Said total ount will be the backwage amount that the M is obligated to cause to be paid under paragraph (a)(ii) of this paragraph 9.

d) Payment of remediation, in accordance h subparagraph (a)(ii) of this paragraph with respect to the employees of a named tractor with respect to alleged violations Section 6 and\or 7 of the Act by that Con- ctor at a specified establishment for a cified period (during the term of this A) will free the FIRM of any obligation ler this ACPA to pay any additional reme- tion with respect to any alleged viola- ns of Section 6 and\or 7 of the Act by t Contractor at that establishment during t period.

e) In the event that the DOL notifies any ailer or other downstream customer of the M of any allegedly "hot" goods having been d or shipped by the FIRM to the customer, ectly or indirectly, the DOL will also in- n that customer of any remediation action en by the FIRM pursuant to the provisions agraphs 8 and 9 of this ACPA, to the ex- t then known to the DOL.

POTENTIAL LITIGATION; IMPACT OF THIS EEMENT

a) While this ACPA is in effect, the DOL l not initiate litigation against the FIRM enjoin any violations of Section 15(a)(1) the Act with respect to any violations in- ved in any purchase(s) by the FIRM, unless DOL first gives the FIRM notice in writ- and affords to the FIRM an opportunity to : and confer with the DOL with respect to ther litigation is necessary or appropri- . However, such notice and opportunity-to- :-and-confer processes will not apply if DOL reasonably concludes that:

i) the FIRM has willfully violated Sec- tion 15(a)(1) of the Act and/or this ACPA, or

ii) such a violation is imminent and cannot be prevented by the DOL unless such litigation is initiated.

b) Any violations of this ACPA, as well as violations of the Act, may be relied upon any such litigation at any time. In re- sponse, however, the FIRM may show whether the violations (if any) were insubstantial in nature and extent and may show the steps taken by the FIRM to avoid and remedy them; and, in doing so, the FIRM will (as to any events occurring during the term of this ACPA) be entitled to a rebuttable presumption that the FIRM took "all reasonable steps," within the meaning of subparagraph (b) of paragraph 1 of this ACPA, if the FIRM shows that it substantially complied with all the steps called for by this ACPA.

c) The activities that the FIRM undertakes by this ACPA to engage in are subject to en- forcement by specific performance during the term of this ACPA at the instance of the DOL, in addition to any of the other rights or remedies available to the DOL not inconsis- tent with the terms of this ACPA; but the FIRM reserves the right to cease at any time doing business, direct or indirect, with any Contractor.

d) The DOL will not seek injunctive relief against, or criminal prosecution of, the FIRM for any alleged violation(s) of the provi- sions of Section 15(a)(1) of the Act that

i) predate execution of this ACPA, or

ii) occur during the term of this ACPA,

and

arise out of acts or omissions of any Con- tractor in violation of Section 6 and/or 7 of the Act, provided that the FIRM remains dur- ing the term of this ACPA in substantial com- pliance with this ACPA and remains in full compliance with paragraphs 8 and 9 of this ACPA.

e) Nothing done or to be done by the FIRM pursuant to the express terms of this ACPA will be interpreted by the DOL as constitut- ing a violation of the Act by the FIRM during the term of this ACPA nor as sufficient, in and of themselves, to make the FIRM an em- ployer or joint employer of any employee of any Contractor for purposes of the Act during the term of this ACPA.

11. INITIAL IMPLEMENTATION OF THIS AGREEMENT

a) This ACPA will be fully implemented in accordance with its terms no later than 60 days after execution, except as is otherwise specified in this paragraph 11.

b) In the event that the FIRM has at work on goods of the FIRM (at the time of execu- tion of this ACPA) more than 50 Contractors and\or more than 1,000 Contractor employees, the implementation of the monitoring provi- sions of this ACPA may (at the option of the FIRM) be phased in over a period longer than 60 days, as further specified by subpara- graphs (c) and (d) of this paragraph 11.

c) Contractors that are at work on goods of the FIRM at the time of execution (or any time within 60 days prior to execution) of this ACPA will be brought within the monitoring provisions of this ACPA, as follows: 50 such Contractors or a sufficient number of such Contractors to account, in the aggregate, for 1,000 employees (to whom the monitoring provisions of this ACPA are applicable), whichever number of Contractors is greater, will be brought under the monitoring provisions of this ACPA during the first 60 days following execution and during each 30 days thereafter until all of such Contractors have been brought under said provisions, with all such Contractors to have been brought under said provisions no later than 120 days following execution; and, within five days after the start of each such portion of the phase-in period, the FIRM will provide to the DOL in writing a list of all such Contractors to be covered by that portion of the phase-in period.

d) Neither heightened monitoring under the PMC nor imposition of special payroll-reporting processes (as provided for in paragraph 6 of this ACPA) will be required on the basis of any non-willful violations of the Act found by the FIRM to have been committed by a Contractor in the phase-in period (or portion thereof applicable to that Contractor under subparagraph (c) of this paragraph 11) so long as the FIRM conducts additional monitoring, within 30 days, that discloses that no violations of the Act and\or the ECP have taken place since the monitoring resulting in that violation finding.

e) Notwithstanding any other provision of this paragraph 11: whenever a Contractor listed in the paragraph A (if any) at the start of this ACPA is involved in any existing or future (in the 12-month period after the DOL violation finding triggering that listing) purchase by the FIRM, the FIRM will immediately utilize, with respect to that Contractor, at least the intermediate-intensity monitoring provided for in the PMC until no fewer than two consecutive monitoring visits by the FIRM required by the PMC verify full correction continuously throughout a 180-day period since the problem was (at any time and by any means) last noted; and the monitoring will be continued thereafter as in the case of any other Contractor, at an intermediate or high-intensity level if monitoring conducted during that period so indicates under the criteria set forth in the PMC for determining the intensity of monitoring.

12. DURATION AND TERMINATION OF THE AGREEMENT

a) This ACPA is effective upon execution.

b) This ACPA will remain in effect for 60 days from execution or until it is terminated (by the DOL or the FIRM), whichever occurs later. Any such termination must be in writing by certified mail, return receipt requested, to the other party to this ACPA; and any such termination will take effect ten days after such notice is so mailed or such later date as is specified in the termination notice itself.

c) This ACPA can be modified only in writing and only in a writing that undertakes by its express terms to modify this ACPA and is signed by the parties to this ACPA.

d) If the execution of this ACPA is accomplished by the execution of a Memorandum of Agreement that agrees to this ACPA by reference (with or without modifications and\or clarifications), the Memorandum of Agreement will be subject to the termination provisions of this ACPA; and a termination (of this ACPA according to its terms) will also have the same effect on the Memorandum of Agreement.

13. NOTICES BETWEEN THE PARTIES

a) Whenever this ACPA (inclusive of any attachment(s)) requires notice by a party to this ACPA to the other party to this ACPA in writing, the notice will be sent or delivered to the address furnished by the addressee party at the time of the execution of this ACPA by the addressee party (or such other address as the addressee party may thereafter designate for such purposes by giving written notice thereof to the other party to this ACPA in writing by certified mail, return receipt requested).

b) A notice to a party to this ACPA is deemed received if it is actually received or a certified mail return receipt indicating receipt is executed at said address.

# Attachment No.1: EMPLOYER COMPLIANCE PROGRAM

[ECP(AM).6]

The signatory firm (called the Contractor) and ______________________ (called the FIRM) hereby agree as follows:

1. PURPOSE, SCOPE, & APPLICABILITY OF EMPLOYER COMPLIANCE PROGRAM

a) This document is an Employer Compliance Program (called an ECP). It is designed to help ensure compliance with the Fair Labor Standards Act (called the Act), a federal law.

b) Among other things, the Act prohibits any person or firm from transporting, offering for transportation, shipping, delivering, or selling in interstate or foreign commerce (called commerce) any goods produced in violation of the minimum wage and/or overtime pay provisions of the Act. The Act also prohibits shipping, delivering, or selling such goods with knowledge (or reason to believe) that anyone else intends to ship, deliver, or sell them in commerce.

c) To help ensure that the FIRM fully complies with these provisions of the Act, the FIRM and the U.S. Department of Labor (called the DOL) entered into an agreement. Under the terms of that agreement, the FIRM requires compliance with this ECP by each person or firm from which the FIRM makes, directly or indirectly, any purchase of any goods and/or services (to be performed on any goods); and any such purchase is called a purchase in this ECP.

d) Compliance with this ECP by each Contractor is an express condition of any purchase; and any person or firm from which any purchase is made, directly or indirectly, is a Contractor.

e) The signatory firm is a Contractor, by virtue of such a purchase by the FIRM. This ECP is a part of the contract for that purchase, regardless of whether the contract has been reduced to writing in any other way.

f) The Contractor agrees to fully comply with this ECP as a condition of each purchase that the FIRM makes from the Contractor or in which the Contractor is involved, directly or indirectly, even if no ECP is signed by any contractor regarding the particular purchase.

g) The Contractor agrees to comply fully with the provisions of the Act, as interpreted by DOL; and its compliance with this ECP will be tested in that light.

2. MINIMUM WAGE COMPLIANCE

a) The Contractor will comply fully with all the requirements of the minimum wage provisions of the Act, including those explained below in this paragraph 2.

b) In any given workweek, the total gross pay of an employee must not be less than the total number of hours worked by the employee multiplied by the federal minimum wage in effect during the workweek in which the work is performed by the employee. The current federal minimum wage, as of the date this ECP form was prepared, is $4.25 per hour.

c) The minimum wage provisions of the Act apply to employees paid (in whole or in part) on the basis of piecework earnings. If the total earnings do not equal (or exceed) the number of hours worked in a workweek multiplied by the federal minimum wage, then the difference must be paid to the employee in addition to the other earnings.

d) The minimum wage provisions of the Act apply to each workweek separately. Earnings from one workweek cannot be used to meet the minimum wage requirements for any other workweek; nor can earnings be averaged over a period longer than a workweek for purposes of determining whether minimum wage requirements have been met.

3. OVERTIME PAY COMPLIANCE

a) The Contractor will comply fully with all the requirements of the overtime pay provisions of the Act, including those explained below in this paragraph 3.

b) Each employee must be compensated for each hour worked in excess of 40 hours in any workweek at a rate not less than one and one-half times that employee's regular rate of pay.

c) An employee's regular rate of pay cannot lawfully be lower than the federal minimum wage rate (nor can it be lower than any other minimum rate required by law, such as a State law).

d) The overtime pay provisions apply to employees paid (in whole or in part) on the basis of piecework earnings. An employee paid piecework earnings must be paid extra pay when the employee works in excess of 40 hours in a workweek. Generally, the extra pay must be computed as follows: divide the employee's total piecework earnings by the total hours worked by the employee in the workweek to

compute the employee's regular rate for the workweek, and the employee is due one half of this regular rate of pay for each hour worked in excess of 40 hours in the workweek (in addition to the piecework earnings of that employee for that workweek).

e) The overtime pay provisions apply to most employees paid (in whole or part) on the basis of a salary for all hours worked. Such an employee must be paid extra pay when the employee works in excess of 40 hours in any workweek. The extra pay due on the salary is to be computed as follows: divide the weekly salary by the total hours worked by that employee in the workweek to compute that employee's regular rate for the workweek, and the employee is due one half of this regular rate for each hour worked in excess of 40 hours in that workweek (in addition to the salary). Some States (including California) have laws requiring the extra pay to be computed at one and one-half times a rate computed by dividing the weekly salary by 40 hours.

f) The Act does not require overtime pay for the hours worked in excess of 8 hours in a workday. Some States (including California) have laws requiring overtime pay for such hours.

4. MEANING OF "HOURS WORKED"

a) The minimum wage and overtime pay provisions of the Act (as well as the Act's recordkeeping requirements) depend on the use of the term "hours worked," as interpreted by DOL. The Contractor will comply fully with this correct use of the term "hours worked" in counting, recording, and paying for the hours worked by employees, including complying with the provisions of the rest of this paragraph 4 and the provisions of paragraph 7 of this ECP.

b) All time that an employee spends actively working or otherwise gives over to the use of an employer (as in the case of being required to be present on the premises of the employer) is to be included in "hours worked" for purposes of complying with the Act and this ECP.

c) A meal break may be excluded from hours worked only if it is not less than 30 minutes in length and the employee is, in advance, completely relieved of all responsibilities and duties and performs no work during the break; but such an exclusion must be for all purposes.

d) Short breaks are hours worked and cannot be excluded from hours worked for purposes of counting, recording, or paying for hours worked by employees.

5. CHILD LABOR COMPLIANCE

a) The Contractor will comply fully with the requirements of the child labor provisions of the Act, including those explained below in this paragraph 5.

b) Generally no child under 16 years of age may work in any manufacturing establishment, including any contract sewing establishment.

c) Children between 16 and 18 years of age may not engage in any occupation determined by DOL to be particularly hazardous for them, including (but are not limited to) the following:

i) the occupation of motor vehicle driver (and the occupation of outside helper) on any public road or highway, except to the extent specifically exempted by DOL regulations;

ii) work of operating an elevator (except operating an unattended automatic-operation passenger elevator); and

iii) work of operating any high-lift truck.

d) Proof of age must be kept on file by the employer for each person under 19 years of age.

6. PAYROLL RECORDS AND POSTING OF POSTERS

a) The Contractor will make, keep, and preserve (for a period of three years from the date of the last entry in the record) complete and accurate records of the wages, hours, and other conditions and practices of employment maintained, as specified in recordkeeping regulations under the Act (found in Title 29, Code of Federal Regulations, Part 516). The Contractor hereby acknowledges receiving a copy of those regulations.

b) For each employee, a separate individual earnings record (called an IER) will be made, kept, and preserved by the Contractor. All the entries for a workweek will be on a separate line labeled with the workweek ending date, with all of the information for that workweek placed on that line in labeled columns; and the entries will match in both form and content the entries on the payroll checkstub given to that employee with that employee's payroll check for that workweek, under the provisions of paragraph 8 of this ECP. The IER will contain all the other payroll record information required by the recordkeeping regulations under the Act, in spaces thereon that are clearly labeled with the nature of the data entered in the space; and any modifications (such as any changes in the employee's hourly rate from time to time) will be accompanied by an entry showing the date that the modification became effective.

c) The Contractor will prominently post (and will permanently keep prominently posted), in each establishment of the Contractor in which any work subject to the Act is or has been performed within the preceding three calendars years, the following:

i) a copy of a current informational poster regarding the Act, designed by DOL and displaying the current telephone number of the nearest District Office of the Wage & Hour Division of DOL, in English and any other language made necessary by the presence of any employee(s) who cannot read in the English language,

ii) a copy of this ECP, including the Contractor signature on the last page, and

iii) a notice, in each of the above-referenced languages, that notifies employees of the Contractor that they can report to the FIRM, on a confidential basis, any violations of this ECP by the Contractor and that shows the name and telephone number of an authorized agent of the FIRM to whom such complaints can be reported by telephone; and

ll these documents will be posted, side by ide, at the spot in the establishment where he employees check in at the start of a orkday, next to any timeclock.

. COUNTING AND RECORDING HOURS WORKED; USE F TIMECARDS AND TIMECLOCKS

a) Each employee will have his or her own eparate timecard, for each workweek; and on ach timecard, entries will be made as exlained in this paragraph 7.

b) For each workday, the following timeard entries will be made:

i) the time of day that the employee's work activities for the workday actually begins;

ii) the time of day when any meal break (of 30 minutes or more) began, if the employee performed no duties during that break and had in advance been relieved of all duties; and the time of day when that break ended;

iii) the time of day when the employee's work activities for the workday actually ended;

iv) the total elapsed time from the time noted in subparagraph (i) to the time noted in subparagraph (iii), in this subparagraph (b) of this paragraph 7; and

v) the elapsed time specified in subparagraph (iv) less the elapsed time (if any) noted in subparagraph (ii), in this subparagraph (b) of this paragraph 7.

c) For each workweek, all of the following tries will be made on each of those timecards:

i) the total of the daily hours-worked totals; and

ii) the signature (or initials) of a person in authority, to certify for the Contractor that all of the entries on the timecard are complete and accurate, as required by this ECP.

iii) In totaling the hours worked, as recorded on a time card for an employee for a workday, the beginning time and the ending time may be rounded to the nearest quarter of an hour (so long as the use of this practice does not have the effect of failing to reflect, over a representative time period, all of the employee's hours worked).

d) All the entries on each time card that signify the time of day will be made by timeclock punches (by utilizing a tamper-proof timeclock that is to be furnished and maintained by the Contractor) subject to the procedures specified below in this paragraph 7.

e) Each employee is to perform all punching of that employee's hours worked on the timeclock, without any exceptions of any kind whatsoever.

f) If one or more punches have been mistakenly made or omitted by an employee, a correct entry will be entered in pen by the employee for each missing or incorrect punch, accompanied by the employee's clearly-readable initials and the date the employee made the correction.

g) If the Contractor (or the Contractor's authorized agent) finds that any timeclock entry or handmade entry made by the employee is not accurate, a non-obliterating line is to be drawn through the entry in pen and a corrected entry entered in pen next to it, accompanied by the clearly-readable initials of the Contractor (or the Contractor's authorized agent) who made the correction and the date that that correction was made by that person.

h) In each situation of a type referred to in subparagraph (f) and\or (g) of this paragraph 7, the following additional procedures will be followed:

i) the employee will be counseled on the importance of making timely and accurate entries on the timecards and doing so properly by properly using the timeclock (and the employee will be suitably disciplined if the employee fails to come into compliance);

ii) the employee will be consulted as to what the correct entry should have been;

iii) when the Contractor (or the Con-

tractor's authorized agent) and the employee are in agreement as to what the entry should have been, the corrected entry will be made by the employee, accompanied by the employee's clearly-readable initials and the date that the corrected entry is made by the employee; but if there is any disagreement, the corrected entry will be made by the Contractor (or the Contractor's authorized agent), accompanied by: the clearly-readable initials of the Contractor (or the Contractor's authorized agent), the date when the corrected entry is made, and an explanation by the Contractor (or the Contractor's authorized agent) regarding the nature and extent of the disagreement; and

iv) all corrected entries will be made promptly and will be made no later than the payday for the particular workweek that is involved (in the absence of extraordinary circumstances preventing promptness).

8. PAYROLL PROCESSES

a) The workweek, for purposes of complying with the Act, will end at the same time on the same day of each calendar week for all employees.

b) Each employee will be paid weekly, for all hours worked by the employee in the workweek covered by the payment.

c) The payday for any workweek for any employee will be not more than seven calendar days following the end of the workweek and will be the same day of the calendar week for all of the employees for each workweek.

d) All wages will be paid by using a payroll check and will be paid free and clear. No wages will be paid in cash or by any means other than a payroll check. In the event that any error is detected which needs to be corrected after the single payroll check for the workweek involved in that error has already been given to the employee, an additional payroll check will be issued for each of the workweeks for which a correction is to be made; and each check will be accompanied by a check stub as described in this ECP, identifying the workweek for which the correction is being made. If the number of corrections being made for a single employee on a single occasion make it impractical to issue an additional check for each workweek involved and/or correction(s) are being made more than 10 days after the regular pay day for any workweek involved, the corrections will then be treated as a backwage payment and the FIRM (plus the employee involved) will be promptly notified of all the details of the payment.

e) No payroll check will be cashed or otherwise negotiated, in whole or in part, by the Contractor or by any of its owners, officers, agents, or supervisory employees.

f) All payroll checks will be drawn on a single payroll account at a single establishment of a single bank or other financial institution (except as may be necessary from time to time to transfer all accounts of the Contractor from one such establishment to another, with the intent that that change be permanent).

g) No non-payroll transactions will be drawn on the payroll account (except as may be necessary to transfer funds not needed for payroll purposes, from time to time, directly from that account to the Contractor's general account).

h) Lawful deductions from wages, such as those made for the withholding and social security taxes (employee portion only) due on said wages and withheld from the pay of the employees, may be treated as payroll transactions for purposes of the subparagraph (g) of this paragraph 8, if consistently so treated and processed out of said payroll account regarding all employees.

9. INFORMATION TO BE ON PAYROLL CHECKSTUBS

a) Each payroll check will be accompanied by a detailed breakdown on a payroll checkstub, showing each item of information (for the particular employee for the particular workweek covered by the payment) specified in this paragraph 9.

b) Total hours worked (which is to equal the sum of the entries referred to in subparagraphs (c) and (d) of this paragraph 9).

c) Regular hours worked.

d) Overtime hours worked, if any;

e) Total gross compensation (which is to equal the sum of the entries referred to in subparagraphs (f) through (h) of this paragraph 9).

f) Gross regular-rate earnings, stating the portion attributable to each of the following:

i) the gross piecework earnings, if any,

ii) the gross make-up pay, if any, paid to bring the pay for work compensated on the basis of piecework rate(s) up to the applicable minimum wage rate for the workweek,

iii) the gross hourly earnings, if any, specifying the amount computed at each hourly rate (if there is more than one such rate for the employee) and identifying which hours were worked at each such rate, and

iv) other gross regular-rate earnings, if any, stating type and rate in each instance;

g) The premium-rated portion of the pay or overtime hours, if any;

h) Other gross earnings, if any, specifying type and rate in each instance;

i) Legal deductions made from the total gross earnings to arrive at total net earnings, specifying the portion which is for each of the following: federal withholding taxes; employee portion of the Social Security taxes; State withholding taxes, if any; local withholding taxes, if any; and disability income taxes, if any; and

j) Any other deductions, itemizing both the nature and amount of each one separately.

10. RESPONSIBILITY TO MONITOR COMPLIANCE

a) On an ongoing basis, the Contractor will monitor that the Act and this ECP are being fully complied with, including doing all the monitoring specified in this paragraph 10.

b) The Contractor (its principal owner or other top management official if the Contractor is an organization) will personally monitor that this ECP is fully complied with. The extent of that personal involvement will be sufficient (even if some of the monitoring required by this ECP is delegated) to ensure that no noncompliance with the Act and/or this ECP occurs.

c) The monitoring will be done by the Contractor in accordance with a schedule of daily, weekly, and monthly checks that include all the measures specified in this paragraph.

d) On a no-less-than-once-a-day basis, the Contractor will do all of the following monitoring:

i) check, with respect to each person, that all of the employees present have punched the timeclock and that no person is underage or doing any work without being on the payroll.

ii) check, with respect to all employees in general, whether (near the start of the workday) the number of timecards that are punched in matches the number of employees present and whether (near the end of the workday) the number of timecards that are still punched in matches the number of employees who are still present.

iii) check further (on the occasion of any monitoring) whenever any discrepancies are found by use of any technique, to determine the full extent of the discrepancies.

e) On a no-less-than-once-a-week basis, the Contractor will do all of the following monitoring:

i) check, with respect to each employee, that the timeclock has been properly used to record all hours worked (and, if not, check that the employee was correctly counseled and that correct procedures were used to correct the missed or incorrect timecard punches).

ii) check, with respect to all employees (by checking a random sample), whether the hours worked recorded on the time cards have been correctly totaled and whether each component of the total gross pay (including the computation of piecework earnings, if the employee is paid in whole or in part on a piecework basis) has been correctly computed.

iii) check further (on the occasion of any monitoring) whenever any discrepancies are found by use of any technique, to determine the full extent of the discrepancies.

f) On a no-less-than-once-a-month basis, the Contractor will do all of the following monitoring:

i) check, with respect to each employee, whether hours worked and wages paid were correct in the opinion of the employee (by asking the employee personally) and whether the methodology used to compute the wages paid the employee is correct.

ii) checking, with respect to all employees generally (by checking a random sample), whether the methodology used to compute the wages paid the employee is correct.

iii) check further (on the occasion of any monitoring) whenever any discrepancies are found by use of any technique, to determine the full extent of the discrepancies.

g) Whenever a problem is detected, prompt corrective action will be taken; and a heightened state of monitoring of the problem areas will be used by the Contractor for as long as necessary to verify that the corrective actions taken have eliminated all the problems.

h) The Contractor will make, keep, and preserve complete and detailed records of all monitoring activities, conducted to comply with this ECP or otherwise. Such records will, at a minimum, detail the nature and extent of each of the following:

i) the date and extent of each monitoring activity that was conducted,

ii) the name and position of the person who did the actual monitoring,

iii) the nature and extent of any dis-

crepancies or other problems noted,

iv) the details of each corrective action taken to correct each problem that was noted,

v) the heightened monitoring to be implemented and continued until additional monitoring confirms that the corrective actions have eliminated all of the problems, and

vi) the details of the heightened monitoring actually conducted; and

all of the records required by this subparagraph (h) will be retained for at least one year.

11. DUTY TO COOPERATE WITH FIRM'S MONITORING

a) The Contractor will cooperate fully with all efforts by the FIRM (or its duly-authorized agents) to monitor whether the Contractor is fully complying with the Act and this ECP, including keeping the FIRM fully informed at all times as to where any and all work subject to this ECP is being performed.

b) To help ensure such monitoring is effective, the Contractor will allow (on demand and without any prior notice or other limitations) any agent of the FIRM or DOL to have full and immediate access to any premises, any records (including the right to copy the records), and any employees (including the right to privately interview each employee) that are (or may be or may have been) relevant to determining compliance with the Act and/or this ECP by the Contractor at any time.

c) The Contractor will supply certified copies of records of the Contractor as demanded by the FIRM pursuant to any agreement between the FIRM and the DOL.

12. REQUIRED NOTICES OF UNPROFITABILITY

a) If at any time it appears to the Contractor that, due to the price terms, the Contractor is or will be unable to make a profit on the Contractor's participation in any purchase by the FIRM while still complying fully with the Act, as interpreted by DOL, the Contractor will immediately write to the FIRM to tell the FIRM of that fact.

b) As soon thereafter as possible, the Contractor will again write to the FIRM to report to the FIRM the Contractor's findings as to the following matters:

i) the results of a time and cost study (demonstrating the payroll costs needed to continue such participation while still complying with the Act), plus reasonable overhead, and

ii) the Contractor's own estimate of the changes in the price terms needed for the Contractor to make a profit on the continuation of such participation while still complying with the Act.

c) If more than 10 days passes after the Contractor has written to the FIRM a letter of the type referred to in subparagraph (b) of this paragraph 12 without the FIRM agreeing in writing to adjust the price terms, as proposed in that letter from the Contractor, the Contractor will notify the DOL in writing of that fact (and furnish to the DOL a copy of each of the letters on the subject on the particular purchase involved).

13. MANNER OF CONTRACT PERFORMANCE

a) The Contractor will comply with all regulations, restrictions, and prohibitions on the use of homework, as prescribed by DOL's homework regulations (Title 29, Code of Federal Regulations, at Part 530). Homework on women's garments is prohibited by those regulations.

b) All work on each purchase will be performed by employees of the Contractor, unless the FIRM's prior written approval has been granted for a particular subcontract. No approval will be effective until the subcontractor has agreed in writing that all of the terms and conditions of this ECP apply equally to the subcontractor and that the term Contractor as used in this ECP will be deemed to also include the subcontractor for all purposes.

c) All work performed in any establishment will be subject to this ECP if any of the work in connection with a purchase by the FIRM is done in that establishment, unless (with the prior written approval of the FIRM) the Contractor does all work on the purchase in a separate department of that establishment with a work force doing work only on that purchase (and/or on other purchases by the FIRM).

14. CONSEQUENCES OF VIOLATIONS; READING ECP

a) The Contractor acknowledges and agrees that any failure to fully comply with this ECP may result in the FIRM terminating all purchases from or involving the Contractor and may result in the FIRM refusing to make any further purchases from or involving the Contractor (or its owners and\or management).

b) By signing this ECP, the Contractor certifies that the Contractor has read this entire ECP and certifies that the Contractor agrees to the terms and conditions of this ECP and that the Contractor will fully comply with this ECP.

# Attachment No. 2: PROGRAM TO MONITOR CONTRACTORS

[PMC(AM).6]

. NAME AND PURPOSE OF DOCUMENT

a) This document is a Program To Monitor ontractors (called PMC), for use by a shipper to help to ensure full compliance by the hipper with Section 15(a)(1) of the Fair Laor Standards Act (called the Act); and, for urposes of this PMC, the term "shipper" includes any person or firm engaging in any of he activities that are regulated by Section 5(a)(1) of the Act.

b) Section 15(a)(1) of the Act generally rohibits any person or firm from transporting, offering for transportation, shipping, elivering, or selling in interstate or forign commerce (called commerce) any goods roduced in violation of the minimum wage nd/or overtime pay provisions of the Act, ithout regard to whether the underpaid employees are employees of that particular person or firm. It also prohibits any person or irm from shipping, delivering, or selling uch goods with knowledge (or reason to beieve) that any other person or firm intends o ship, deliver, or sell the goods in comerce.

c) This PMC is designed to help the exeiting firm (called the FIRM) to comply with ll these provisions of the Act. It does so y specifying a schedule for monitoring and nforcing compliance with the minimum wage nd overtime pay provisions of the Act by ach person or firm from which the FIRM akes, directly or indirectly, any purchase f any goods (and/or services, to be perormed on any goods); and any such purchase s called a purchase in this PMC.

GENERAL SCOPE AND FREQUENCY OF MONITORING

a) Monitoring will be conducted by the RM with respect to each Contractor involved any purchase. This PMC describes the varous levels of monitoring that will, at a nimum, be conducted by the FIRM. Monitoring ll cover all aspects of the Contractor's mpliance with the minimum wage and overtime y provisions of the Act and with the Employer Compliance Program (called ECP), including the child labor provisions and the cordkeeping, posting, and reporting provions.

b) Three levels of intensity of monitoring tivity will be established and applied to ntractors by the FIRM, as set forth in this ragraph 2.

c) Minimum-intensity monitoring (as defined in paragraph 3 of this PMC) will be the minimum level of such monitoring from which no Contractor will be excused at any time.

d) Intermediate-intensity monitoring (as defined in paragraph 4 of this PMC) will become applicable to a Contractor if the FIRM finds (or has found) at any time any act or omission by the Contractor at any time on any purchase made by the FIRM in violation of:

i) the minimum wage and/or overtime pay provisions of the Act, or

ii) the recordkeeping requirements of the Act (or the implementing regulations at Title 29, Code of Federal Regulations, Part 516) or the ECP, if the act or omission has occurred before or may have impaired the ability of the FIRM and\or the DOL to detect violation(s) of the minimum wage and\or overtime pay provisions of the Act by the Contractor.

e) High-intensity monitoring (as defined in paragraph 5 of this PMC) will become applicable to a Contractor if:

i) the Contractor is required to comply with any certified payroll reporting procedures pursuant to any agreement between the DOL and the FIRM,

ii) the Contractor is found by the FIRM to have commited any act or omission of the types referred to in subparagraph (d) of this paragraph 2 while subject to ongoing intermediate-intensity or high-intensity monitoring, or

iii) the DOL hereafter finds that the Contractor willfully and/or repeatedly violated the minimum wage and/or overtime pay provisions of the Act (regardless of whether any direct or indirect purchase from the Contractor by the FIRM was involved in the violations found by the DOL), provided that the FIRM is notified in writing by the DOL of the DOL finding and the resulting applicability of high-intensity monitoring under this PMC.

f) Where there is an ongoing relationship between the FIRM and a Contractor, all the monitoring called for by this paragraph 2 will be ongoing and in accordance with the provisions of this PMC. Where there is no such relationship, the same will be done; but such monitoring will commence shortly after commencement of contract performance (but not before completion of a full payroll cycle or the passage of 20 days, whichever first occurs).

3. COMPONENTS OF MINIMUM-INTENSITY MONITORING

a) In all instances, minimum-intensity monitoring will include, at a minimum, all of the features specified in this paragraph 3.

b) Visits to each Contractor establishment involved in any purchase will be conducted, to check whether the Act and the ECP are being fully complied with. Such a visit will be made to each establishment at least once each 90 days (or at least once each 180 days in the case of an establishment where the FIRM's monitoring of that Contractor at that establishment in accordance with this PMC over the preceding one-year period has resulted in no violations of the Act or the ECP being noted, provided that

i) the Contractor uses a tamper-proof timeclock to record all the hours worked by each employee of the Contractor and uses a reputable independent payroll service to compute from the timecards the wages due and to prepare the paychecks (including the paystubs) to pay such wages, and

ii) the FIRM notifies the DOL in writing in advance (and annually thereafter) of the name and actual business address of each such Contractor without DOL promptly notifying the FIRM that the DOL objects to such lessening of the frequency of monitoring by the FIRM).

c) Each such visit will include both checking that is general in nature and checking to determine whether each established or potential problem previously found by the FIRM during any prior monitoring activity involving the Contractor has been fully corrected, including:

i) reviewing with the Contractor personally (and with any person to whom the Contractor has delegated any monitoring responsibilities) the provisions of the ECP and questioning the Contractor as to whether the ECP is being fully complied with, including correction of each such problem previously found,

ii) an inspection of the time and payroll records for facial compliance with the Act and the ECP, and

iii) personal interviews of 5 percent of the Contractor's workforce, but no fewer than three such employees in any event.

d) Monitoring to be done on that particular visit will be expanded to the level required for an intermediate-intensity monitoring visit (as specified in paragraph 4 of this PMC) if any reason to believe that the Contractor may not have complied in full with the Act and/or the ECP is noted.

e) The intensity of monitoring to be done thereafter on an ongoing basis will be reclassified to the intermediate-intensity level if the FIRM finds, as a result of monitoring (scheduled or unscheduled, initial or expanded), any act or omission of the types referred to in subparagraph (d) of paragraph 2 of this PMC.

f) At the conclusion of each monitoring visit, a closeout conference will be conducted, as called for in subparagraph (g) of paragraph 6 of this PMC.

4. COMPONENTS OF INTERMEDIATE-INTENSITY MONITORING

a) In all instances, intermediate-intensity monitoring will, at a minimum, include all of the features specified in this paragraph 4.

b) Visits to each Contractor establishment involved in any purchase will be conducted, to check whether the Act and the ECP are being fully complied with. Such a visit will be made to each establishment at least once each 30 days.

c) Each such visit will include both checking that is general in nature and checking to determine whether each established or potential problem previously noted by the FIRM during any prior monitoring activity has been fully corrected, including:

i) reviewing with the Contractor personally (and with any person to whom the Contractor has delegated any monitoring responsibilities) the provisions of the ECP and questioning the Contractor as to whether the ECP is being fully complied with, including correction of each such problem previously found and each problem that causes the Contractor to be subject to such heightened monitoring,

ii) an inspection of the time and payroll records for facial compliance with the Act and the ECP, including an inspection of all such records for at least one full workweek, and

iii) personal interviews of 10 percent of the Contractor's workforce, but no fewer than five such employees in any event.

d) Monitoring to be done on that particular visit will be expanded to the level required for a high-intensity monitoring visit (as specified in paragraph 5 of this PMC) if any reason to believe that the Contractor may not have complied in full with the Act and/or the ECP is noted.

e) The intensity of monitoring to be done thereafter on an ongoing basis will be reclassified to the high-intensity level if the FIRM finds, as a result of monitoring (scheduled or unscheduled, initial or expanded), any violation of the Act or the ECP.

f) Whenever a Contractor has become subect to ongoing intermediate-intensity monioring, monitoring at that level will be conimued until correction of each problem trigering the applicability of such monitoring as been verified in accordance with subpararaph (f) of paragraph 6 of this PMC.

g) At the conclusion of each monitoring isit, a closeout conference will be conductd, as called for in subparagraph (g) of pargraph 6 of this PMC.

. COMPONENTS OF HIGH-INTENSITY MONITORING

a) In all instances, high-intensity monioring will, at a minimum, include all of the eatures specified in this paragraph 5.

b) Visits to each Contractor establishment nvolved in any purchase will be conducted, o check whether the Act and the ECP are beng fully complied with. Such a visit will be ade to each establishment at least once each orkweek.

c) Each such visit will include both necking that is general in nature and checkng to determine whether each established or otential problem previously noted by the IRM during any prior monitoring activity has een fully corrected, including:

i) reviewing with the Contractor personally (and with any person to whom the Contractor has delegated any monitoring responsibilities) the provisions of the ECP and questioning the Contractor as to whether the ECP is being fully complied with, including correction of each such problem previously found and each problem that causes the Contractor to be subject to such heightened monitoring;

ii) an inspection of the time and payroll records for facial compliance with the Act and the ECP, including an inspection of all such records for the entire period since the preceding monitoring visit called for by this PMC.

iii) personal interviews of 10 percent of the Contractor's workforce, but no fewer than ten such employees in any event.

d) Monitoring to be done on that particur visit will be expanded in intensity and ope (including employee interviews that are eater in number and scope and are suffiently detailed to uncover both the full ture and scope of any problems) if any reaon to believe that the Contractor may not ve complied in full with the Act and/or the P is noted.

e) Whenever a Contractor has become subct to ongoing high-intensity monitoring, nitoring at that level will be continued til correction of each problem triggering the applicability of such monitoring has been verified in accordance with subparagraph (f) of paragraph 6 of this PMC.

f) At the conclusion of each monitoring visit, a closeout conference will be conducted, as called for in subparagraph (g) of paragraph 6 of this PMC.

6. INTEGRITY AND EFFECTIVENESS OF MONITORING PROCESSES

a) To help ensure that the monitoring processes called for by this PMC serve the intended purposes of this PMC, the measures specified in this paragraph 6 will be, without any exceptions, observed by the FIRM with respect to all monitoring activities.

b) All monitoring visits called for by this PMC will be conducted by unannounced visits, without any prior notice to any Contractor. Upon arrival at an establishment for such a monitoring visit, the FIRM will demand full and immediate access to any premises where any work in connection with any purchase is (or may be or may have been) being performed, immediate access (and the right to inspect and/or copy) any records that are or may be relevant to compliance with the Act and/or the ECP, and the immediate opportunity to interview privately any employee(s) who are (or may be or may have been) performing any work in connection with any purchase, for purposes of checking for full compliance with the Act and the ECP.

c) Each monitoring visit called for by this PMC will address the entire period since the preceding monitoring visit called for by this PMC or the start of the involvement of the Contractor (unless interrupted by one or more periods in excess of 180 days during which there was no such involvement) in any purchase(s), whichever is later, in addition to addressing any established or potential problem found on any prior monitoring visit (until correction of the problem has been verified in accordance with subparagraph (f) of this paragraph 6).

d) In conducting employee interviews, each interview will be conducted in private (with only the FIRM and the employee being interviewed present), each employee to be interviewed will both be selected by the FIRM and selected at random from among those affected by purchase(s), and each interview will (at a minimum) be designed and conducted to determine whether the employee has any information about the Contractor (or any sub-Contractor) that tends to show that:

i) time and payroll records are not complete and accurate as to all employees,

ii) there have been any acts or omis-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

01 CV 0792 (ILG)(RML)

FEN X. CHEN, QIU CHEN, and YU ZHENG, CHAI CHEN, DANG ZHENG, HUA CHEN, YONG CHEN, KUN HUANG, and QI LIU,

Plaintiffs,

- against -

STREET BEAT SPORTSWEAR, INC., ALBERT PAPOUCHADO, MICHEL AMAR, JIAN WEN LIANG a.k.a. RAYMOND LIANG, FEN CHEN a.k.a. HUA FEN CHEN, LUN WEI FAN, 1A FASHIONS INC., and RED ARROW INC.,

Defendants.

# AMENDED COMPLAINT

DAVIS POLK & WARDWELL
450 LEXINGTON AVENUE
NEW YORK, NEW YORK 10017
(212) 450-4000

ASIAN AMERICAN LEGAL DEFENSE & EDUCATION FUND INC.
99 HUDSON STREET
NEW YORK, NEW YORK 10013
(212) 966-5932

*Attorneys for* PLAINTIFFS

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FEN X. CHEN, QIU CHEN, YU ZHENG, CHAI CHEN, DANG ZHENG, HUA CHEN, YONG CHEN, KUN HUANG, and QI LIU,

Plaintiffs,

-against-

STREET BEAT SPORTSWEAR, INC., ALBERT PAPOUCHADO, MICHEL AMAR, JIAN WEN LIANG a.k.a. RAYMOND LIANG, FEN CHEN a.k.a. HUA FEN CHEN, LUN WEI FAN, 1A FASHIONS INC., and RED ARROW INC.

Defendants.

------------------------------------------------------------X

01 Civ. 0792 (ILG) (RML)

**[PROPOSED] SECOND <u>AMENDED COMPLAINT</u>**

PRELIMINARY STATEMENT

1. This is an action to obtain wages rightfully owed Plaintiffs under federal and state labor laws and under common law. At various time in the last few years, Plaintiffs worked for defendants often averaging 100 hours or more of work per week and were never paid overtime. Two of the Plaintiffs were even asked to work without pay. When they refused and complained, these Plaintiffs were fired in retaliation and false charges were filed with the police against one of them.

JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction

over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. In addition, the Court has jurisdiction over Plaintiffs' claims under the Fair Labor Standards Act pursuant to 29 U.S.C. §216(b). Plaintiffs have consented in writing to become parties to this lawsuit.

3. Venue is vested in the Eastern District of New York pursuant to 28 U.S.C. § 1391 (a) as substantial part of the events giving rise to the claims occurred in this district.

PARTIES

4. Plaintiffs FEN X. CHEN, QUI CHEN, YU ZHENG, CHAI CHEN, DANG ZHENG, HUA CHEN, YONG CHEN, KUN HUANG, and QI LIU are garment workers who worked for the Defendants. The Chens are not related to Defendant Fen Chen.

5. Defendants 1A FASHIONS INC. and RED ARROW INC. are garment factories owned and/or operated as an "enterprise" by Defendants JIAN WEN LIANG a.k.a. RAYMOND LIANG, FEN CHEN a.k.a. HUA FEN CHEN, and LUN WEI FAN along with other unnamed garment factories. These defendant factories and the other factories in the enterprise have gone through several corporate names and several addresses over the past several years, but have remained essentially the same, employing many of same employees, using the much of same equipment and doing work for Defendant Street Beat Sportswear, Inc. The earlier corporate names included Hua Great Procetech, Inc., Covello, Inc., XMG Fashion, Inc., New Port Fashions, Inc., Kam Fai Fashion Inc., and CCY New Worktech, Inc. More recently, Red Arrow Inc. has been succeeded and replaced by Hunter Fashion, Inc. and later City Garment, Inc.

6. Because of their joint operation and overlapping ownership and control, Defendants 1A Fashion Inc. and Red Arrow Inc. and other factories under the ownership or control of

Defendants Liang, Chen and Fan constitute an "enterprise" as defined by the Fair Labor Standards Act, 29 U.S.C. § 203(r).

7. Hereinafter the factory enterprises run and controlled by Jian Wen Liang, Fen Chen, and Lun Wei Fan which includes Defendants 1A Fashions Inc. and Red Arrow Inc. as well as their other corporate factories, along with Jian Wen Liang, Fen Chen, and Lun Wei Fan, will be sometimes collectively referred to as "Factories" or "Factory Defendants."

8. Defendant STREET BEAT SPORTSWEAR, INC. is a manufacturer of women's sportswear and employs Factory Defendants to produce such sportswear. Street Beat Sportswear, Inc. was incorporated in Queens County on February 2, 1992.

9. Defendants ALBERT PAPOUCHADO and MICHEL AMAR are officers and owners of Defendant Street Beat Sportswear, Inc. They manage Defendant Street Beat Sportswear, Inc.

10. Defendant Street Beat Sportswear, Inc. and Defendants Albert Papouchado and Michel Amar are hereinafter collectively sometimes referred to as "Street Beat" or "Manufacturer Defendants."

11. Factory Defendants and Manufacturer Defendants are Plaintiffs' employers or joint employers within the meaning of the Fair Labor Standards Act.

12. Defendants are engaged in interstate commerce or the production of goods for interstate commerce.

STATEMENT OF FACTS

13. Plaintiffs are garment workers who worked for Defendants from 1996 until 2000.

(a) Fen X. Chen and Qui Chen worked as hangers from July 1999 until September

2000.

    (b) Plaintiff Yu Zheng worked as a garment inspector from June 1999 until October 1999 and as a hanger from August 2000 until November 2000.

    (c) Plaintiff Chai Chen worked as a button sewer from November 1998 until July 1999.

    (d) Plaintiff Dang Zheng worked as a hanger and later as button sewer from June 1996 until July 1999.

    (e) Plaintiff Hua Chen worked as an iron presser from August 1999 until November 1999.

    (f) Plaintiff Yong Chen worked as a hanger from July 1999 until August 1999, and then again from March 2000 until August 2000.

    (g) Plaintiff Kun Huang worked as a general helper from March 1997 until July 1997.

    (h) Plaintiff Qi Liu worked as a garment inspector from November 1996 until July 1997.

14. On information and belief, Manufacturer Defendants provide the garment design, the sewing instructions, the textiles, the trimmings and other materials to Factory Defendants for the preparation of garments.  The Factory Defendants are a fully integrated element of Street Beat's manufacturing operation.

15. Some of the Plaintiffs were paid by the piece and others by the hour.

16. During their employment with Defendants, Plaintiffs worked seven days a week with

only one or two days off a year.

17. They regularly worked from early morning until late at night. Very often they worked past midnight into the next morning and after taking a short break of a few hours, would resume working.

18. For example, in one week in May 2000, Fen X. Chen and Qiu Chen hung 59,476 garments. In that week, Plaintiffs estimate that they worked 140 hours.

19. Plaintiffs and other workers at the Factories were never paid their rightful overtime wages for all their hours of work over 40 hours a week during their employment with Defendants.

20. Defendants willfully and intentionally failed to pay Plaintiffs and other workers in the Factories their lawful wages. Defendants acted maliciously and wantonly in their disregard for Plaintiffs' rights by making Plaintiffs work seven days a week and over a hundred hours of work a week without overtime pay and threatening them with the loss of their jobs if they did not comply.

21. Defendants maintained false employment records, including false time records in an effort to cover up their violations.

22. On information and belief at all times material to the complaint, each of the Factories was completely controlled and dominated by the Manufacturer Defendants, and each Defendant aided and abetted the wrongful acts of the others.

23. On information and belief, approximately 90% of the garments that the Factories prepare are produced for Manufacturer Defendants.

24. The Manufacturer Defendants knew or should have reasonably known that Plaintiffs were not properly paid minimum wage and overtime for their work by Factory Defendants and that unlawful Sunday work was taking place.

25. Street Beat had a representative present in the Factories on an average of three times a week who among other things monitored the production and quality of Plaintiffs' work.

26. The Manufacturer Defendants had notice that these violations were likely to be present in the Factories. Street Beat had been sued previously by workers in factories run by some of the same Defendants and at some of the same locations. These same factories had been found in violation of the Fair Labor Standards Act by the United States Department of Labor. The owners of these factories including Defendant Liang had been found by the New York State Supreme Court to have fired workers in retaliation for complaints about unlawful wage and hour practices. Defendant Liang had also been found guilty of misdemeanor violations by the New York City Criminal Court for taking unlawful kick backs in violation of the New York state wage and hours law. New York Labor Law § 198-b.

27. Defendants had a duty to protect the lives, health and safety of Plaintiffs. See, New York Labor Law §200. By forcing Plaintiffs to work such long hours, Defendants violated that duty and profited from it.

28. On information and belief, the Manufacturer Defendants contracted with the Factory Defendants at prices too low and subject to conditions for delivery too onerous to allow for the payment of minimum wage and overtime pay to Plaintiffs and other employees. Plaintiffs believe that Manufacturer Defendants have similarly contracted with others at such low prices.

Manufacturer Defendants profited directly through the unlawful treatment of Plaintiffs and others working for Factory Defendants.

29. Manufacturer Defendants knew or should have known that their garments were produced by Plaintiffs and other workers in violation of the minimum wage and overtime laws, i.e. "hot goods." Thus, Manufacturer Defendants were barred from transporting or selling these garments by the Fair Labor Standards Act, 29 U.S.C. § 215 and New York Labor Law § 345(10). Nevertheless, Manufacturer Defendants continued to ship and sell such garments from the Factory Defendants and profited from doing so.

30. Manufacturer Defendants utilize the practice of contracting out the production of their garments to Factory Defendants and others similarly situated, thereby entrusting Factory Defendants with the Manufacturer Defendants' duty to exercise due care and to comply with labor law provisions and common law principles relevant to the production of garments and the treatment of workers, in part to seek to avoid compliance with labor laws and liability for violation of those laws.

31. On February 26, 1997, Manufacturer Defendants signed a "Memorandum of Agreement" [Exhibit A] with the United States Department of Labor by which the Manufacturer Defendants entered into an ongoing "Augmented Compliance Program Agreement" (the "Agreement") [form agreement attached as Exhibit B]. The Agreement imposed several duties on the Manufacturer Defendants, including but not limited to (1) the pre-contract evaluation of the economic feasibility, based on the price terms involved, of a contractor's compliance with the Fair Labor Standards Act, (2) the ongoing monitoring of contractor compliance with the Fair

Labor Standards Act, and (3) in the event that violations of the Fair Labor Standards Act by a contractor are detected by the Manufacturer Defendants, a suspension of shipment of all goods affected by said violations and payment of all unpaid back wages. On information and belief, the Manufacturer Defendants breached this contract.

32. On information and belief, each of the Defendants was the agent, employee and/or joint venture partner of, or was working in concert with the co-defendants and was acting within the course and scope of such agency, employment and/or joint venture or concerted activity. To the extent that said conduct or omissions were perpetrated by certain defendants, the other defendant or defendants confirmed or ratified such conduct and omissions.

SECTION 216(b) "CLASS" CLAIMS

33. Manufacturer Defendants employ other workers in other factories in New York City under the same or similar circumstances as are found in the Factories. Manufacturer Defendants provide these factories with the large majority of work done in these factories and dominate and control these factories and their owners. Manufacturer Defendants are the joint employers of the workers in these other factories. On information and belief, the workers in these factories are not paid overtime pay.

34. Pursuant to 20 U.S.C. § 216(b), Plaintiffs seek to represent all similarly situated workers in factories in New York City that make garments Street Beat and where Street Beat is a joint employer.

RETALIATION

35. On Sunday, September 24, 2000, Defendant Lun Wei Fan directed the Plaintiffs Fen

X. Chen and Qui Chen along with a third worker to move the garments that they had previously hung to the basement for shipping to the manufacturer. This was not part of the Chen's job, and they were not to be paid for this work. This job is usually done by as many as four men and requires a full day because the garments must be moved, and then re-hung on rolling carriers.

36. Plaintiffs Fen X. Chen and Qui Chen complained that this was not their work and wanted to continue hanging the lot of garments that they were working on and for which they would be paid. Defendant Fan said that they could either do this unpaid work or be fired. Plaintiff Fen X. Chen responded that they would complete their work on the lot of garments they had begun, and then after being paid for that work plus the work that they had done the prior three weeks, they would leave. The Plaintiffs are paid on a Wednesday to Wednesday basis, but Factory Defendants had a two week lag in payments such that on Wednesday, Plaintiffs and other employees were paid for work that had begun three weeks earlier. The Chens continued to work hanging garments on Monday and Tuesday. On Wednesday, September 26, 2000, when Plaintiff Fen X. Chen returned from lunch, he was met by the police who arrested him based on false assault charges made by Defendant Fan.

FALSE ARREST

37. On or about September 24, 2000, Plaintiff Fen X. Chen was in a dispute about the size of the button holes in the garments with Bi Wu Wu, a button sewer,. Plaintiff Fen X. Chen believed that Bi Wu Wu was making the button holes too small, at the direction of Defendant Lun Wei Fan, in order to slow down Fen X. Chen in his employment duties.

38. During this dispute, Bi Wu Wu picked up a chair and threatened Plaintiff Fen X.

Chen. Plaintiff Fen X. Chen, in an effort to defend himself, picked up a small bottle of sauce.

39. There was no physical contact between Bi Wu Wu and Plaintiff Fen X. Chen.

40. Defendant Lun Wei Fan directed Bi Wu Wu to complain about Plaintiff Fen X. Chen's actions to police officers of the City of New York and to represent to those officers that Plaintiff Fen X. Chen had hit Bi Wu Wu with the bottle. Defendant Lun Wei Fan and Bi Wu Wu were both aware that this representation was false.

41. On or about September 25, 2000, Bi Wu Wu and Defendant Lun Wei Fan, accompanied by a Street Beat quality control employee, complained to police officers of the City of New York, accusing Plaintiff Fen X. Chen of having committed the crimes of assault in the third degree, menacing in the second degree, harassment in the second degree, and criminal possession of a weapon in the fourth degree under the laws of the State of New York. These accusations included false statements of fact including the statement, made by Bi Wu Wu at the direction of Defendant Lun Wei Fan, that Plaintiff Fen X. Chen had struck Bi Wu Wu with a bottle, and a statement by Defendant Lun Wei Fan that Plaintiff Fen X. Chen had threatened Defendant Lun Wei Fan.

42. On or about September 26, 2000, at approximately 2:00 p.m., these police officers arrested Plaintiff Fen X. Chen, and restrained him of his liberty until he was discharged.

43. The police officers arrested Plaintiff Fen X. Chen based upon the false charges cited above, and upon the request, counsel, command and procurement of Defendant Lun Wei Fan.

44. In doing all the acts and things aforesaid, Defendant Lun Wei Fan acted willfully and maliciously.

45. After having been arrested, Plaintiff Fen X. Chen was held in custody and restrained of his liberty for approximately twelve hours. While under arrest and deprived of his liberty, Plaintiff Fen X. Chen was taken to a police station, finger printed, and "booked." Plaintiff Fen X. Chen's name and pedigree were entered on the police records according to the police practice on the arrest of criminals, and a charge was entered that he had been arrested for assault.

46. Plaintiff Fen X. Chen was brought before the Criminal Court of the City of New York the next day, September 27, 2000, and he was released without bail. The Court also issued Orders of Protection against Plaintiff Fen X. Chen, ordering him, inter alia, to stay away from the person, home, school, business, and place of employment of Bi Wu Wu and of Defendant Lun Wei Fan.

47. The charges against Plaintiff Fen X. Chen were adjourned in contemplation of dismissal under New York C.P.L. § 170.55.

48. Prior to the arrest, Plaintiff Fen X. Chen had enjoyed a good reputation in his community.

49. As a result of all the acts of Defendant Lun Wei Fan, Plaintiff Fen X. Chen was greatly humiliated, subjected to mental and bodily distress, and suffered additional costs and expenses, including legal fees.

FIRST CLAIM FOR RELIEF

FEDERAL OVERTIME CLAIMS

50. Plaintiffs allege and reallege all the above paragraphs.

51. Defendants' willful failure to pay Plaintiffs overtime pay for work over 40 hours per week violates 29 U.S.C. § 201 et seq. and the supporting federal Department of Labor regulations.

SECOND CLAIM FOR RELIEF

NEW YORK STATE MINIMUM WAGE AND OVERTIME CLAIM

52. Plaintiffs allege and reallege all the above paragraphs..

53. Defendants' willful failure to pay Plaintiffs the minimum wage and overtime pay for work over 40 hours per week violate New York Labor Law §§ 190 et seq. and 650 et seq. and the supporting New York State Department of Labor regulations.

THIRD CLAIM FOR RELIEF

NEW YORK STATE SPREAD OF HOURS CLAIM

54. Plaintiffs allege and reallege all the paragraphs above.

55. Defendants intentionally failed to pay Plaintiffs an extra hour's pay for every day that Plaintiffs worked over 10 hours in violation of New York Labor Law §§ 190 et seq. and 650 et seq. and the supporting New York State Department of Labor regulations.

FOURTH CLAIM FOR RELIEF

NEGLIGENT SUPERVISION AGAINST MANUFACTURERS

56. Plaintiffs allege and reallege all the above paragraphs.

57. Manufacturer Defendants hired, retained or contracted with the Factory Defendants to

perform garment manufacturing work for them. Manufacturer Defendants exercised control over the operative details of garment production work performed by the Factory Defendants.

58. Manufacturer Defendants knew or should have reasonably known that the Factory Defendants were engaging in the alleged wrongful conduct and that this conduct would directly and proximately result in injury to Plaintiffs.

59. Manufacturer Defendants had the authority to supervise, prohibit, control and/or regulate the Factory Defendants so as to prevent these acts and omissions from occurring.

60. Manufacturer Defendants knew or should have reasonably known that unless they intervened to protect Plaintiffs and properly supervised, controlled and/or regulated the conduct of the Factory Defendants, that the Factory Defendants would perceive their acts and omissions as being ratified and condoned.

61. As a direct and proximate result of the Manufacturer Defendants failure to exercise due care and to supervise, control and /or regulate the Factory Defendants, Plaintiffs have suffered injuries entitling them to damages in an amount to be determined at trial.

FIFTH CLAIM FOR RELIEF

NEGLIGENT HIRING AGAINST MANUFACTURERS

62. Plaintiffs allege and reallege all the paragraphs above.

63. Manufacturer Defendants hired, retained or contracted with the Factory Defendants to perform garment manufacturing work for them.

64. Manufacturer Defendants failed to exercise reasonable care in selecting, hiring, retaining

or contracting with the Factory Defendants to perform this work. At the time that the Manufacturer Defendants entered into this relationship with the Factories, they knew or should have reasonably known that the Factory Defendants would violate Plaintiffs' rights under the federal and state labor laws and that, as a direct and proximate result of these violations, Plaintiffs would suffer the injuries alleged herein.

65. As a direct and proximate result of the Manufacturer Defendants' negligent selection, hiring, retention and contracting with the Factory Defendants, Plaintiffs have suffered the injuries alleged herein, entitling the Plaintiffs to damages in amounts to be proven at trial.

SIXTH CLAIM FOR RELIEF

NEGLIGENCE PER SE: VIOLATION OF FEDERAL AND

STATE "HOT GOODS" PROVISIONS AGAINST THE MANUFACTURERS

66. Plaintiffs allege and reallege all the paragraphs above.

67. Manufacturer Defendants hired, retained or contracted with the Factory Defendants to perform garment manufacturing work for them. The garments produced for Manufacturer Defendants by the Factory Defendants using Plaintiffs' labor were produced in violation of the wage and hour provisions of the Fair Labor Standards Act and New York Labor Law as alleged above.

68. Manufacturer Defendants knew or should have known about these violations of the wage and hour provisions of the federal and state labor laws.

69. Manufacturer Defendants nevertheless transported, shipped and sold these illegally produced garments in violation of the "hot goods" provisions of the Fair Labor Standards Act, 29

U.S.C. §§ 215(a) and 217 and New York Labor Law § 345(10). Plaintiffs are among the class of persons that these labor laws were designed to protect.

70. As a direct and proximate result of the Manufacturer Defendants' transportation, shipping and sale of said garments, Plaintiffs have suffered economic and personal injuries, including the receipt of substandard wages, unduly long hours of work without any day of rest, resulting in injury to the Plaintiffs' health and welfare, and damages in an amount nature and degree to be proven at trial.

SEVENTH CLAIM FOR RELIEF

THIRD PARTY BENEFICIARY OF CONTRACT CLAIM AGAINST MANUFACTURERS

71. Plaintiffs allege and reallege all the paragraphs above.

72. As alleged above, Manufacturer Defendants entered into an Agreement with the United States Department of Labor requiring the Manufacturer Defendants, among other things, to evaluate the feasibility of contractors' compliance with the Fair Labor Standards Act, monitor said compliance, and suspend shipment of goods affected by violations of the Fair Labor Standards Act in the event that said violations were detected by the Manufacturer Defendants' monitoring.

73. On information and belief, Manufacturer Defendants materially breached the terms of the Assurances and the Agreement by, among other things, failing to ensure that the Factory Defendants complied with the Fair Labor Standards Act, as alleged above.

74. Plaintiffs, as employees of the Factory Defendants, were the third party beneficiaries of the Department of Labor's contract with the Manufacturer Defendants. Thus, the Manufacturer

Defendants are liable to the Plaintiffs, as third party beneficiaries, for the Manufacturer Defendants' breach of the Assurances and the Agreement.

75. Because of the Manufacturer Defendants' breach of the Assurances and the Agreement, Plaintiffs have suffered harm and pain and suffering, entitling them to damages in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

## FEDERAL AND STATE RETALIATION CLAIM AGAINST THE FACTORIES

76. Plaintiffs allege and reallege all the paragraphs above.

77. The Factory Defendants willful termination of the employment of Fen X. Chen and Qui Chen in retaliation for their complaint about having to work for less than the minimum wage violates 29 U.S.C. § 215 and New York State Labor Law §215.

## NINTH CLAIM FOR RELIEF

## FALSE ARREST AGAINST LUN WEI FAN

78. Plaintiffs allege and reallege all paragraphs above.

79. Defendant Lun Wei Fan committed the common law tort of false arrest.

## PRAYER FOR RELIEF

Wherefore Plaintiffs respectively request that this Court enter an order and judgment awarding Plaintiffs:

(a) unpaid wages, including minimum wage, overtime pay and spread of hours pay, plus liquidated damages and/or interest thereon;

(b) compensatory damages according to proof;

(c) punitive damages according to proof;

(d) attorneys' fees and costs; and

(e) such other relief as this Court shall deem just and proper.

Dated: November 4th, 2005

Respectfully submitted,

______________________________

JAMES H.R. WINDELS (JW-9726)
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
212-450-4000

KENNETH KIMERLING (KK-5762)
Asian American Legal Defense and
Education Fund Inc.
99 Hudson Street
New York, New York 10013
212-966-5932

ATTORNEYS FOR Plaintiffs